**MUCKLEROY LUNT, LLC**
Martin A. Muckleroy (Nev. Bar #9634)
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Telephone: 702-907-0097
Facsimile: 702-938-4065
Email: martin@muckleroylunt.com

(additional counsel on signature page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

PEAK FINANCE, LLC, Derivatively on Behalf of
Nominal Defendant, HPEV, INC.,

                       Plaintiff,

vs.

TIMOTHY J. HASSETT, QUENTIN D. PONDER,
JUDSON W. BIBB III, THEODORE H.
BANZHAF and MARK HODOWANEC,

              Defendants,

    and

HPEV, INC.,

              Nominal Defendant.

CASE NO.:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Peak Finance, LLC ("Peak" or "Plaintiff"), by and through its undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against defendants named herein. Plaintiff alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's

investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by HPEV, Inc. ("HPEV" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by HPEV; (c) a review of other publicly available information concerning HPEV; and (d) consultation with persons knowledgeable about the Company.

## SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Nominal Defendant HPEV, Inc. against certain members of the Company's Board of Directors and executive officers for violations of federal and state law, including issuing a materially false and misleading proxy statement in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "1934 Act") and breaches of fiduciary duty from June 18, 2013 through the present (the "Relevant Period").

2.      HPEV is a Nevada corporation with its executive offices located in Florida. The Company develops and intends to commercialize thermal dispersion technologies in various product platforms and a parallel power input gearbox, around which HPEV has designed a mobile generator system that can be retrofit onto new and existing trucks. In April 2014, the Company formed Ultimate Power Truck, LLC, of which HPEV owns 95% and a shareholder of the Company owns the remaining 5%.

3.      HPEV has no revenues and has suffered losses of approximately $3.0 million in fiscal year 2013, $23.6 million in fiscal year 2014, $1.3 million in the first quarter of fiscal year 2015, and $3.0 million in the second quarter of fiscal year 2015. At the same time the Company has had no revenues, the Defendants have breached their fiduciary duties by awarding themselves substantial compensation without the requisite Board approval, using funds raised through the issuance of equity. In fact, the Company's issuance of equity to fund the Defendants' compensation was also done without the requisite Board approval and has served to dilute the Company's existing shareholders' ownership stakes, including Plaintiffs.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

4.      In addition, the Defendants have made materially false and misleading statements in the Company's 2015 proxy statement filed with the SEC in violation of Section 14(a) of the 1934 Act.

5.      As a result of the misconduct described herein, the current members of HPEV's Board of Directors who are named defendants herein are antagonistic to this lawsuit such that making a demand on the Board would be futile. Each of the Defendants named herein faces a substantial likelihood on non-exculpated liability for their breaches of fiduciary duty and violations of the federal securities laws, thus disabling the Board members from impartially considering the subject matter of this lawsuit. Further, all of the current Board members are both named defendants and officers of the Company rendering them non-independent, which they concede in the Company's public filings. Thus, demand is futile.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action because the claims asserted herein arise in part under § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Regulation 14a-9 promulgated thereunder by the SEC. Jurisdiction is therefore proper under 28 U.S.C. § 1331, because Plaintiff's claims arise under the Constitution, laws, or treaties of the United States. Supplemental jurisdiction over Plaintiff's state-law claims is conferred by 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation incorporated in this District, or is an individual who is currently a management person in HPEV within the meaning of Nev. Rev. Stat. § 78.160.

8.      Venue is proper within this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial portion of the transactions and wrongs complained of herein occurred within this District, or alternatively, pursuant to 28 U.S.C. § 1391(b)(3), since the defendants are all subject to the Court's personal jurisdiction with respect to the instant action.

**PARTIES**

9.     Plaintiff Peak Finance, LLC ("Peak" or "Plaintiff") is currently and has continuously been a stockholder of HPEV since June 18, 2013. Peak is a Florida limited liability corporation located in Delray Beach, Florida 33484.

10.     Nominal Defendant HPEV is incorporated under the laws of the State of Nevada and maintains its principal place of business at 8875 Hidden River Parkway, Suite 300, Tampa, Florida 33637. According to the Company's SEC filings, HPEV develops and intends to commercialize dispersion technologies in various product platforms, and has developed and intends to commercialize an electric load assist technology around which the Company has designed a vehicle retrofit system.  HPEV's technologies are divided into three distinct but complementary categories: heat dispersion technology, mobile electric power and electric load assist.

11.     Defendant Timothy Hassett ("Hassett") is a co-founder of HPEV and has been the Chairman of HPEV's Board of Directors since its inception and Chief Executive Officer ("CEO") since April 5, 2012.   Upon information and belief, Hassett is a citizen of California.

12.     Defendant Quentin Ponder ("Ponder") has served as President of HPEV from October 20, 2011 until April 5, 2012, Secretary from October 20, 2011 until November 11, 2011 and Treasurer of the Company since October 20, 2011.  On April 5, 2012, Ponder was appointed Chief Financial Officer ("CFO") of HPEV and Vice Chairman of the Board of Directors. Upon information and belief, Ponder is a citizen of Florida.

13.     Defendant Judson W. Bibb ("Bibb") has been a director of the Company since April 15, 2011 and was appointed Secretary of the Company on November 11, 2011 and Vice President of HPEV on April 5, 2012. Upon information and belief, Bibb is a citizen of Florida.

14.     Defendant Theodore Banzhaf ("Banzhaf") has been President of the Company since April 5, 2012.  Upon information and belief, Banzhaf is a citizen of Oklahoma.

15.     Defendant Mark Hodowanec ("Hodowanec") has been the Chief Technology Officer of the Company since February 14, 2014. Upon information and belief, Hodowanec is a citizen of Pennsylvania.

16.     Defendants Hassett, Bibb and Ponder are sometimes collectively referred to as the "Current Director Defendants."

17.     Defendants Hassett, Bibb, Ponder, Banzhaf and Hodowanec are sometimes collectively referred to herein as  the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

18.     By reason of their positions as officers, directors and/or fiduciaries of HPEV and because of their ability to control the business and corporate affairs of  the Company, the Individual Defendants owed HPEV and its shareholders fiduciary obligations of  good faith, loyalty and candor, and were and are required to use their utmost ability to control  and manage the Company in a fair, just, honest and equitable manner. The Individual  Defendants were and are required to act in furtherance of the best interests of HPEV and  its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

19.     Each director and officer of the Company owes to HPEV and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

20.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of HPEV, were able to and did, directly and/or indirectly, exercise control  over the wrongful acts  complained of herein.

21.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of HPEV were required to, among  other things:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c. Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

22. Moreover, HPEV maintains a Code of Ethics (hereinafter the "Code"), which applies to the Company's employees, officers and directors. The Code states in relevant part:

**ETHICAL BEHAVIOR**

The Company is committed to creating a work environment and a business culture grounded in ethical behavior in every respect. The Company is committed to (i) fostering an environment of honesty and fairness, (ii) providing a safe and healthy environment free from the fear of retribution, and (iii) respecting the dignity due everyone. **The Company is committed to pursuing sound growth and earnings objectives and to exercising prudence in the use of its assets and resources.** The Company is committed to fair competition and the sense of responsibility required of a good customer and service provider. (Emphasis added).

\*\*\*

**AVOID CONFLICTS OF INTEREST**

Employees have an obligation to give their complete loyalty to the best interests of the Company. They should avoid any action that may involve, or may appear to involve, a conflict of interest with the Company. A "conflict of interest" exists when a person's private interests interfere in any way with the interests of the Company.

\*\*\*

If a potential conflict of interest exists, it must be reported in writing to the Company's Chief Executive Officer or the Chief Financial Officer for approval. **Potential conflicts of interests involving executive officers or**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**directors must be reported to the Audit Committee for approval.** (Emphasis added).

\*\*\*

## CORPORATE OPPORTUNITY

Employees should not (i) take any business, commercial or other opportunities for themselves that are discovered in performing their job with the Company and /or through the use of Company property, information or position; (ii) **use Company property, information, or position for personal gain**; or (iii) directly compete with the Company. Employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. (Emphasis added).

\*\*\*

## MAINTAIN THE INTEGRITY OF CONSULTANTS, AGENTS AND REPRESENTATIVES

Business integrity is a key standard for the selection and retention of consultants, agents, and representatives (collectively, "Third Parties"). Third Parties should be informed that the Company conducts business with high ethical standards, and that it expects the Third Parties to conduct themselves in a similar manner when working on behalf of the Company. **When deemed appropriate or required, Third Parties should be provided with a copy of the Company's Code of Ethics and Business Conduct, and required to certify that they will work with or on behalf of the Company in accordance with its provisions.** (Emphasis added).

\*\*\*

## OBTAIN AND USE COMPANY ASSETS WISELY

Proper use of Company property, information, resources, material, facilities and equipment is your responsibility. **Use and maintain these assets with care and respect, guarding against waste and abuse**, and never borrow or remove Company property without management's permission. Company assets must be returned upon termination of employment. (Emphasis added).

23.     The Current Director Defendants breached their duties of loyalty and good faith and violated the Company's Code of Ethics by allowing defendants to cause or by themselves causing the Company to enter into numerous transactions without obtaining the requisite authorization from the Company's Board of Directors, including the issuance of debt and/or

7

equity to pay for services and raise funds purportedly for the benefit of the Company and then using a substantial amount of such funds to pay or accrue excessive and unauthorized compensation on behalf of themselves and the other Individual Defendants.    At the same time the Current Director Defendants used a substantial portion of the capital raised on behalf of the Company through illegally issued equity to improperly and without proper authorization reward themselves and the other Individual Defendants with excessive compensation, the Company had failed to generate any revenues whatsoever from 2012 to date and received a "going concern" audit opinion for at least fiscal years 2013 and 2014. During fiscal years 2013 and 2014, and the first two quarters of fiscal year 2015, the Company has suffered net losses of approximately $3.0 million (FY2013), $23.6 million (FY2014), $1.3 million (1QFY2015) and $3.0 million (2QFY2015). The unauthorized issuance of equity and/or debt for services rendered and raising of capital has caused a substantial dilution of existing shareholder ownership stakes, including Plaintiff's. Moreover, the Company does not have an Audit Committee to review potential conflicts of interest involving its executive officers or directors as conceded in HPEV's 2013-2015 Proxy Statements.

## SUBSTANTIVE ALLEGATIONS

**Background**

24.    HPEV was incorporated on July 22, 2002 in the State of Nevada under the name Bibb Corporation ("Bibb").  On September 3, 2010, the Company changed its name to Z3 Enterprises, Inc. ("Z3") and on April 5, 2012, to HPEV.

25.    Bibb began its development stage in July 2002. Since inception, Bibb focused primarily on research and development activities, organizing the company, finding and negotiating with vendors, raising capital and laying the groundwork to take the Company public.

26.    The Company has a lengthy history of failed business models.  The original planned principal operations were to produce fully integrated multi-media products targeting the marginally literate. That failed and the Company then changed its name to Z3, shifting its focus

to health and wellness books; educational, entertainment and reality show programming, feature films and special event marketing as well as other entertainment projects.

27.     On March 29, 2011, Z3 entered into a share exchange agreement (which was amended on June 14, 2011) with HPEV, Inc., a Delaware corporation ("the Share Exchange Agreement") to acquire 100 shares, constituting all of the issued and outstanding shares of HPEV, Inc. in consideration for the issuance of 22,000,000 shares of common stock. Upon closing of the share exchange on April 15, 2011, HPEV, Inc. became Z3's wholly owned subsidiary. There was a change of control of Z3 on April 15, 2011 as a result of the issuance of 21,880,000 shares of Z3's common stock to the original shareholders of HPEV, Inc. pursuant to the terms of the Share Exchange Agreement. An additional 120,000 shares were issued during the fourth quarter of 2011 which completed the issuance of 22,000,000 shares of common stock under the terms of the amended Share Exchange Agreement. Z3 officially changed its name to HPEV on April 12, 2012.

28.     According to its public filings, the Company has developed and intends to commercialize dispersion technologies in various product platforms, and has developed and intends to commercialize an electric load assist technology around which it has designed a vehicle retrofit system. In preparation, the Company has applied for trademarks for one of its technologies and its acronym. The Company currently has two trademarks in the application process: HPEV and TEHPC.  The Company believes that its proprietary technologies, including its patent portfolio and trade secrets, can help increase the efficiency and affect manufacturing cost structure in several large industries beginning with motor/generator and fleet vehicles.

29.     The markets for products utilizing the Company's technology include consumer, industrial and military markets, both in the U.S. and worldwide. The Company's initial target markets include those involved in moving materials and moving people, such as: (i) motors/generators; (ii) mobile auxiliary power; (iii) compressors; (iv) turbines (wind, micro); (v) bearings; (vi) electric vehicles: rail, off-highway, mining, delivery, refuse; (vii) brakes/rotors/calipers; (viii) pumps/fans; (ix) passenger vehicles: auto, bus, train, aircraft; (x)

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

commercial vehicles: SUV, light truck, tram, bucket truck; (xi) military: boats, Humvee, truck, aircraft; and (xii) marine: boats ranging in size from 30 feet to 120 feet and beyond.  The Company's technologies are divided into three distinct but complimentary categories: heat dispersion technology, mobile electric power and electric load assist.

**The Spirit Bear Transaction**

30.   On December 14, 2012 ("Closing Date"), HPEV entered into a Securities Purchase Agreement ("SPA") with Spirit Bear Limited ("Spirit Bear").  Pursuant to the SPA, HPEV Sold to Spirit Bear (i) 200 shares of Company's Series A Convertible Preferred Stock, $.001 per share ("Preferred Stock") and (ii) warrants to purchase (the "Warrants") (i) 2,000,000 shares of the Company's common stock at an exercise price of $.35 per share (subject to adjustment as provided in the warrant); (ii) 2,000,000 shares of the Company's common stock at an exercise price of $.50 per share (subject to adjustment as provided in the warrant); (iii) 2,000,000 shares of the Company's common stock at an exercise of $.75 per share (subject to adjustment as provided in the warrant) (collectively, the "Warrant Shares"). The purchase price for sale of the Preferred Stock and Warrants was $500,000, of which $313,777.62 was paid in cash and $186,222.38 was paid by cancelation of $186,222.38 in outstanding indebtedness held by Spirit Bear.

31.   Each share of the Preferred Stock was convertible into 20,000 shares of HPEV common stock and under certain circumstances the Preferred Stock was convertible into Senior Convertible Notes (the "Debentures").

32.   HPEV and Spirit Bear also entered into a Registration Rights Agreement, dated December 14, 2012 (the "Registration Rights Agreement"). Pursuant to the Registration Rights Agreement, the Company was required to file a registration statement to register the shares issuable upon conversion of the Preferred Stock and the Debentures and the shares issuable upon the exercise of the Warrants. If the Registration Statement was not filed within thirty days of the Closing Date, then the number of Warrant Shares would be increased by 500,000 to 6,500,000. If the SEC had not declared the Registration Statement effective within 120 days of the Closing

Date, then the Company was required to pay to each holder of Preferred Shares an amount in cash per Preferred Share held equal to the product of (i) $5,000.00 multiplied by (ii) the product of (A) .02 multiplied by (B) the number of months after the Effectiveness Deadline that the Registration Statement is not declared effective by the SEC.

33.     Additionally, the SPA set forth certain conditions that the Company and Spirit Bear had agreed to in connection with the purchase of the Preferred Shares and the Warrants. Section 6(xiii) stated the following:

> Stockholders of the Company shall have agreed in writing satisfactory to Purchaser (1) to nominate to serve as independent directors individuals designated in writing by Purchaser (the "**Spirit Bear Designees**") in such number as shall be equal to the number of current directors; (2) to call a special meeting of the shareholders of the Company for the purpose of ratifying the nomination of the Spirit Bear Designees; (3) as applicable, to vote its respective shares in the affirmative for the election of the Spirit Bear Designees to the Board of Directors; and (4) to take any and all such steps as shall be required to ensure that, during the period of three (3) years beginning on the Closing Date (or until such date as Purchaser shall cease to be an affiliate of the Company, should such date occur earlier than the third anniversary of the Closing Date) the Company's Board of Directors shall, irrespective of the number of members, at all times be composed of an even number of members of which at least Fifty Percent (50.00%) shall be Spirit Bear Designees.

34.     Further, Section 6(xiv) stated:

> The Bylaws or charter of the Company shall be amended to the satisfaction of the Purchaser to provide that the Company's Board of Directors shall, irrespective of the number of members, at all times be composed of an even number of members of which at least Fifty Percent (50.00%) shall be individuals designated by Spirit Bear and who shall be deemed Independent Directors during the period of three (3) years beginning on the Closing Date (or until such date as Purchaser shall cease to be an affiliate of the Company, should such date occur earlier than the third anniversary of the Closing Date).

35.     In other words, on or before the Closing Date of the transaction, the Company agreed that: (i) its Board of Directors would, at all times, be composed of an even number of directors of which at least 50% would be Spirit Bear designees; and (ii) that the Company would amend its Bylaws or charter to memorialize the foregoing changes to the Board.

36.     Further, the SPA contained a provision providing anti-dilution protection to Spirit Bear.  Section 7 of the SPA, entitled SUBSEQUENT SALE OF SHARES BELOW PURCHASE PRICE, stated the following, in relevant part:

> For a period of one (1) year from the Closing Date, in the event that the Company issues or sells any shares of common stock for a price ("**Base Price**") less than $0.22 per share, or issues or sells any Common Stock Equivalent (defined below) convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, common stock for less than payment of the Base Price (any such sale or issuance of common stock or Common Stock Equivalents being referred to herein as a "**Dilutive Issuance**"), then the Company shall promptly issue additional shares of common stock to Purchaser, for no additional consideration, in an amount sufficient that the total purchase price paid by Purchaser for all Preferred Shares and Warrants purchased by such Purchaser at the Closing and held of record by such Purchaser at the time of the Dilutive Issuance, when divided by the sum of (i) the product of (A) 20,000 and (B) the number of such Preferred Shares so held plus (ii) the total number of additional shares of common stock to be issued to Purchaser under this Section as a result of the Dilutive Issuance, will equal the Base Price (such adjustment, a "**Dilution Adjustment**"). Such Dilution Adjustment shall be made successively whenever a Dilutive Issuance is made within the one (1) year period. Notwithstanding the foregoing, this Section shall not apply in respect of an Exempt Issuance (defined below).

37.     On February 6, 2013, the Company received a letter from Spirit Bear claiming that the Company was in default of the SPA. According to Spirit Bear, the Company had not acted promptly to make 50% of the Company's Board Spirit Bear designees. In addition, Spirit Bear stated that the Company had not amended its bylaws with respect to Special Meetings and Meeting Adjournments nor had it provided a certified copy of its Articles of Incorporation within 10 days of the closing of the Stock Purchase Agreement.

**The February 20, 2013 Resolutions**

38.     In response to Spirit Bear's letter, on February 20, 2013, the Current Director Defendants adopted a number of Board resolutions (the "February 20, 2013 Resolutions"), which stated the following: (i) pursuant to the SPA, the Board of Directors nominated Jay A. Palmer ("Palmer") and Carrie Dwyer ("Dwyer"), two Spirit Bear designees, to the Board of Directors; and (ii) pursuant to the SPA, the Company agreed to amend Section 3 of Article II of the Bylaws

which shall reduce the percentage of shareholders who may call a special meeting of the Board of Directors from 25% to 10% of all shareholders entitled to cast votes and Section 6 of Article II of the Bylaws shall reduce the period of adjournment between shareholders' meetings, for which notice is given regarding the subsequent meeting as in the case of an original meeting, from more than 45 days to more than 10 days. The February 20, 2013 Resolutions were memorialized in a document entitled "*Unanimous Written Consent of the Directors of HPEV Inc., A Nevada Corporation.*"

39.     Additionally, the Board also resolved to provide the following compensation to its officers: Starting to accrue on January 15, 2013, compensations of (i) $12,500 per month for Timothy Hassett, the Chairman and Chief Executive Officer, (ii) $10,000 per month for Quentin Ponder, the Chief Financial Officer and Treasurer, (iii) $14,500 per month for Theodore Banzhaf, the President, (iv) $14,500 per month for a still undesignated Chief Technical Officer and (v) $8,000 per month for Judson Bibb, the Vice-President and Secretary. The salaries would not be paid until and unless the Company raised $1 million.

40.     The Board also resolved that when and if the Company achieved certain milestones, the compensation to the officers shall be increased. The milestones are as follows: (1) generating $1million in additional funding, (2) generating $100,000 in revenue or an additional $1 million in funding, (3) achieving profitability (which is defined as being cash flow positive for three consecutive months) and (4) maintaining profitability for four consecutive quarters. With the achievement of the first milestone, the compensation for the President and the Chief Technical Officer will increase to $17,500 per month. With the achievement of the second milestone, the compensation for the Chief Executive Officer shall increase to $17,500 per month, the compensation for the Chief Financial Officer and Treasurer shall increase to $12,000 per month, the compensation for the President and the Chief Technical Officer shall increase to $20,000 per month, and the compensation for the Vice President and Secretary shall increase to $10,000 per month. With the achievement of the third milestone, the compensation for the Chief Executive Officer shall increase to $25,000 per month, the compensation for the Chief Financial

Officer and Treasurer shall increase to $18,000 per month, the compensation for the President shall increase to $24,000 per month, the compensation for the Chief Technical Officer shall increase to $25,000 per month, and the compensation for the Vice President and Secretary shall increase to $12,000 per month.  With the achievement of the fourth milestone, the compensation for the Chief Executive Officer shall increase to $30,000 per month, the compensation for the Chief Financial Officer and Treasurer shall increase to $24,000 per month, the compensation for the President shall increase to $29,000 per month, the compensation for the Chief Technical Officer shall increase to $30,000 per month, and the compensation for the Vice President and Secretary shall increase to $15,000 per month.

41.   In addition, the Board authorized the CEO to make quarterly bonuses of $50,000 and/or 50,000 shares of, or options for common stock available for each officer plus, special payments from 5% of the Company's net income to be given for individual contributions, such as the awarding of patents or the signing of major customer contracts.

42.   The Board also resolved to decrease the exercise price of the five options to purchase one million shares awarded to the President, Defendant Banzhaf, and to provide for cashless exercise of these options. The milestone stock prices were reduced to $2.00, $3.00, $4.00, $4.50 and $5.00 for 20 consecutive trading days each. These milestone stock prices had been changed from $2.00, $3.00, $5.00, $7.50 and $10.00. Once the stock traded at these prices for 20 consecutive trading days, Banzhaf had the right to exercise an option to purchase 1,000,000 shares of common stock at each milestone stock price. These options expire one year after Banzhaf has been terminated without cause.

43.   The Board also granted Defendant Bibb options to purchase 2,000,000 shares of the Company's common stock, at a purchase price of par value or $0.001 per share. The options expire one year after Bibb has been terminated without cause. The options can be exercised on a cashless basis.

44.   The February 20, 2013 Resolutions also contained the following provision which authorized management to solicit investment in the Company up to $3.2 million:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**APPROVAL OF CAPITAL RAISE**

**WHEREAS**, the Board has determined that it is in the best interests of the Corporation and its shareholders to provide capital to implement the Corporations business plan;

**WHEREAS**, the officers of the Corporation have analyzed the expected financial needs of the company for the next year and beyond; calculated the expenses to be incurred, the payments to consultants and the salaries to be paid; and created estimates regarding the generation of revenues, the payment of debts and the point at which the company becomes self-sustaining;

**WHEREAS**, additional funding is needed to enable the Corporation to continue to implement the business plan; and

**WHEREAS**, the Chief Executive Officer and the President have previously made a presentation to an accredited investor in California.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors hereby authorizes the Chief Executive Officer and the President to continue negotiating and finalize the specific terms of the investment of up to $3.2 million through the issuance of equity or debt as long as existing obligations and agreements are not violated; and be it

**RESOLVED FURTHER** that any officer of the Corporation, acting alone, be and hereby is authorized, empowered and directed, for and on behalf of the Corporation, to negotiate, deliver and perform the agreement with the investor, including the execution of an agreement with the aforementioned investor…

45.     Neither of the two Spirit Bear director appointees were signatories to the February 20, 2013 Resolutions, nor were requested to be signatories to the February 20, 2013 Resolutions.

46.     On March 6, 2013, the HPEV Board of Directors held a meeting.  Pursuant to the meeting minutes, Defendants Hassett, Ponder, Bibb, and Banzhaf were in attendance, as well as the two Spirit Bear designees, Palmer and Dwyer.

47.     During the meeting, the Board, among other things: (i) unanimously elected Donica Holt ("Holt"), the third Spirit Bear designee, to serve on HPEV's Board of Directors; (ii) moved to increase the total number of Board members to six; and (iii) agreed that any type of funding the Company gets will be authorized from the Board.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

48.     Despite the foregoing resolutions which provided that any type of funding the Company received had to be authorized by the HPEV Board, the Current Director Defendants, in breach of their fiduciary duties, continued to issue HPEV equity or debt without the proper authorization of the Company's Board of Directors.

**The Spirit Bear Litigation**

49.     On April 12, 2013, the Company and Spirit Bear reached agreement regarding the settlement of allegations that the Company did not perform certain obligations pursuant to the SPA with Spirit Bear, and with respect to certain actions taken by the Company with respect to providing compensation to its management (the "April 12, 2013 Settlement Agreement"). Spirit Bear agreed to discharge the Company from all claims Spirit Bear may have had as well as to forgo all actions of any kind related to those claims which existed on or prior to April 12, 2013. Both parties also agreed that the signing of the agreement did not constitute an admission of wrongdoing or liability.

**The Spirit Bear/Palmer Demand for Documents and Demand to Cease and Desist**

50.     On August 16, 2013, the Company received a Demand for Documents and Demand to Cease and Desist from Nevada counsel representing Spirit Bear and Palmer, one of the Spirit Bear designees (the "Demand"). The Demand requested that the Company provide Palmer all books and records regarding all equity or debt issued by the Company since January 1, 2013, and an accounting of all compensation disbursed to Company executive officers since such date. Spirit Bear claimed that management of the Company issued equity or debt without authority, and established compensation levels for the Company's officers and paid salaries to its officers in violation of its agreements with Spirit Bear and the Company's public filings.

51.     On September 16, 2013, Palmer filed an emergency petition for a writ ordering the Company to allow him to inspect the books and records of the Company. On October 1, 2013 the Court awarded Palmer the right to inspect the books and records regarding (a) all equity or debt issued by Company management since January 1, 2013 and (b) all compensation disbursed to the Company's executive officers since January 1, 2013, with an accounting of disbursements.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**The HPEV Complaint and Spirit Bear Derivative Counter & Third Party Claims and Direct Counter Claims**

52.　On August 27, 2013, the Company filed a complaint in the United States District Court, District of Nevada, against Spirit Bear, Jay Palmer, and the two other directors appointed by Spirit Bear, Carrie Dwyer and Donica Holt (Case 2:13-cv-01548) (the "Spirit Bear Litigation") seeking a judicial declaration that the Board resolutions from February 2013 authorizing the compensation of management and the issuance of debt and equity were valid and that defendants Spirit Bear, Palmer, Dwyer and Holt were bound by the April 12, 2013 Settlement Agreement.

53.　On October 9, 2013, the Company filed a First Amended Complaint which dismissed, without prejudice, Palmer, Dwyer and Holt from the Spirit Bear Litigation. On October 28, 2013, Spirit Bear filed its Answer to the Company's First Amended Complaint and asserted derivative and third party claims on behalf of HPEV against Hassett, Banzhaf, Ponder, Bibb and Hodowanec ("Verified Derivative Counter & Third Party Claim").

54.　Spirit Bear's Verified Derivative Counter & Third Party Claim asserted that: (i) HPEV management altered documents and issued debt or equity without authority; (ii) HPEV management misled directors and forced directors' signatures on the Company's second amended Form 10-K filed with the SEC on May 21, 2013; and (iii) pursuant to the February 20, 2013 Resolution adopted by the HPEV Board of Directors which, at that time, consisted of Defendants Hassett, Ponder and Bibb, management took unauthorized and excessive compensation even after management stated that it had rescinded said compensation.

55.　In support of its Verified Derivative Counter & Third Party Claim, Spirit Bear referenced the "Approval of Capital Raise" provisions of the February 20, 2013 Resolution, which provided management with the authority and discretion to issue HPEV equity or debt beyond negotiating and finalizing one specific investment with one specific investor located in California. After Palmer learned that management had improperly issued debt or equity beyond the one specific investment with one specific California investor, he expressed his concerns to

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

the HPEV Board and management.  In response, management furnished a second document entitled "*Unanimous Written Consent of the Directors of HPEV Inc., A Nevada Corporation,*" which was virtually identical to the original document (including signatures), except that the Approval of Capital Raise provision was altered and the reference to "an accredited investor in California" was stricken and replaced with "accredited investors."

56.     On October 15, 2013, the Company filed an Emergency Motion for Partial Summary Judgment on its claim for Declaratory Relief set forth in HPEV's First Amended Complaint (the "Motion for Partial Summary Judgment") in an effort to streamline the litigation as delay could have a negative impact on the business, including meeting contractual milestones by December 14, 2013. In the Motion for Partial Summary Judgment, the Company sought a declaration that the resolutions were valid, the Company's capital raises were authorized and the April 12, 2013 Settlement Agreement was valid and enforceable.

57.     By Order filed August 5, 2014, the Court found that genuine issues of material fact exist on the issues raised in the Motion for Partial Summary Judgment and, on that basis, denied the Motion for Partial Summary Judgment.  Notably, the Court found that Spirit Bear had presented evidence that created the inference that the original document entitled "*Unanimous Written Consent of the Directors of HPEV Inc., A Nevada Corporation*" had been altered and that the term "an accredited investor in California" had been subsequently replaced with the term "accredited investors" without making any further changes to the document.

58.     On April 7, 2014, while the Motion for Partial Summary Judgment was still pending, Spirit Bear filed an Emergency Motion for a Preliminary Injunction which sought an Order from the Court requiring the Company to maintain an effective registration statement with the SEC applicable to the HPEV securities that Spirit Bear previously acquired. The Company opposed the Motion for Preliminary Injunction. By Order dated August 5, 2014, the Court denied Spirit Bear's Motion for Preliminary Injunction.

59.     Also, on April 7, 2014, the Third Party Defendants, except Banzhaf who had not yet been served, filed a Motion to Dismiss Spirit Bear's Verified Derivative Counter & Third

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Party Claim for, among other things, lack of personal jurisdiction and failure to state a claim

2  upon which relief may be granted (the "Motion to Dismiss").

3      60.    Spirit Bear filed its opposition to the Motion to Dismiss on April 24, 2014 and on

4  May 5, 2014 moved the court to for Leave to Amend its Answer to First Amended Complaint,

5  Verified Derivative Counter & Third Party Claim. On May 19, 2014, Banzhaf joined in the

6  Motion to Dismiss. By Order dated June 26, 2014, the Court granted Spirit Bear's Motion to

7  Amend its Answer, Verified Derivative Counter & Third Party Claim, which it filed on June 27,

8  2015 adding a direct counter claim against HPEV (the "Direct Counter Claim"). The Court stated

9  that it would "treat HPEV's motion [to dismiss] as a challenge to the newly amended third-party

10  complaint and issue a separate order on that motion." By Order dated November 21, 2014, the

11  Court granted the Company's Motion to Dismiss Spirit Bear's derivative and third party counter

12  claim as to Defendant Mark Hodowanec and denied it with respect to the all other defendants.

13      61.    Spirit Bear's Direct Counter Claim asserted various causes of action against the

14  Company including: (i) Breach of the SPA, (ii) Breach of the Implied Covenant of Good Faith

15  and Fair Dealing with respect to the SPA, (iii) Breach of the Registration Rights Agreement, (iv)

16  Breach of the Implied Covenant of Good Faith and Fair Dealing with respect to the Registration

17  Rights Agreement, (v) Conversion, and (vi) Declaratory Relief seeking a declaration that (a)

18  Spirit Bear's three designees to the Board (i.e. Palmer, Dwyer and Holt) remain holdover

19  directors of the Company until their successors are elected, (b) every action taken by the Board

20  since the annual meeting was not valid, (c) the Lincoln Park Registration Statement was not

21  valid, (d) every action to be taken by the Board in the future is invalid, and (e) the amendment to

22  HPEV's Bylaws from plurality voting to majority voting and the election of directors that

23  occurred at the annual meeting was improper and invalid. The Company filed a Motion to

24  Dismiss the Spirit bear's Direct Counter Claim on July 17, 2014. By Order dated November 26,

25  2014, the Court denied the Company's Motion to Dismiss the Direct Counter Claim.

26      62.    On July 8, 2014, Spirit Bear filed a Motion for Partial Summary Judgment

27  regarding the composition of the Company's Board of Directors. The Motion sought an Order

28                                    19

from the Court declaring that HPEV's Board is and has been comprised of six directors since March 6, 2013, which includes the Current Director Defendants Hassett, Ponder and Bibb, and the Spirit Bear Directors, Palmer, Dwyer and Holt. The Company opposed this Motion. By Order dated November 26, 2014, the Court granted Spirit Bear's Motion for Partial Summary Judgment, in part, granting a partial declaratory judgment in favor of Spirit Bear declaring that Palmer, Dwyer, and Holt remained holdover director on the Company's board despite the January 2014 director election wherein they failed to receive a majority vote of the shareholders.

**The Settlement Agreements**

63.    On January 28, 2015, the Company and the Current Director Defendants entered into a comprehensive settlement agreement with Spirit Bear and its affiliates and assignees which, upon the purchase by the Company or its designee of certain specified securities held by Spirit Bear on a date and at an amount specified in the agreement, would permanently resolve, settle, dismiss, and release all actual and potential claims among them (except for breaches under the settlement agreement itself, if any were to arise) without liability therefor (the "January 28, 2015 Settlement Agreement"). Section 2.6 of the January 28, 2015 Settlement Agreement provides, in relevant part, that "any portion of public filings with the SEC addressing this settlement . . . shall require the approval of a majority of the voting members of the HPEV Board of Directors . . . ." The January 28, 2015 Settlement Agreement was never effectuated.

64.    On that same date, the parties entered into a Derivative Action Settlement Agreement related to shareholder derivative claims filed by Spirit Bear against Defendant Banzhaf and the Current Director Defendants.  As indicated in the Derivative Action Settlement Agreement the parties agreed, subject to receiving final Court approval, to settle the derivative action filed by Spirit Bear against Defendant Banzhaf and the Current Director Defendants. The Court preliminarily approved the settlement of the derivative lawsuit, approved a Notice to Shareholders, and set April 30, 2015 as the deadline for filing any objections to the derivative suit settlement agreement. The final approval hearing has not yet been held.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

65.     The Company and Spirit Bear then entered into a Settlement and Release Agreement, effective, May 1, 2015.  Pursuant to the terms of the May 1, 2015 Settlement Agreement, the parties agreed to resolve with finality all issues related directly to and arising from the Securities Purchase Agreement dated December 14, 2012, including dismissing all the lawsuits as well as unconditionally releasing all actions, complaints, liabilities, obligations, damages, expenses and the like among the parties and related or affiliated persons. The Company agreed to file a registration statement on Form S-1 covering an aggregate of 14,845,072 shares of common stock, preferred stock and common stock warrants on behalf of Spirit Bear and its assignees (the "Registration Statement"). A representative of Spirit Bear agreed that the obligation to register the shares on a Form S-1 need only include shares of common stock and shares of common stock issuable upon conversion of the Preferred Stock and exercise of the Warrants held by Spirit Bear and its assignees.  Upon the effective date of the Registration Statement, each of the parties to the May 1, 2015 Settlement Agreement shall release the others from all claims the party ever had against the others, other than claims to enforce the May 1, 2015 Settlement Agreement and/or damages provided for in the May 1, 2015 Settlement Agreement.

66.     As part of the May 1, 2015 Settlement Agreement, Spirit Bear and its assignees were to deliver to Spirit Bear's counsel the 6,000,000 warrants in their possession. At the same time, the Company was to deliver to its counsel new warrants that were identical to the outstanding warrants other than with respect to an exercise price of $0.25 per share and an issue date of May 7, 2015. The 1,000,000 penalty warrants that were issued to Spirit Bear in 2012, relating to the parties bridge loan made prior to Spirit Bear's equity investment, were also reissued with an exercise price of $0.25. No additional shares or warrants were issued as part of the May 1, 2015 Settlement Agreement. Spirit Bear agreed that Palmer, Dwyer and Holt, the Spirit Bear holdover directors, would tender their resignation letters from the Board of Directors of the Company. The resignation letters would become effective upon the filing of the Registration Statement. Furthermore, Spirit Bear also agreed that as of the date the Company

1   files the Registration Statement, Spirit Bear will no longer have any rights to appoint nominees

2   to the Board of Directors.  Importantly, the May 1, 2015 Settlement Agreement between the

3   Company and Spirit Bear was neither presented to nor approved by the Court.

4         67.    In addition to Spirit Bear and its assignees' rights to enforce the Company's

5   obligation to file the Registration Statement by injunctive relief and/or specific performance

6   without posting a bond, HPEV also agreed to pay Spirit Bear and its assignees weekly, liquidated

7   damages per day equal to the amount of shares owned by Spirit Bear and its assignees multiplied

8   by $0.02 for each day that such Registration Statement was not in effect. Also, if HPEV failed to

9   deliver the shares in connection with a warrant exercise within five trading days of receipt of a

10   conversion notice, HPEV would also be required to weekly pay liquidated damages to the

11   warrant holder equal to the amount of warrants exercised multiplied by $0.02 for each day that

12   the Company failed to deliver such shares, unless the failure was a result of regulatory action or

13   force majeure.

14         68.    On June 1, 2015, HPEV entered into a First Amendment to the May 1, 2015

15   Settlement Agreement (the "Amendment") with Spirit Bear and the parties identified as

16   assignees of Spirit Bear who are signatories to the Amendment, which amends certain provisions

17   of the May 1, 2015 Settlement Agreement. Based on the Amendment, Palmer, Dwyer and Holt

18   (the Spirit Bear holdover directors), tendered their resignation letters from the Board of Directors

19   of the Company on June 3, 2015. Spirit Bear also agreed that it would no longer have any rights

20   to appoint nominees to the Company's Board of Directors. Pursuant to the Amendment, the

21   Company agreed to file a registration statement on Form S-1 covering an aggregate of

22   14,845,072 shares of common stock, preferred stock and warrants on behalf of Spirit Bear and its

23   assignees no later than July 15, 2015. Spirit Bear agreed that the obligation to register the shares

24   on a Form S-1 need only include shares of common stock and shares of common stock issuable

25   upon conversion of the Preferred Stock and exercise of the Warrants held by Spirit Bear and its

26   assignees.  The Company agreed to issue replacement Warrants for certain previously-issued

27

28           22

Warrants, which would then be canceled in. Within 10 business days of June 1, 2015, the parties agreed to dismiss all of the pending litigation between and among them.

69.     On June 3, 2015, Palmer, Dwyer and Holt, the three Spirit Bear appointees to the Board, tendered their resignations from the Board of Directors.  On July 15, 2015, the Company filed a Registration Statement on Form S-1 covering an aggregate of 14,845,072 shares of common stock, preferred stock and warrants on behalf of Spirit Bear and its assignees.

70.     On August 10, 2015, Spirit Bear filed a Form 4 with the SEC indicating that it had sold the last of its remaining shares of HPEV common stock and thus, no longer has standing as a shareholder of HPEV to pursue a derivative claim on behalf of the Company.

**Going Concern**

71.     The Company received going concern opinions from its auditors for years ended December 31, 2013 and December 31, 2014.

72.     The 2013 Form 10-K filed with the SEC on April 2, 2014 stated that "The Company's ability to continue as a going concern is dependent upon its ability to generate future profitable operations and repay its liabilities arising from normal business operations when they come due.  At this time, the Company is no longer seeking additional sources of capital through the issuance of debt, equity, or joint venture agreements, but there can be no assurance the Company will be successful at accomplishing its objectives."

73.     Additionally, the 2013 Form 10-K stated "notwithstanding the going concern opinion of our independent public auditors, as of the filing date of this report, management believes that it has adequate funding to ensure completion of the initial phases of its business plan, which is to license its thermal technologies and applications; to license or sell a mobile electric power system powered by the Company's proprietary gearing system; and to license it submersible motor dry pit technologies and/or to bring to market its technologies and applications through key distribution partners. The Company believes that it has sufficient funds for its planned operations in the next 12 months, including without limitation, funding the litigation it commenced against Spirit Bear Limited."

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

74.    Yet, despite the Company's statements that it was no longer seeking additional sources of capital, Defendant Banzhaf and the Current Director Defendants  improperly and aggressively approved and/or authorized an astounding number of transactions involving the issuance of HPEV equity or debt, all of which were undertaken without Board authorization.

75.    The Company's 2014 Form 10-K filed with the SEC on March 31, 2015 (the "2014 Form 10-K"), repeated the going concern opinion. The Company reported that it had continued to incur losses and had not yet fully commenced operations, raising substantial doubt about its ability to continue as a going concern.  The 2014 Form 10-K also stated the following: "Our ability to continue as a going concern is dependent on our ability to generate revenue, achieve profitable operations and repay our obligations when they come due. These consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classification of liabilities that might result from this uncertainty. As of the filing date of this Annual Report on Form 10-K, *management is negotiating additional funding arrangements to support completion of the initial phases of our business plan*: to license its thermal technologies and applications, including submersible dry-pit applications; to license and sell mobile generation retrofit kits (our Ultimate Power Truck business) driven by our proprietary gearing system; and to license a plug-in hybrid conversion system for heavy duty trucks, tractor trailers and buses. There can be no assurance, however, that we will be successful in accomplishing these objectives."  (Emphasis added).

76.    The Company's 2015 2Q Form 10-Q filed with the SEC on August 12, 2015, indicated that the Company had already incurred an additional $3,113,778 and still had not generated any revenues. The 2015 2Q Form 10-Q stated:

> The accompanying condensed consolidated financial statements have been prepared assuming we will continue as a going concern. We have incurred net losses of $36,649,585 since inception and have not fully commenced operations, raising substantial doubt about our ability to continue as a going concern. Our ability to continue as a going concern is dependent on our ability to generate

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

revenue, achieve profitable operations and repay our obligations as they come due.

77.     Thus, despite that the Company commencing operations in 2011, the Individual Defendants have not even completed the initial phases of their business plan.  In fact, the only thing that the Individual Defendants have been successful at is rewarding themselves with lavish compensation and bonuses and diluting shareholder ownership stakes.

**The Ultra Vires Transactions**

78.     Article III Section 1 of the Company's Bylaws states the following:

SECTION 1. POWERS. Subject to limitation of the Nevada Revised Statutes, the Articles of Incorporation, of these bylaws, and of actions required to be approved by the shareholders, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board. The Board may, as permitted by law, delegate the management of the day-to-day operation of the business of the corporation to a management company or other persons or officers of the corporation provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board. Without prejudice to such general powers, it is hereby expressly declared that the Board shall have the following powers:

a)     To select and remove all of the officers, agents and employees of the corporation, prescribe the powers and duties for them as may not be inconsistent with law, or with the Articles of Incorporation or by these bylaws, fix their compensation, and require from them, if necessary, security for faithful service.

b)     To conduct, manage, and control the affairs and business of the corporation and to make such rules and regulations therefore not inconsistent with law, with the Articles of Incorporation or these bylaws, as they may deem best.

c)     To adopt, make and use a corporate seal, and to prescribe the forms of certificates of stock and to alter the form of such seal and such of certificates from time to time in their judgment they deem best.

d)     To authorize the issuance of shares of stock of the corporation from time to time, upon such terms and for such consideration as may be lawful.

e)     To borrow money and incur indebtedness for the purposes of the corporation, and to cause to be executed and delivered therefore, in the corporate name, promissory notes, bonds, debentures, deeds of trust,

mortgages, pledges, hypothecation or other evidence of debt and securities there for.

79.     Board authorization can be accomplished two ways: (i) Actions taken at a meeting, and (ii) Actions taken without a meeting. Actions taken at a meeting requires a quorum to be present and that every act or decision requires a majority of that quorum to transact business. Article III of the Company's By-Laws provide:

SECTION 10. QUORUM. A majority of the authorized number of directors then in office constitutes a quorum of the Board for the transaction of business, except to adjourn as hereinafter provided. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board, unless a different number is required by law or by the Articles of Incorporation. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the number of directors required as noted above to constitute a quorum for such meeting.

80.     Actions taken without a meeting requires unanimous Board approval:

SECTION 15. ACTION WITHOUT MEETING. Any action required or permitted to be taken by the Board may be taken without a meeting if, before or after the action, all members of the Board shall individually or collectively consent in writing to such action. Such consent or consents shall have the same effect as a unanimous vote of the Board and shall be filed with the minutes of the proceedings of the Board.

81.     Throughout the Relevant Period, the Current Director Defendants, in breach of their fiduciary duties to HPEV, unilaterally entered into and/or approved or caused the Company to enter into and/or approve the following transactions, all of which were undertaken either without a quorum present when a meeting was held or without obtaining the necessary and requisite consent from all of the members of the Board when a meeting was not held (namely, the three Spirit Bear appointed Directors, all of which refused to approve the following transactions):

82.     On July 1, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enable the investor to purchase, up to January 3, 2016, an aggregate of 111,111 shares of common stock at an exercise price of $0.66. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

83.     On July 1, 2013, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.44 per share in consideration for $100,000. The warrants enabled the investor to purchase, up to January 2, 2016, an aggregate of 222,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

84.     On July 9, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to January 16, 2016, an aggregate of 111,111 shares of common stock at an exercise price of $0.69. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

85.     On July 10, 2013, an accredited investor purchased 225,000 shares of common stock and warrants in a private offering at a purchase price of $0.44 per share in consideration for $100,000. The warrants enabled the investor to purchase, up to January 11, 2016, an aggregate of 337,500 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and

1  sale  of $1,000,000 of shares and warrants, it would file a registration statement with  the SEC

2  covering the securities.

3      86.    On July 15, 2013, an accredited  investor purchased 111,111 shares of common

4  stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for

5  $50,000. The warrants enabled the investor to purchase, up to  January 16, 2016, an aggregate of

6  111,111 shares of common stock at an  exercise price of $0.66. The warrants were exercisable on

7  a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and

8  sale  of $1,000,000 of shares and warrants, it would file a registration statement with  the SEC

9  covering the securities.

10      87.    On July 16, 2013, an accredited  investor purchased 222,222 shares of common

11  stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for

12  $100,000. The warrants enabled the investor to purchase, up to  January 15, 2016, an aggregate of

13  222,222 shares of common stock at an  exercise price of $0.69. The warrants were exercisable on

14  a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and

15  sale  of $1,000,000 of shares and warrants, it would file a registration statement with  the SEC

16  covering the securities.

17      88.    On July 16, 2013, an accredited  investor purchased 222,222 shares of common

18  stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for

19  $100,000. The warrants enabled the investor to purchase, up to  January 24, 2016, an aggregate of

20  222,222 shares of common stock at an  exercise price of $0.54. The warrants were exercisable on

21  a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and

22  sale  of $1,000,000 of shares and warrants, it would file a registration statement with  the SEC

23  covering the securities.

24      89.    On July 17, 2013, an accredited  investor purchased 111,111 shares of common

25  stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for

26  $50,000. The warrants enabled the investor to purchase, up to  January 18, 2016, an aggregate of

27  111,111 shares of common stock at an  exercise price of $0.59. The warrants were exercisable on

28

a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

90.     On July 17, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of 111,111 shares of common stock at an exercise price of $0.54. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

91.     On July 17, 2013, an accredited investor purchased 166,666 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $75,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of 166,667 shares of common stock at an exercise price of $0.54. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

92.     On July 19, 2013, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of 55,555 shares of common stock at an exercise price of $0.54. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

93.     On July 22, 2013, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of

1  55,555 shares of common stock at an exercise price of $0.54. The warrants were exercisable on a
2  cashless basis. The Company agreed that within 45 days of the consummation of the offer and
3  sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC
4  covering the securities.

5       94.     On July 22, 2013, an accredited investor purchased 55,555 shares of common
6  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for
7  $25,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of
8  83,333 shares of common stock at an exercise price of $0.49. The warrants were exercisable on a
9  cashless basis. The Company agreed that within 45 days of the consummation of the offer and
10  sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC
11  covering the securities.

12       95.     On July 22, 2013, an accredited investor purchased 55,555 shares of common
13  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for
14  $25,000. The warrants enabled the investor to purchase, up to February 16, 2016, an aggregate of
15  55,555 shares of common stock at an exercise price of $0.56. The warrants were exercisable on a
16  cashless basis. The Company agreed that within 45 days of the consummation of the offer and
17  sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC
18  covering the securities.

19       96.     On July 25, 2013, an accredited investor purchased 388,889 shares of common
20  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for
21  $175,000. The warrants enabled the investor to purchase, up to January 25, 2016, an aggregate of
22  388,889 shares of common stock at an exercise price of $0.54. The warrants were exercisable on
23  a cashless basis. The Company agreed that all sales made subsequent to achievement of the
24  $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration
25  statement.

26       97.     On August 2, 2013, an accredited investor purchased 111,111 shares of common
27  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

28

$50,000. The warrants enabled the investor to  purchase, up to February 6, 2016, an aggregate of 111,111 shares of common  stock at an exercise price of $0.56. The warrants were exercisable on a cashless  basis. The Company agreed that all investments made subsequent to  achievement of the $1,000,000 threshold and before  the filing of the Form S-1  would be included in the registration statement.

98.    On August 12, 2013, the Company issued 166,667 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for $75,000 in funding. The investor also received warrants to purchase 250,000  shares of common stock at a purchase price of fifty eight cents ($0.58) per  share. The warrants were  exercisable on a cashless basis and expired on  February 12, 2016. The Company agreed that all investments made subsequent  to achievement of the $1,000,000 threshold and before  the filing of the Form S- 1 would be included in the registration statement.

99.    On August 13, 2013, the Company issued 111,111 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for$50,000 in funding. The investor also received warrants to purchase 166,667  shares of common stock at a purchase price of fifty eight cents ($0.58) per  share. The warrants were exercisable on a cashless basis and expired on  February 12, 2016. The Company agreed that all investments made subsequent  to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement.

100.    On August 14, 2013, an accredited investor was awarded an additional 336,956 shares of restricted common stock as a result of the fact that the market price  per share of the common stock did not trade at $0.77 or higher on the  ninetieth business day from the closing date. The reset shares combined with  the original shares received changed the overall value of the stock purchased to $0.23 per share.

101.    On August 19, 2013, the Company issued 111,111 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for$50,000 in funding. The investor also received warrants to purchase 111,111  shares of common stock at a purchase price

of thirty seven cents ($0.37) per share. The warrants were exercisable on a cashless basis and expired on February 23, 2016. The Company agreed that all investments made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement.

102.    On August 21, 2013, the Company issued 55,555 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for $25,000 in funding. The investor also received warrants to purchase 55,555 shares of common stock at a purchase price of thirty seven cents ($0.37) per share. The warrants were exercisable on a cashless basis and expired on February 23, 2016. The Company agreed that all investments made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement.

103.    On September 9, 2013, the Company issued 222,222 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for $100,000 in funding. The investor also received warrants to purchase 222,222 shares of common stock at a purchase price of forty three cents ($0.43) per share. The warrants were exercisable on a cashless basis and expired on March 9, 2016. The Company agreed that all investments made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement.

104.    On October 10, 2013, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $100,000. The warrants enable the investor to purchase, up to April 16, 2016, an aggregate of 333,333 shares of common stock at an exercise price of $0.52. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

105.    On October 10, 2013, an accredited investor purchased 222,222 shares of common stock and warrants to purchase an aggregate of 333,333 shares of common stock at an exercise price of $0.52 until April 16, 2016, in a private offering for $100,000.

106.    On December 17, 2013, an accredited investor purchased 166,667 shares of common stock and warrants in a private offering at a purchase price of $0.30 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to June 18, 2016, an aggregate of 166,667 shares of common stock at an exercise price of $0.56. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

107.    On December 17, 2013, an accredited investor purchased 100,000 shares of common stock and warrants in a private offering at a purchase price of $0.30 per share in consideration for $30,000. The warrants enabled the investor to purchase, up to June 18, 2016, an aggregate of 100,000 shares of common stock at an exercise price of $0.56. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

108.    On December 17, 2013, accredited investors purchased an aggregate of 533,334 shares of common stock and warrants to purchase an aggregate of 533,334 shares of common stock at an exercise price of $0.56 until June 18, 2016, in a private offering for an aggregate of $160,000.

109.    On December 18, 2013, an accredited investor purchased 125,000 shares of common stock and 168,750 warrants in a private offering at a purchase price of $0.40 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to June 18, 2016, an aggregate of 168,750 shares of common stock at an exercise price of $0.66. The warrants were

exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

110.    On December 18, 2013, the Company granted Monarch Bay Securities, LLC ("Monarch") warrants to purchase 42,667 shares of common stock as a commission for acting as a placement agent for the Company with respect to finding investors for offerings of the Company's securities. The warrants enabled Monarch to purchase shares of common stock at a price of fifty six cents ($0.56) per share. The warrants were exercisable on a cashless basis and will expire on June 18, 2016.

111.    On December 18, 2013, an accredited investor purchased 125,000 shares of common stock and warrants to purchase 168,750 shares of common stock at an exercise price of $0.66 per share until June 18, 2016 in a private offering for $50,000.

112.    On December 20, 2013, the Company issued a 30-month warrant to purchase 200,000 shares of common stock at an exercise price of $0.51 per share to Andrew Kyzyk as an inducement to join the Company's Board of Advisors. Mr. Kyzyk resigned from the Advisory Board on February 28, 2014 and the warrant was cancelled.

113.    On December 27, 2013, an accredited investor purchased 125,000 shares of common stock and warrants in a private offering at a purchase price of $0.40 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to June 26, 2016, an aggregate of 125,000 shares of common stock at an exercise price of $0.66. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the registration statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

114.    On December 27, 2013, an accredited investor purchased 125,000 shares of common stock and warrants to purchase 125,000 shares of common stock at an exercise price of $0.66 per share until June 26, 2016 in a private offering for $50,000.

115.    On December 31, 2013, the Company issued a warrant for 200,000 shares of common stock to Richard Schul in order to induce him to join the Company's Board of Advisors and retain his services for a period of at least 12 months.

116.    On January 31, 2014, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $100,000. The warrants enabled the investor to purchase, up to January 31, 2019, an aggregate of 222,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

117.    On January 31, 2014, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to January 31, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

118.    On February 1, 2014, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to February 1, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

119.    On February 5, 2014, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to February 5, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

120.    On February 5, 2014, the Company completed the sale of $930,000 of units (the "Units") in a private placement (the "Offering") pursuant to subscription agreements with 17 accredited investors (the "Investors"). Each Unit consisted of shares of the Company's common stock priced at $0.45 per share, and (ii) a five-year warrant to purchase up to the identical amount of shares of common stock purchased at an exercise price of $0.60 per share (each individually a "Warrant", and collectively, the "Warrants"). The Warrants (and Placement Agent Warrants described below) contained a provision for cashless exercise. A total of 2,066,668 shares of common stock were sold, and Warrants to purchase up to an additional 2,066,668 shares of common stock were issued to the Investors in the Offering. In connection with the Offering, the Company paid a placement agent fee of $74,400 to Drexel Heritage (the "Placement Agent"), and issued a five-year warrant to the Placement Agent (the "Placement Agent Warrant") to purchase up to an aggregate of 261,333 shares of common stock at an exercise price of $.60 per share pursuant to the placement agent agreement ("Placement Agreement") with the Placement Agent. Under the Placement Agreement, the Placement Agent was also issued a 5-year warrant to purchase 1,500,000 shares of common stock with an exercise price of $.56 per share. The warrants issued to the Placement Agent provided for cashless exercise and piggyback registration rights.

121.    On February 10, 2014, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $40,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1    55,556 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a

2    cashless basis. The Company agreed that within 45 days of the consummation of the offer and

3    sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC

4    covering the securities.

5          122.    On February 10, 2014, an accredited investor purchased 88,889 shares of common

6    stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

7    $40,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of

8    88,889 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a

9    cashless basis. The Company agreed that within 45 days of the consummation of the offer and

10    sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC

11    covering the securities.

12          123.    The Company entered into an employment agreement, dated February 10, 2014,

13    with Mark Hodowanec to serve as the Company's Chief Technical Officer for an initial annual

14    salary of $175,000, to be paid in equal monthly installments. Hodowanec's annual salary would

15    be increased to $210,000 upon commercialization of the 25/50 kW mobile generators; to

16    $240,000 upon the Company generating $100,000 in revenues or $1,000,000 in new financing; to

17    $300,000 upon the Company achieving profitability; and to $360,000 upon the Company

18    maintaining profitability for four consecutive quarters. The Company also agreed to reimburse

19    Hodowanec for his healthcare costs until the Company adopted a healthcare plan. If

20    Hodowanec's employment was terminated without cause, he would be entitled to severance in

21    the amount of two years' salary in effect at such time to be paid by the Company in one payment

22    or in four equal installments at the end of each quarter following termination, at the Company's

23    discretion. Such severance obligation shall accelerate and become immediately payable upon a

24    change of control of the Company. The Company would also pay any excise tax on Hodowanec's

25    behalf that may be triggered under the Internal Revenue Code as a result. Hodowanec would not

26    compete with the Company during the term of the agreement.

27

28

124.   Consulting fees to Banzhaf in the amount of: (i) $9,829 for December 2013 paid, and (ii) consulting fees of $12,500 for January 2013 through July 2013, consulting fees of $17,500 for August through November 2013 and consulting fees of $7,671 accrued by Banzhaf.

125.   On February 14, 2014, an accredited investor purchased 88,889 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $40,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 88,889 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

126.   On February 15, 2014, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $100,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 222,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

127.   On February 19, 2014, HPEV and Lincoln Park Capital Fund, LLC ("Lincoln Park") entered into a purchase agreement (the "Purchase Agreement"), together with a registration rights agreement (the "Registration Rights Agreement"), pursuant to which the Company had the right to sell to Lincoln Park up to $10,000,000 in shares of its common stock, par value $0.001 per share ("Common Stock"), subject to certain limitations. Under the terms and subject to the conditions of the Purchase Agreement, Lincoln Park was obligated to purchase up to $10,000,000 in shares of common stock (subject to certain limitations) from time to time over the 36-month period commencing on the date that a registration statement (the "Initial Registration Statement"), which the Company agreed to file with the SEC pursuant to the Registration Rights Agreement, was declared effective by the SEC and a final prospectus in

connection therewith is filed. The Company could direct Lincoln Park, at its sole discretion and subject to certain conditions, to purchase up to 75,000 shares of common stock in regular purchases. In addition, the Company could direct Lincoln Park to purchase additional amounts as accelerated purchases if on the date of a regular purchase the closing sale price of the common stock equaled or exceeded $0.60 per share. The purchase price of shares of common stock related to future funding would be based on the prevailing market prices of such shares at the time of sales (or over a period of up to 12 business days leading up to such time), but in no event would shares be sold to Lincoln Park on a day the common stock closing price is less than the floor price of $0.25, subject to adjustment. The Company would control the timing and amount of any sales of common stock to Lincoln Park. The Company's sales of shares of common stock to Lincoln Park under the Purchase Agreement are limited to no more than the number of shares that would result in the beneficial ownership by Lincoln Park and its affiliates, at any single point in time, of more than 9.99% of the then outstanding shares of the common stock. As consideration for its commitment to purchase shares of common stock pursuant to the Purchase Agreement, the Company agreed to issue to Lincoln Park 671,785 shares of common stock upon execution of the Purchase Agreement. The 671,785 shares of common stock were issued to Lincoln Park on February 25, 2014; no consideration was received. The Purchase Agreements and the Registration Rights Agreement contained customary representations, warranties and agreements of the Company and Lincoln Park and customary conditions to completing future sale transactions, indemnification rights and obligations of the parties. Except that Lincoln Park is not obligated to purchase more than $500,000 of common stock in any single regular purchase, there is no upper limit on the price per share that Lincoln Park could be obligated to pay for shares of common stock under the Purchase Agreement. The Company had the right to terminate the Purchase Agreements at any time, at no cost or penalty. Actual sales of shares of common stock to Lincoln Park under the Purchase Agreements would depend on a variety of factors to be determined by the Company from time to time, including (among others) market conditions, the trading price of the common stock and determinations by the Company as to the appropriate

1   sources of funding for the Company and its operations.  Lincoln Park's registration statement

2   with respect to 4,671,785 of HPEV common stock was declared effective July 3, 2014.  The

3   Company hoped that the funds from selling shares to Lincoln Park would be sufficient to meet its

4   liquidity needs until it begins generating cash flows from revenues.

5       128.   On February 24, 2014, an accredited investor purchased 100,000 shares of

6   common stock and warrants in a private offering at a purchase price of $0.45 per share in

7   consideration for $45,000. The warrants enabled the investor to purchase, up to February 14,

8   2019, an aggregate of 100,000 shares of common stock at an exercise price of $0.60. The

9   warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the

10  consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a

11  registration statement with the SEC covering the securities.

12      129.   On February 24, 2014, an accredited investor purchased 111,111 shares of

13  common stock and warrants in a private offering at a purchase price of $0.45 per share in

14  consideration for $50,000. The warrants enabled the investor to purchase, up to February 14,

15  2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The

16  warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the

17  consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a

18  registration statement with the SEC covering the securities.

19      130.   On February 24, 2014, an accredited investor purchased 11,111 shares of common

20  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

21  $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of

22  11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a

23  cashless basis. The Company agreed that within 45 days of the consummation of the offer and

24  sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC

25  covering the securities.

26      131.   On February 24, 2014, an accredited investor purchased 55,556 shares of common

27  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

28

$25,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 55,556 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis.

132.    On February 25, 2014, an accredited investor purchased 418,333 shares of common stock in a private offering at a purchase price of $0.60 per share in consideration for $251,000. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

133.    On February 25, 2014, an accredited investor purchased 40,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $18,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 40,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

134.    On February 27, 2014, an accredited investor purchased 144,444 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $65,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 144,444 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

135.    On February 28, 2014, an accredited investor purchased 133,334 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $60,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 133,334 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the

consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

136.   On February 28, 2014, an accredited investor purchased 444,445 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $200,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 444,445 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

137.   On February 28, 2014, an accredited investor purchased 40,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $18,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 40,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

138.   On February 28, 2014, an accredited investor purchased 100,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $45,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 100,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

139.   On February 28, 2014, an accredited investor purchased 333,333 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $150,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The

warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

140.   On February 28, 2014, an accredited investor purchased 112,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,400. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 112,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

141.   On March 1, 2014, an accredited investor purchased 50,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $22,500. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 50,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

142.   On March 1, 2014, an accredited investor purchased 666,666 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $300,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 666,667 shares of common stock at an exercise price of $0.60. The warrants would be exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

143.   On March 1, 2014, an accredited investor purchased 11,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to March 14, 2019, an aggregate of

11,112 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

144.    On March 1, 2014, an accredited investor purchased 22,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $10,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 22,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

145.    On March 1, 2014, an accredited investor purchased 33,333 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $15,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 33,333 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

146.    On March 1, 2014, an accredited investor purchased 22,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $10,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 22,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

147.    On March 1, 2014, an accredited investor purchased 22,223 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

$10,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 22,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

148. On March 1, 2014, an accredited investor purchased 11,112 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

149. The Company entered into an employment agreement, dated March 5, 2014, with Hassett to serve as CEO for an initial annual salary of $210,000, to be paid in equal monthly installments. If the Company's cash flow is positive for three consecutive months, the monthly compensation would increase to $25,000 per month. If the Company maintains profitability for four consecutive quarters, the monthly compensation would increase to $30,000 per month. The Company also agreed to reimburse Hassett for his healthcare costs until the Company adopted a healthcare plan. If Hassett's employment was terminated without cause, he will be entitled to severance in the amount of two years' salary in effect at such time to be paid by the Company in one payment or in four equal installments at the end of each quarter following termination, at the Company's discretion. Such severance obligation shall accelerate and become immediately payable upon a change of control of the Company. The Company will also pay any excise tax on Hassett's behalf that may be triggered under the Internal Revenue Code as a result. Hassett would not compete with the Company during the term of the agreement.

150. On March 8, 2014, an accredited investor purchased 33,334 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

$15,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 33,333 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

151. On March 8, 2014, an accredited investor purchased 55,556 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 55.556 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

152. On March 8, 2014, an accredited investor purchased 11,112 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

153. On March 8, 2014, an accredited investor purchased 11,112 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

154.    On March 11, 2014, an accredited investor purchased 166,667 shares of common stock in a private offering at a purchase price of $0.60 per share in consideration for $100,000. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

155.    On March 14, 2014, a five-year warrant to purchase 400,000 shares of common stock at an exercise price of $0.60 was issued to Paul Hodowanec, the brother of Mark Hodowanec, the Company's Chief Technical Officer, for business development services provided to the Company. The warrant was exercisable on a cashless basis.

156.    On March 14, 2014, a warrant for 250,000 shares was issued to Don Bowman for legal services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 250,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis.

157.    On March 14, 2014, a warrant for 107,000 shares was issued to Global H2O for business development services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 107,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis.

158.    On March 14, 2014, a warrant for 780,000 shares was issued to Sagiv Israeli for business development services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 780,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis; and 195,000 shares of common stock were issued.

159.    On March 14, 2014, 195,000 shares of common stock were issued to Sagiv Israeli for business development services.

160.    On March 14, 2014, a warrant for 400,000 shares was issued to consultants for business development services provided to the Company. The warrant enabled the recipient to

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  purchase, up to March 14, 2019, an aggregate of 400,000 shares of common stock at an exercise

2  price of $2.00. The warrant was exercisable on a cashless basis.

3       161.    On March 14, 2014, a warrant for 250,000 shares was issued to David Lubin for

4  legal services provided to the Company. The warrant enabled the recipient to purchase, up to

5  March 14, 2019, an aggregate of 250,000 shares of common stock at an exercise price of $0.60.

6  The warrant was exercisable on a cashless basis.

7       162.    On March 14, 2014, a warrant for 15,000 shares was issued to Dennis Murchison

8  for business development services provided to the Company. The warrant enabled the recipient to

9  purchase, up to March 14, 2019, an aggregate of 15,000 shares of common stock at an exercise

10  price of $0.60. The warrant was exercisable on a cashless basis.

11       163.    On March 18, 2014, the Company issued a warrant for 200,000 shares to Scott

12  Van Dorn as an inducement to join and remain on the Company's Board of Advisors for at least

13  12 months.

14       164.    On March 31, 2014, the Board amended Banzhaf's options to provide for cashless

15  exercise and for the stock price milestones to be: $1.50, $1.75, $2.00, $2.25 and $2.50 in lieu of

16  the current milestone prices of $2.00, $3.00, $5.00, $7.50 and $10.00.

17       165.    On March 31, 2014, grant of options to purchase 1,000,000 shares of common

18  stock at $2.00 per share to Hassett.

19       166.    On March 31, 2014, grant of options to purchase 1,000,000 shares of common

20  stock at $2.00 per share to Banzhaf.

21       167.    On March 31, 2014, grant of options to purchase 1,000,000 shares of common

22  stock at $2.00 per share to Hodowanec.

23       168.    On March 31, 2014, the Board approved the grant of options to Bibb to purchase

24  2,000,000 shares of common stock at an exercise price of $2.00 per share.

25       169.    On July 1, 2014, HPEV entered into a 36 month independent contractor agreement

26  with PGC Investments LLC ("PGC Agreement"), to manage the day- to-day operations of

27  Ultimate Power Truck. The PGC Agreement includes monthly cash compensation, warrants in

28                                          48

common stock and shares of  common stock, as follows: a) 350,000 cashless warrants with a strike price of $1.00 that vest upon reaching revenues of $1,000,000; b) 1,530,000 cashless warrants with a strike price of $1.00 that vest ratably upon reaching  incremental revenues of $3,000,000 with a total target revenue of $100,000,000; c) 720,000 cashless warrants with a strike price of $1.00 that vest  ratably over 36 months; and d) 500,000 shares of HPEV common stock that vest  upon reaching revenues of $100,000,000 or upon sale of the Company.

170.   On July 1, 2014, HPEV issued 17,778 shares to Monarch upon the cashless exercise of 42,667 shares subject to a warrant held  by Monarch.

171.   On July 1, 2014, HPEV issued PGC (i) a three-year (commencing  upon vesting) cashless warrant to purchase an aggregate of  1,530,000 shares of common stock exercisable at $1,00 per  share that  become exercisable ratably  upon reaching incremental revenues of $3,000,000 (from MG product sales which result from the efforts of Dennis Campbell and PGC) with a total target  revenue of $100,000,000 and (ii) a three-year cashless warrant to purchase an aggregate of 720,000 shares of common stock  at an exercise price of $1.00 that become exercisable ratably on a quarterly basis; and (iii) 500,000 shares of common stock  that vest upon reaching revenues of $100,000,000 or upon sale of the Company.

172.   On July 9, 2014, HPEV issued 7,467 shares to an accredited investor upon the cashless exercise of 16,000 shares subject to a  warrant held by such investor.

173.   On July 30, 2014, HPEV issued a 30 month warrant to purchase 200,000 shares of our common stock at an exercise price of $0.80  per share to William Finley for serving on the Company's Board of Advisors. The warrant was exercisable on a cashless basis.

174.   On July 30, 2014, HPEV reached preliminary terms on an LLC Agreement (the "Preliminary LLC Agreement") with Alfred A. Cullere ("Cullere") concerning the  governance and operations of Ultimate Power Truck.  Under the terms of the  Preliminary LLC Agreement, HPEV would own 95% of the membership interests  and Cullere would own 5%.  Cullere's interest cannot be diluted, even if  additional membership interests are issued.  These terms could change upon  formalizing the final agreement.

175.    On August 25, 2014, HPEV issued a three-year warrant to purchase 750,000 shares of common stock at an exercise price of $0.80 per share to John Storer for business development consulting services provided to the Company. The warrant was exercisable on a cashless basis.

176.    On September 10, 2014, HPEV issued a 30-month warrant to purchase 200,000 shares of common stock at an exercise price of $0.80 per share to Daniel Ustian for serving on the Company's Board of Advisors. The warrant was exercisable on a cashless basis.

177.    On September 12, 2014, HPEV sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering.  The warrants were exercisable on a cashless basis.

178.    On September 15, 2014, HPEV sold 181,818 shares and a three-year warrant to purchase 121,818 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

179.    On September 16, 2014, HPEV sold 363,636 shares and a three-year warrant to purchase 243,636 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

180.    On September 16, 2014, HPEV sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

181.    On September 17, 2014, HPEV sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

182.    On September 18, 2014, HPEV issued a 30 month warrant to purchase 200,000 shares of common stock at an exercise price of $0.80 per share to Roman Kuropas for serving on HPEV's Board of Advisors. The warrant was exercisable on a cashless basis.

183.    On September 23, 2014, HPEV sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

184.    On September 24, 2014, HPEV sold 181,818 shares and a three-year warrant to purchase 121,818 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

185.    On October 3, 2014, HPEV sold 454,545 shares and a three-year warrant to purchase 304,545 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

186.    On October 31, 2014, HPEV sold 90,909 shares and a five-year warrant to purchase 90,909 shares of common stock at an exercise price of $0.70 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

187.    On November 10, 2014, HPEV sold 181,818 shares and a three-year warrant to purchase 181,818 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

188.    On November 10, 2014, HPEV sold an aggregate of 140,909 shares and a five-year warrant to purchase an aggregate of 140,909 shares of common stock at an exercise price of $0.70 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

189.    On December 5, 2014, HPEV sold an aggregate of 78,728 shares and a three-year warrant to purchase an aggregate of 78,728 shares of common stock at an exercise price of $0.75 per share to three accredited investors in a private offering. The warrants were exercisable on a cashless basis.

190.    On December 8, 2014, HPEV sold 36,364 shares and a three-year warrant to purchase 36,364 shares of common stock at an exercise price of $0.75 per share and 37,000 shares and a three-year warrant to purchase 37,000 shares at an exercise price of $0.55 per share


to two accredited investors in a private offering. The warrants were exercisable on a cashless basis.

191. On December 9, 2014, HPEV sold 100,000 shares and a three-year warrant to purchase 100,000 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

192. On December 11, 2014, HPEV sold 36,364 shares and a three-year warrant to purchase 36,364 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

193. On February 6, 2015, HPEV sold 18,181 shares and a three-year warrant to purchase 18,181 shares of common stock at an exercise price of $0.65 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

194. On March 24, 2015, HPEV issued an aggregate of 120,000 shares of common stock to Elite Bay for investor relations services provided to HPEV.

195. On March 31, 2015, HPEV issued a five-year warrant to purchase 400,000 shares of common stock at an exercise price of $2.50 per share to Drexel Hamilton for services provided to HPEV.

196. On April 21, 2015, HPEV sold 333,333 shares and a five-year warrant to purchase 333,333 shares of common stock at an exercise price of $0.57 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

197. On April 23, 2015, HPEV entered into a subscription agreement with Lincoln Park, pursuant to which Lincoln Park agreed to purchase 555,556 shares of common stock at a per share price of $0.45 and a warrant to purchase 555,556 shares of common stock, for an aggregate purchase price of $250,000 subject to certain limitations.

198. On May 5, 2015, HPEV issued 250,004 shares of common stock to JFS Investments PR LLC pursuant to a consulting agreement for business development consulting services provided to HPEV.

199.   On May 5, 2015, HPEV issued 50,001 shares of common stock to Garden State Securities, Inc. pursuant to an engagement letter for placement agent provided to HPEV.

200.   On May 5, 2015, HPEV issued 100,001 shares of common stock to Daniel Walsh pursuant to an engagement letter for placement agent provided to HPEV.

201.   On May 5, 2015, HPEV issued 100,001 shares of common stock to Ernest Pelegrino pursuant to an engagement letter for placement agent provided to HPEV

202.   On May 5, 2015, HPEV issued 500,006 shares of common stock to Manufacturers Hanover LLC pursuant to a consulting agreement for business development consulting services provided to HPEV.

203.   On May 11, 2015, HPEV sold an aggregate of 188,888 shares and a five-year warrant to purchase an aggregate of 188,888 shares of common stock at an exercise price of $0.60 per share to five accredited investors in a private offering. The warrants were exercisable on a cashless basis.

204.   On May 12, 2015, HPEV sold an aggregate of 444,444 shares and a five-year warrant to purchase an aggregate of 444,444 shares of common stock at an exercise price of $0.57 per share to two accredited investors in a private offering. The warrants were exercisable on a cashless basis.

205.   On May 19, 2015, HPEV sold 55,556 shares and a five-year warrant to purchase 55,556 shares of common stock at an exercise price of $0.60 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

206.   On May 20, 2015, HPEV sold 55,556 shares and a five-year warrant to purchase 55,556 shares of common stock at an exercise price of $0.60 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

207.   On July 10, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy") announcing the date for a special meeting of stockholders during which shareholders will be requested to vote on, among other things, the increase in the number of shares of

common stock the Company is authorized to issue from 100,000,000 to 140,000,000 shares of common stock.  The 2015 Proxy stated the following, in relevant part:

> The Company's current Articles of Incorporation authorize the issuance of 100,000,000 shares of Common Stock. As of June 16, 2015, there were 66,192,770 shares of Common Stock issued and outstanding. We would have to issue an aggregate of 10,000,000 shares of common stock if the current outstanding options to purchase shares of common stock are exercised, 29,856,807 shares of our common stock if the outstanding warrants are converted and to 7,000,000 shares of common stock if the 140 shares of our Preferred Stock would be converted. According to our Articles of Incorporation we are only authorized to issue 100,000,000 shares of common stock. Accordingly, we need to amend our Articles to Incorporation to increase the number of shares of common stock we are authorized to issue.

> The purpose of the proposed increase in authorized share capital is to make available additional shares of Common Stock for issuance for general corporate purposes without the requirement of further action by the stockholders of the Company. Further, *the increase in authorized shares is to ensure that there are a more than adequate number of shares available for the Company to execute on the outstanding securities currently issued.* Furthermore, and independent of the need to have additional shares of common stock available for the exercise or conversion of outstanding convertible securities, *the Company will need additional authorized shares in connection with establishing additional employee or director equity compensation plans or arrangements or for other general corporate purposes. There is currently no agreement or arrangement with respect to any of the foregoing other than as described herein.* Increasing the authorized number of shares of the Common Stock of the Company will provide the Company with greater flexibility and allow the issuance of additional shares of Common Stock in most cases without the expense or delay of seeking further approval from the stockholders.

> The shares of Common Stock do not carry any pre-emptive rights. The adoption of the Amendment will not of itself cause any changes in the Company's capital accounts.

> The increase in authorized share capital will not have any immediate effect on the rights of existing holders of the Company's Common Stock. However, the Board of Directors will have the authority to issue authorized shares of Common Stock without requiring future approval from the stockholders of such issuances, except as may be required by applicable law. To the extent that additional authorized shares of Common Stock are issued in the future, they will decrease the existing stockholders' percentage equity ownership interests and, depending upon the price at which such shares of common stock are issued, could be dilutive to the existing stockholders. Any such issuance of additional shares of Common Stock could

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

have the effect of diluting the earnings per share and book value per share of outstanding shares of Common Stock of the Company.

One of the effects of the increase in authorized share capital, if adopted, however, may be to enable the Board to render it more difficult to or discourage an attempt to obtain control of the Company by means of a merger, tender offer, proxy contest or otherwise, and thereby protect the continuity of present management. The Board would, unless prohibited by applicable law, have additional shares of Common Stock available to effect transactions (including private placements) in which the number of the Company's outstanding shares would be increased and would thereby dilute the interest of any party attempting to gain control of the Company. Such action, however, could discourage an acquisition of the Company, which the stockholders of the Company might view as desirable.

(Emphasis added).

208.    In other words, in the event that the Company's current outstanding options are exercised and the Company's current outstanding warrants are converted, the Company would have to issue an additional 46,856,807 shares of common stock, which would increase the total amount of shares of common stock that is issued and outstanding to 113,049,577.  Given that the Company's Articles of Incorporation only authorizes the issuance of 100,000,000 shares of common stock and the Company had already exceeded this limit, the Current Director Defendants did not have the authority to enter into any additional transactions or agreements involving the issuance of HPEV equity.

209.    Yet, despite the foregoing, on August 12, 2015, the Company filed its quarterly statement for the quarter ended June 30, 2015 on a Form 10-Q with the SEC which stated the following, in relevant part:

*Financial advisory agreements*

During the quarter ended June 30, 2015, we entered into separate agreements with three companies, which subsequently became shareholders, to provide financial advisory services, including developing, studying and evaluating a financing plan, strategic and financial alternatives, and merger and acquisition proposals. Under the terms of the agreements, we agreed to issue an aggregate of 333,332 shares of common stock each month through June 2016, as services were delivered, for a total of 5,000,000 shares over the term of the agreements. These agreements may be canceled by either party with a 30 day notice. During the six months ended June 30, 2015, we recorded expense at fair value of $510,007 for the issuance of

1,000,013 shares. If the services are provided and the agreements are not canceled, an additional 3,999,987 shares remain to be issued.

210.     Accordingly, the Current Director Defendants lacked the authority to enter into the three foregoing agreements which would require the Company to issue an additional 5,000,000 shares of common stock.

211.     Notwithstanding the foregoing unauthorized transactions, the Current Director Defendants have also committed waste by causing HPEV to pay or accrue millions of dollars in compensation despite the Company's precarious financial condition.

**HPEV's False and Misleading Proxy Statement and the Reasons for Its Falsity**

212.     Throughout the Relevant Period, the Management Defendants' public statements repeatedly summarized the compensation agreements between the Company and its officers.

213.     On July 10, 2015, HPEV filed a Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "2015 Proxy") stating the following with respect to the calculation of the number of shares beneficially owned by Defendant Banzhaf:

> Includes five options to purchase 1,000,000 shares each at such time as our common stock trades at $2.00, $3.00, $5.00, $7.50 and $10.00 for 20 consecutive days while Mr. Banzhaf serves as President and one year following a termination of Mr. Banzhaf employment without cause. Exercise prices of these options will be equal to the closing price of the Company's stock on the date the option vests. ***On March 31, 2014, the Board amended Mr. Banzhaf's options*** to provide for cashless exercise and for the stock price milestones to be: $1.50, $1.75, $2.00, $2.25 and $2.50 in lieu of the current milestone prices of $2.00, $3.00, $5.00, $7.50 and $10.00. Also includes options to purchase 1,000,000 shares of common stock at $2.00 per share.
> (Emphasis added).

214.     The 2015 Proxy was false and misleading as it failed to disclose to investors that the March 31, 2014 amendment was void or voidable because a majority of the Company's directors had not approved the change to Defendant Banzhaf's compensation.

215.     On November 26, 2014, Judge Jennifer A. Dorsey held that the Sprit Bear Designees "remained holdover directors on the HPEV board despite the January 2014 director

election." In so ordering, she eliminated any potential doubt as to the ultra vires nature of the stock option grant.

216.    The Company had previously admitted in a December 24, 2013 Proxy Statement filed pursuant to Section 14(a) of the Securities Exchange Act of 1934 that "neither the Bylaws nor Nevada law grants the three management directors such authorization; according to the Bylaws only the Board or a majority of the outstanding shares can alter, amend or repeal the bylaws."

217.    Further, in its October 7, 2014 Proxy Statement filed pursuant to Section 14(a) of the Securities Exchange Act of 1934 the Company further admitted the following:

**Consequences of the Failure to Elect Replacement Directors**

If the three nominees to serve as replacement directors are not elected by the holders of a majority of issued and outstanding shares, it is likely that a Nevada court will decide who is and who is not a director. ***Further, in its Motion for Partial Summary Judgment, Spirit Bear advances the argument that if its three designees are and have been directors of the Company since January 13, 2014, several actions would have been undertaken without proper corporate authority and Spirit Bear may try to unwind those transactions.***

The uncertainty caused by this situation could result in further damage to the Company, both in terms of cost and money litigating the matter as well as hampering future capital raises. Third parties may not be willing to invest or do business with the Company if it is unclear who are the directors of the Company.

Timothy Hassett, as the shareholder calling for this Meeting, and Theodore Banzhaf, a the President of the Company, who are calling for the Special Meeting wish to eliminate the uncertainty that presently exists. The Company does not concede that Spirit Bear's position is correct. The election of replacement directors clearly eliminates the argument advanced by Spirit Bear that Palmer, Dwyer and Holt are still directors because their successors have not been elected.

(Emphasis added).

218.    Yet despite the fact the Company admitted in its December 24, 2013 and October 7, 2014 proxies that the Board's actions were ultra vires it failed to do so in the 2015 Proxy, even after Judge Dorsey confirmed that the Spirit Bear designees were holdover directors.

219.    Because of the failure of the 2015 Proxy to disclose the ultra vires nature of the March 31, 2015 stock option grant, the 2015 Proxy contains a material omission.

220.    The 2015 Proxy also fails to disclose material information regarding agreements the Company entered into for the sale of common stock, options, warrants, or preferred stock.

221.    The 2015 Proxy states the following with respect to the reasons for the Company's proposal to increase the authorized shares of common stock from 100,000,000 shares to 140,000,000 shares of common stock:

> The purpose of the proposed increase in authorized share capital is to make available additional shares of Common Stock for issuance for general corporate purposes without the requirement of further action by the stockholders of the Company. Further, the increase in authorized shares is to ensure that there are a more than adequate number of shares available for the Company to execute on the outstanding securities currently issued. Furthermore, and independent of the need to have additional shares of common stock available for the exercise or conversion of outstanding convertible securities, the Company will need additional authorized shares in connection with establishing additional employee or director equity compensation plans or arrangements or for other general corporate purposes. ***There is currently no agreement or arrangement with respect to any of the foregoing other than as described herein***. Increasing the authorized number of shares of the Common Stock of the Company will provide the Company with greater flexibility and allow the issuance of additional shares of Common Stock in most cases without the expense or delay of seeking further approval from the stockholders.

(Emphasis added).

222.    What the 2015 Proxy fails to disclose is that during the quarter ended June 30, 2015, the Company entered into separate agreements with three companies all of which subsequently became shareholders, to provide financial advisory services, including developing, studying and evaluating a financing plan, strategic and financial alternatives, and merger and acquisition proposals. Under the terms of the agreements, the Company agreed to issue an aggregate of 333,332 shares of common stock each month through June 2016 as services were delivered, for a total of 5,000,000 shares over the duration of the agreements. These agreements may be canceled by either party with a 30 days' notice. During the six months ended June 30, 2015, the Company recorded an expense at fair value of $510,007 for the issuance of 1,000,013

1    shares. Pursuant to the agreements, if the services are provided and the agreements are not

2    canceled, then an additional 3,999,987 shares remain to be issued.  Clearly, the Individual

3    Defendants were aware of these agreements when the 2015 Proxy was issued on July 10, 2015,

4    yet they failed to disclose the agreements, rendering the Company's statement in the 2015 Proxy

5    that "There is currently no agreement or arrangement with respect to any of the foregoing other

6    than as described herein" materially false and misleading.

7                    **THE INDIVIDUAL DEFENDANTS HAVE COMMITTED WASTE**

8           223.    As previously discussed, on February 20, 2013, the Board of Directors at the time,

9    consisting of Defendants Hassett, Ponder and Bibb, resolved to establish compensation levels for

10   the officers of the Company.  The February 20, 2013 Resolutions provided that the following

11   amounts would begin to accrue on January 15, 2013: (i) $13,500 per month to Defendant

12   Hassett[1], (ii) $10,000 per month to Defendant Ponder, (iii) $14,500 per month to Banzhaf, (iv)

13   $14,500 per month a still undesignated Chief Technical Officer[2] and (v) $8,000 per month to

14   Defendant Bibb. The accrued compensation would not be paid until the Company raised $1

15   million.

16          224.    In other words, of the million dollars raised by the Company, the Company's

17   officers would pocket $60,500 per month or $726,000 per year in salary. This amounts to a

18   whopping 72.6% of funds which should ideally be used to fund the Company's operations, as

19   HPEV has not generated any revenue to date, lost $2.875 million in 2013, $23.560 million in

20   2014 and $4.238 million for the six months ended June 30, 2015, and whose independent

21   auditors have expressed their concern as to the ability of the Company to continue as a going

22   concern.   Instead, the Individual Defendants put their own interests above those of the Company

23   and decided that the money should go directly to the Company's officers.

24

25   [1] The Company falsely stated in 18 separate filings with the SEC that Defendant Hassett would
     be paid $12,500 per month pursuant to the February 20, 2013 Resolutions, including most
26   recently, the Company's July 10, 2015 proxy statement filed on schedule 14A.
     [2] The Company entered into an employment agreement with Hodowanec to serve as Chief
27   Technical Officer on February 10, 2014.

28                                              59

225.    On July 24, 2013 the Company finally raised $1 million.

226.    Pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Hassett the compensation he had accrued from January 15, 2013 and,  in August 2013, began to pay him $13,500 per month in salary.

227.    Pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Ponder the compensation he had accrued from January 15, 2013 and, in August 2013, began to pay him $10,000 per month in salary.

228.    Pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Banzhaf the compensation he had accrued from January 15, 2013 and, in August 2013, began to pay him $14,500 per month in salary.

229.    Pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Bibb the compensation he had accrued from January 15, 2013 and, in August 2013, began to pay him $8,000 per month in salary.

230.    On February 10, 2014, the Company hired Defendant Hodowanec to serve as the Company's Chief Technical Officer. According to the Company's SEC filings, he was initially paid $14,583.33 per month, an amount in excess of what the Board had authorized in its February 20, 2013 Resolutions. As previously discussed, pursuant to Article III Section 1(a) of the Company's Bylaws, the Board has the power to "fix the compensation of officers, agents and employees of the Corporation."  Upon information and belief, the Spirit Bear designees did not authorize the increase in compensation to Hodowanec and thus, the Board lacked the requisite authority to approve the increased compensation.

231.    On February 20, 2013, Defendants Hassett, Ponder and Bibb also approved a resolution providing that when and if the Company achieves certain milestones, the compensation to the officers would be further increased. The milestones are as follows: (1) generating $1 million in additional funding, (2) generating $100,000 in revenue or an additional $1 million in funding, (3) achieving profitability (which is defined as being cash flow positive for three consecutive months) and (4) maintaining profitability for four consecutive quarters.

232.    With the achievement of the first milestone, the compensation for Defendant Banzhaf and the still undesignated Chief Technical Officer would increase to $17,500 per month.

233.    With the achievement of the second milestone, the compensation for Defendant Hassett would increase to $17,500 per month, the compensation for Defendant Ponder would increase to $12,000 per month, the compensation for Defendant Banzhaf and the still undesignated Chief Technical Officer would increase to $20,000 per month, and the compensation for Defendant Bibb would increase to $10,000 per month.

234.    In other words, in exchange for raising $3 million, the Board voted to pay themselves, Defendant Banzhaf and the undesignated Chief Technical Officer $954,000 a year or approximately 1/3 of the money raised.

235.    With the achievement of the third milestone, the compensation for Defendant Hassett would increase to $25,000 per month, the compensation for Defendant Ponder would increase to $18,000 per month, the compensation for Defendant Banzhaf would increase to $24,000 per month, the compensation for still undesignated Chief Technical Officer would increase to $25,000 per month, and the compensation for Defendant Bibb would increase to $12,000 per month.

236.    With the achievement of the fourth milestone, the compensation for Defendant Hassett would increase to $30,000 per month, the compensation for Defendant Ponder would increase to $24,000 per month, the compensation for Defendant Banzhaf would increase to $29,000 per month, the compensation for the undesignated Chief Technical Officer would increase to $30,000 per month, and the compensation for Defendant Bibb would increase to $15,000 per month.

237.    Further, on February 20, 2013, Defendants Hassett, Ponder and Bibb also authorized the payment of bonuses of $50,000 and/or 50,000 shares of, or options for common stock available for each officer plus, special payments from 5% of the Company's net income be given for individual contributions to the Company that Defendant Hassett deemed to be "extraordinary," such as the awarding of patents or the signing of major customer contracts.

238.    All told on February 20, 2013, the Board voted to pay the Company's officers $954,000 in salary and bonuses of $1,000,000 assuming they could raise $3 million without even generating a penny in revenue for the Company.  In other words, the Company's officers would divert 65% or $1,954,000 of the $3 million they raised for their own benefit.

239.    The Board also resolved to decrease the exercise price of the five options to purchase one million shares awarded to Banzhaf and to provide for cashless exercise of these options. The milestone stock prices were reduced to $2.00, $3.00, $4.00, $4.50 and $5.00 for 20 consecutive trading days each. These milestone stock prices have been changed from $2.00, $3.00, $5.00, $7.50 and $10.00. Once the stock has traded at these prices for 20 consecutive trading days, Banzhaf has the right to exercise an option to purchase 1,000,000 shares of common stock at each milestone stock price. These options expire one year after Banzhaf has been terminated without cause.

240.    The Board also granted Bibb an option to purchase 2,000,000 shares of the Company's common stock, at a purchase price of par value or $0.001 per share. The options expire one year after Bibb has been terminated without cause. The options can be exercised on a cashless basis.

241.    The Company's July 15, 2015 Registration Statement filed with the SEC on Form S-1 discloses that the Company's Officers, as a result of the numerous ultra vires transactions described above, paid themselves far more than they had originally authorized. Specifically, Defendant Hassett was paid a total of $1,951,500 in salary, bonus and stock options compensation in 2014, Defendant Bibb was paid $3,293,500 salary, stock options and other compensation in 2014 and Banzhaf was paid $4,238,617 in salary, bonus, stock options and other compensation 2014. The total compensation for these three officers in 2014 was $9,483,617. The Company did not disclose how much the Company actually paid in total compensation to Defendants Hodowanec or Ponder in 2014.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DAMAGES TO HPEV CAUSED BY THE INDIVIDUAL DEFENDANTS**

242.    As a direct and proximate result of the Individual Defendants' misconduct, the Individual Defendants have entered into and/or caused HPEV to enter into a number of unauthorized transactions while wasting corporate assets by rewarding themselves with improper compensation and bonuses, all of which have substantially damaged the Company's credibility, corporate image and goodwill.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

243.    Plaintiff brings this action derivatively in the right and for the benefit of HPEV to redress injuries suffered, and to be suffered, by HPEV as a direct result of breaches of fiduciary duty, waste of corporate assets and unjust enrichment.

244.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

245.    HPEV is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff is and was a shareholder of HPEV at the time of the transgressions complained of.  Plaintiff will adequately and fairly represent the interests of HPEV and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

246.    The wrongful acts complained of herein subject, and will continue to subject, HPEV to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

247.    The wrongful acts complained of herein were unlawfully concealed from HPEV's shareholders.

248.    At the time this action was initiated, the Board was comprised of three directors: Defendants Hassett, Ponder and Bibb.   Plaintiff did not make a demand on the Board to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

a.      As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and the Board meetings, each of the Current Director Defendants knew, or were reckless in not knowing, that they engaged in numerous *ultra vires* transactions and committed fraud in determining the Company's officer compensation scheme. Consequently, each of the Current Director Defendants faces a substantial likelihood of liability for the claims asserted in this action;

b.      The Company admits in its July 15, 2015 Registration Statement filed with the SEC on Form S-1 that, "[w]e currently do not have any independent directors as the term 'independent' is defined by the rules of the American Stock Exchange." The NYSE MKT LLC[3] rules state that a director is not independent "unless the issuer's board of directors affirmatively determines that the director does not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." Thus by their own admission, the Current Director Defendants admit that a demand would be futile.

c.      The Company further admits in the July 15, 2015 S-1 that, "[b]ecause **our directors are not independent**, we do not currently have independent audit or compensation committees. As a result, the directors have the ability, among other things, to determine their own level of compensation. **Until we comply with such corporate governance measures, regardless of whether such compliance is required, the absence of such standards of corporate governance may leave our stockholders without protections against interested director transactions, conflicts of interest and similar matters** and investors may be reluctant to provide us with funds necessary to expand our operations." (emphasis added).

d.      The acts complained of herein constitute violations of fiduciary duties owed by HPEV's Board and these wrongful and unreasonable acts are incapable of ratification;

---

[3] The American Stock Exchange changed its name to the NYSE MKT LLC on May 14, 2012.

e.    Each of the Current Director Defendants knew of and/or directly benefited from the wrongdoing complained of herein;

f.    In order to bring this suit, the Current Director Defendants of HPEV would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand; and

g.    Moreover, despite the Management Defendants having knowledge of the claims and causes of action raised by plaintiff, the Management Defendants have failed and refused to seek to recover for HPEV for any of the wrongdoing alleged by Plaintiff herein.

249.    Accordingly, because the Current Director Defendants have directly benefited from the wrongs alleged herein, they cannot in good faith exercise business judgment to determine whether to bring this action against themselves.

250.    Therefore, the Current Director Defendants face a sufficiently substantial likelihood of liability and thus, there is a reasonable doubt as to each Defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.  Accordingly, demand upon the Current Director Defendants is excused as being futile.

## CAUSES OF ACTION

## COUNT I

**(Violations of § 14(a) of the Exchange Act Against Defendants Banzhaf, Hassett, Bibb and Ponder)**

251.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

252.    This claim for relief is not based on any allegations of knowing or reckless conduct by any defendant. This claim does not allege, and does not sound in fraud, and Plaintiff disclaims any reliance upon or reference to allegations of fraud.

253.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of ant security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

254.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

255.    Here, HPEV's 2015 Proxy Statement violates § 14(a) and Rule 14a-9 because it omits material facts.  The 2015 Proxy Statement was reviewed and issued by Defendants Hassett, Ponder, Bibb, and Banzhaf, and in the exercise of reasonable care, Defendants Hassett, Ponder, Bibb, and Banzhaf should have known that the 2015 Proxy Statement was materially false and misleading.

256.    Here, HPEV's 2015 Proxy Statement violates § 14(a) and Rule 14a-9 because it omits material facts.  The 2015 Proxy Statement was reviewed and issued by Defendants Hassett, Ponder, Bibb, and Banzhaf, and in the exercise of reasonable care, Defendants Hassett, Ponder, Bibb, and Banzhaf should have known that the 2015 Proxy Statement was materially false and misleading.

257.    The omissions and the false and misleading statements in the 2015 Proxy Statement were material because a reasonable shareholder would have considered them important in deciding how to vote on the various matters set forth in the Proxy Statements for shareholder action. In addition, a reasonable shareholder would consider the omitted information as significantly altering the "total mix" of information made available in the Proxy Statement.

258.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

## COUNT II

### (Against The Individual Defendants for Breach  of Fiduciary Duty)

259.  Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

260.  The Individual Defendants owed and owe HPEV fiduciary obligations, including the obligations of good faith, fair dealing, loyalty  and care. Among other things, the Individual Defendants were and are required to act in furtherance of the best interests of HPEV and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal  interest or benefit. Each director and officer of the Company owes to HPEV and its shareholders  the fiduciary duty to exercise good faith and diligence in the administration of the Company's  affairs and in the use and preservation of its property and assets, and the highest obligations of  fair dealing. The Individual Defendants breached their fiduciary duties by:

a.    Entering into a series of *ultra vires* transactions concerning the issuance of HPEV equity or debt without obtaining the requisite authorization of the Board of Directors;

b.    Improperly  awarding  themselves  excessive  and  unauthorized compensation; and

c.    Causing  the  Company  to  issuer  a  materially  false  and  misleading  2015 Proxy Statement.

261.  By reason of the foregoing, HPEV was damaged.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

262.  Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

263.    Defendants breached their fiduciary duties by failing to properly supervise and monitor HPEV and by allowing the Company to engage in an illegal, unethical and improper course of conduct.

264.    As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duty, HPEV has wasted valuable corporate assets through payments of compensation to themselves because the Company has incurred and will continue to incur significant potential liability for legal costs, penalties, fines and/or other legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

265.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

266.    By reason of the foregoing, HPEV was damaged.

## COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

267.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

268.    Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of HPEV. The wrongful conduct was continuous and resulted in ongoing harm to the Company. The Individual Defendants were unjustly enriched pursuant to receiving compensation and/or remuneration while breaching their fiduciary duties to the Company, as alleged herein.

269.    Plaintiff, as a shareholder of HPEV, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

270.    By reason of the foregoing, HPEV was damaged.

## COUNT V

### (Derivatively Against the Individual Defendants for Gross Mismanagement)

271.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

272.    By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of HPEV in a manner consistent with the operations of a publicly held corporation:

a.    Entering into a series of *ultra vires* transactions concerning the issuance of HPEV equity or debt without obtaining the requisite authorization of all of the members of the Board of Directors;

b.    Improperly awarding themselves excessive and unauthorized compensation; and

c.    Causing the Company to issue a materially false and misleading 2015 Proxy Statement.

273.    As a direct and proximate result of The Individual Defendants' gross mismanagement and breaches of duty alleged herein, HPEV has sustained significant damages.

274.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Directing Defendants to account to HPEV for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.    Directing HPEV to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote resolution for amendments to HPEV's By-Laws or Articles of

1  Incorporation and taking such other action as may be necessary to place before shareholders

2  for a vote on corporate governance policies;

3       C.     Awarding to HPEV restitution from the Defendants and ordering disgorgement of

4  all profits, benefits and other compensation obtained by the Individual Defendants.

5       D.     Awarding Plaintiff the costs and disbursements of this action, including

6  reasonable attorneys' and experts' fees and expenses; and

7       E.     Granting such other and further relief as the Court may deem just and proper.

8  **<u>JURY DEMAND</u>**

9       Plaintiff demands a trial by jury.

10  Dated: August 18, 2015         Respectfully submitted,

11           **MUCKLEROY LUNT, LLC**

12

13           By:_____*/s/ Martin A. Muckleroy*_____
         Martin A. Muckleroy (Nev. Bar #9634)

14           6077 S. Fort Apache, Ste 140
         Las Vegas, NV 89148

15           Telephone: 702-907-0097

16           Facsimile: 702-938-4065
         Email: martin@muckleroylunt.com

17

18           **FARUQI & FARUQI, LLP**
         Stuart J. Guber

19           Timothy J. Peter
         101 Greenwood Avenue, Suite 600

20           Jenkintown, PA 19046
         Telephone: 215-277-5770

21           Facsimile: 215-277-5771

22           Email: sguber@faruqilaw.com
               tpeter@faruqilaw.com

23

24           **FARUQI & FARUQI, LLP**
         Nadeem Faruqi

25           Nina M. Varindani
         369 Lexington Avenue, 10th Floor

26           New York, New York 10017
         Telephone: 212-983-9330

27           Facsimile: 212-983-9331

28              70

Email: nfaruqi@faruqilaw.com
nvarindani@faruqilaw.com
*Attorneys for Plaintiff*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**VERIFICATION**

I, _SHIRLEY WRIGHT_____, hereby declare as follows:

   1.   I am authorized to sign this verification on behalf of Peak Finance, LLC;

   2.   I have read the foregoing Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

   3.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2015.

1