**MUCKLEROY LUNT, LLC**
Martin A. Muckleroy (Nev. Bar # 9634)
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Telephone: 702-907-0097
Facsimile: 702-938-4065
Email: martin@muckleroylunt.com

(additional counsel on signature page)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| PEAK FINANCE, LLC, Derivatively on Behalf of Nominal Defendant, COOL TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> TIMOTHY J. HASSETT, QUENTIN D. PONDER, JUDSON W. BIBB III, THEODORE H. BANZHAF and MARK HODOWANEC, <br><br> Defendants, <br><br> and <br><br> COOL TECHNOLOGIES, INC., <br><br> Nominal Defendant. | CASE NO.: 2:15-cv-01590-GMN-CWH |

## VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Peak Finance, LLC ("Peak" or "Plaintiff"), by and through its undersigned attorneys, submits this Verified Amended Shareholder Derivative Complaint (the "Complaint") against defendants named herein. Plaintiff alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged

upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by Cool Technologies, Inc.[1] ("Cool Technologies" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Cool Technologies (c) a review of other publicly available information concerning Cool Technologies; and (d) consultation with persons knowledgeable about the Company.

## SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of Nominal Defendant Cool Technologies, Inc. against certain members of the Company's Board of Directors and executive officers for violations of federal and state law, including issuing a materially false and misleading proxy statement in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "1934 Act") and breaches of fiduciary duty from June 18, 2013 through the present (the "Relevant Period").

2.     Cool Technologies is a Nevada corporation with its executive offices located in Florida. The Company develops and intends to commercialize thermal dispersion technologies in various product platforms and a parallel power input gearbox, around which Cool Technologies has designed a mobile generator system that can be retrofit onto new and existing trucks. In April 2014, the Company formed Ultimate Power Truck, LLC, of which Cool Technologies owns 95% and a shareholder of the Company owns the remaining 5%.

3.     Cool Technologies has no revenues and has suffered losses of approximately $3.0 million in fiscal year 2013, $23.6 million in fiscal year 2014, $1.3 million in the first quarter of fiscal year 2015, and $3.0 million in the second quarter of fiscal year 2015. At the same time the

---

[1] The Company changed its corporate name from HPEV, Inc. to Cool Technologies, Inc. through the filing of a Certificate of Amendment to its Articles of Incorporation, filed on August 21, 2015 with the Nevada Secretary of State. For the Court's ease of reference, any reference to Cool Technologies shall also encompass acts undertaken by HPEV prior to the date that the Company changed its corporate name.

Company has had no revenues and received "going concern" opinions from its auditors for fiscal years 2013 and 2014, the Defendants were breaching their fiduciary duties by awarding themselves substantial compensation without the requisite Board approval, using funds raised through the issuance of equity. The Company's issuance of equity to fund the Defendants' compensation, raise capital and pay for certain services was accomplished without the requisite Board approval, rendering these transactions ultra vires and diluting the Company's existing shareholders' ownership stakes, including Plaintiff's.

4.     In addition, the Defendants caused the Company to make materially false and misleading statements in the Company's 2015 Proxy Statement (the "2015 Proxy") filed with the SEC in violation of Section 14(a) of the 1934 Act. Pursuant to the 2015 Proxy, on July 10, 2015, the then existing Board, consisting of Defendants Timothy J. Hassett ("Hassett") and Quentin D. Ponder ("Ponder") and Judson W. Bibb ("Bibb"), nominated Donald Bowman ("Bowman"), Christopher McKee ("McKee"), Richard J. Schul ("Schul") and Daniel C. Ustian ("Ustian") as directors of the Company, with the shareholder vote to be held on August 19, 2015.

5.     On August 13 and 17, 2015, the SEC transmitted "Wells Notices" to Ustian and Navistar International Corporation ("Navistar"), where Ustian had previously served as Chief Executive Officer. The Notices stated that the staff of the SEC had made a preliminary determination to recommend that the SEC file an enforcement action against Navistar and Ustian, alleging violations of the 1934 Act, certain related regulations, the Securities Act of 1933, and an August 5, 2010 Order Instituting Cease-and-Desist Proceedings against Navistar. The issues the staff of the SEC may recommend the SEC pursue concerned three applications in 2011 and 2012 by Navistar to the Environmental Protection Agency for certification of heavy-duty diesel engines emitting 0.2g of NOx, as well as disclosures related to the circumstances of Ustian's departure from Navistar in August 2012. This information was not publicly disclosed until September 2, 2015, when Navistar filed its 2015 3Q Form 10-Q. The failure by Defendants to amend the 2015 Proxy and disclose that Ustian had received Wells Notices and that the SEC was considering an enforcement action (and the circumstances underlying that enforcement

3

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

action) rendered it materially false and misleading. The failure to make this disclosure as to Ustian clearly calls into question his election as a Company director. Further, it also calls into question the election of the other Board members, because their nomination was approved by Defendants Hassett, Ponder and Bibb, the same directors who were responsible for issuing the materially false and misleading 2015 Proxy Statement concealing Ustian's receipt of the Wells Notices. Further, there was only partial disclosure that the new Board nominees, Bowman, McKee, Schul, and Ustian, had received equity in the Company prior to being nominated for the Board as a result of transactions that were notoriously *ultra vires* due to the on-going dispute with Spirit Bear Limited ("Spirit Bear" or "SBL"). For example, the 2015 Proxy failed to disclose that McKee received warrants in exchange for becoming a member of the Company's Advisory Board on December 31, 2013, and additional warrants on April 29, 2015.

6.      As a result of the misconduct described herein, the current members of Cool Technologies' Board of Directors who are named Defendants herein are antagonistic to this lawsuit such that making a demand on the Board would be futile. Defendants Hassett, Ponder and  Bibb are both officers and directors of the Company and each faces a substantial likelihood of non-exculpated liability for their breaches of fiduciary duty and violations of the federal securities laws, thus disabling them in their capacity as directors from impartially considering the subject matter of this lawsuit. The Company concedes in its public filings that defendants Hassett, Ponder and Bibb are not independent in their roles as directors of Cool Technologies.

7.      The remaining members of the Board of Directors, Bowman, McKee, Schul and Ustian, who were elected as directors on August 19, 2015, pursuant to the materially false and misleading 2015 Proxy Statement, all received and benefitted from a series of *ultra vires* transactions, all of which are at issue in this action: (i) Schul and McKee received warrants on December 31, 2013 without requisite Board approval; (ii) Bowman received warrants on March 14, 2014 without requisite Board approval; (iii) Ustian received warrants on September 10, 2014 without requisite Board approval; and (iv) McKee received additional warrants on April 29, 2015, without requisite Board Approval. Making a demand on this Board is futile and directors

4

Bowman, McKee, Schul and Ustian's receipt of equity in *ultra vires* transactions also infects their independence in connection with the proposed settlement in *Spirit Bear Limited v. Hassett, et al.,* Case no. 2:13-cv-01548-JAD-GWF (D. Nev.).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action because the claims asserted herein arise in part under § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Regulation 14a-9 promulgated thereunder by the SEC. Jurisdiction is therefore proper under 28 U.S.C. § 1331, because Plaintiff's claims arise under the Constitution, laws, or treaties of the United States. Supplemental jurisdiction over Plaintiff's state-law claims is conferred by 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation incorporated in this District, or is an individual who is currently a management person in Cool Technologies within the meaning of Nev. Rev. Stat. § 78.160.

10.    Venue is proper within this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial portion of the transactions and wrongs complained of herein occurred within this District, or alternatively, pursuant to 28 U.S.C. § 1391(b)(3), since the defendants are all subject to the Court's personal jurisdiction with respect to the instant action.

## PARTIES

11.    Plaintiff Peak Finance, LLC ("Peak" or "Plaintiff") is currently and has continuously been a stockholder of Cool Technologies since June 18, 2013. Peak is a Florida limited liability corporation located in Delray Beach, Florida 33484.

12.    Nominal Defendant Cool Technologies is incorporated under the laws of the State of Nevada and maintains its principal place of business at 8875 Hidden River Parkway, Suite 300, Tampa, Florida 33637. According to the Company's SEC filings, Cool Technologies develops and intends to commercialize dispersion technologies in various product platforms, and has developed and intends to commercialize an electric load assist technology

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

around which the Company has designed a vehicle retrofit system.   Cool Technologies' technologies are divided into three distinct but complementary categories: heat dispersion technology, mobile electric power, and electric load assist.

13.    Defendant Hassett is a co-founder of Cool Technologies and has been the Chairman of Cool Technologies' Board of Directors since its inception and Chief Executive Officer ("CEO") since April 5, 2012.   Upon information and belief, Hassett is a citizen of California.

14.    Defendant Ponder has served as President of Cool Technologies from October 20, 2011 until April 5, 2012, Secretary from October 20, 2011 until November 11, 2011, and Treasurer of the Company since October 20, 2011.  On April 5, 2012, Ponder was appointed Chief Financial Officer ("CFO") of Cool Technologies and Vice Chairman of the Board of Directors. Upon information and belief, Ponder is a citizen of Florida.

15.    Defendant Bibb has been a director of the Company since April 15, 2011 and was appointed Secretary of the Company on November 11, 2011 and Vice President of Cool Technologies on April 5, 2012. Upon information and belief, Bibb is a citizen of Florida.

16.    Defendant Theodore Banzhaf ("Banzhaf") has been President of the Company since April 5, 2012.  Upon information and belief, Banzhaf is a citizen of Oklahoma.

17.    Defendant Mark Hodowanec ("Hodowanec") has been the Chief Technology Officer of the Company since February 14, 2014. Upon information and belief, Hodowanec is a citizen of Pennsylvania.

18.    Defendants Hassett, Bibb, and Ponder are sometimes collectively referred to as the "Current Director Defendants."

19.    Defendants Hassett, Bibb, Ponder, Banzhaf, and Hodowanec are sometimes collectively referred to herein as  the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

20.     By reason of their positions as officers, directors and/or fiduciaries of Cool Technologies and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Cool Technologies and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cool Technologies and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

21.     Each director and officer of the Company owes to Cool Technologies and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

22.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cool Technologies, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

23.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Cool Technologies were required to, among other things:

       a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

       b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

24.     Moreover, Cool Technologies maintains a Code of Ethics (hereinafter the "Code"), which applies to the Company's employees, officers and directors.  The Code states in relevant part:

**ETHICAL BEHAVIOR**

The Company is committed to creating a work environment and a business culture grounded in ethical behavior in every respect. The Company is committed to (i) fostering an environment of honesty and fairness, (ii) providing a safe and healthy environment free from the fear of retribution, and (iii) respecting the dignity due everyone. **The Company is committed to pursuing sound growth and earnings objectives and to exercising prudence in the use of its assets and resources.** The Company is committed to fair competition and the sense of responsibility required of a good customer and service provider. (Emphasis added).

***

**AVOID CONFLICTS OF INTEREST**

Employees have an obligation to give their complete loyalty to the best interests of the Company. They should avoid any action that may involve, or may appear to involve, a conflict of interest with the Company. A "conflict of interest" exists when a person's private interests interfere in any way with the interests of the Company.

***

If a potential conflict of interest exists, it must be reported in writing to the Company's Chief Executive Officer or the Chief Financial Officer for approval. **Potential conflicts of interests involving executive officers or directors must be reported to the Audit Committee for approval.** (Emphasis added).

***

**CORPORATE OPPORTUNITY**

Employees should not (i) take any business, commercial or other opportunities for themselves that are discovered in performing their job with the Company and/or through the use of Company property, information or position; (ii) **use Company property, information, or position for personal gain**; or (iii) directly compete

8

with the Company. Employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. (Emphasis added).

\*\*\*

### MAINTAIN THE INTEGRITY OF CONSULTANTS, AGENTS AND REPRESENTATIVES

Business integrity is a key standard for the selection and retention of consultants, agents, and representatives (collectively, "Third Parties"). Third Parties should be informed that the Company conducts business with high ethical standards, and that it expects the Third Parties to conduct themselves in a similar manner when working on behalf of the Company. **When deemed appropriate or required, Third Parties should be provided with a copy of the Company's Code of Ethics and Business Conduct, and required to certify that they will work with or on behalf of the Company in accordance with its provisions.** (Emphasis added).

\*\*\*

### OBTAIN AND USE COMPANY ASSETS WISELY

Proper use of Company property, information, resources, material, facilities and equipment is your responsibility. **Use and maintain these assets with care and respect, guarding against waste and abuse**, and never borrow or remove Company property without management's permission. Company assets must be returned upon termination of employment. (Emphasis added).

25. The Current Director Defendants breached their duties of loyalty and good faith and violated the Company's Code of Ethics by allowing the Individual Defendants to cause or by themselves causing the Company to enter into numerous transactions without obtaining the requisite authorization from the Company's Board of Directors, including the issuance of debt and/or equity to pay for services and raise funds purportedly for the benefit of the Company and then using a substantial amount of such funds to pay or accrue excessive and unauthorized compensation on behalf of themselves and the other Individual Defendants. At the same time the Current Director Defendants used a substantial portion of the capital raised on behalf of the Company through illegally issued equity to improperly and without proper authorization reward themselves and the other Individual Defendants with excessive compensation, the Company had

failed to generate any revenues whatsoever from 2012 to date and received a "going concern" audit opinion for at fiscal years 2013 and 2014. During fiscal years 2013 and 2014, and the first two quarters of fiscal year 2015, the Company has suffered net losses of approximately $3.0 million (FY2013), $23.6 million (FY2014), $1.3 million (1QFY2015) and $3.0 million (2QFY2015). The unauthorized issuance of equity and/or debt for services rendered and raising of capital has caused a substantial dilution of existing shareholder ownership stakes, including Plaintiff's. Moreover, the Company does not have an Audit Committee to review potential conflicts of interest involving its executive officers or directors as conceded in Cool Technologies' 2013-2015 Proxy Statements.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Cool Technologies was incorporated on July 22, 2002 in the State of Nevada under the name Bibb Corporation ("Bibb").  On September 3, 2010, the Company changed its name to Z3 Enterprises, Inc. ("Z3") and on April 5, 2012, to HPEV, Inc. ("HPEV"), and on August 19, 2015, to Cool Technologies, Inc.

27.     Bibb began its development stage in July 2002. Since inception, Bibb focused primarily on research and development activities, organizing the company, finding and negotiating with vendors, raising capital and laying the groundwork to take the Company public.

28.     The Company has a lengthy history of failed business models.  The original planned principal operations were to produce fully integrated multi-media products targeting the marginally literate. That failed and the Company then changed its name to Z3, shifting its focus to health and wellness books, educational, entertainment and reality show programming, feature films and special event marketing as well as other entertainment projects.

29.     On March 29, 2011, Z3 entered into a share exchange agreement (which was amended on June 14, 2011) with HPEV, Inc. a Delaware corporation ("the Share Exchange Agreement") to acquire 100 shares, constituting all of the issued and outstanding shares of HPEV, Inc. in consideration for the issuance of 22,000,000 shares of common stock. Upon

10

closing of the share exchange on April 15, 2011, HPEV, Inc. became Z3's wholly owned subsidiary. There was a change of control of Z3 on April 15, 2011, as a result of the issuance of 21,880,000 shares of Z3's common stock to the original shareholders of HPEV, Inc. pursuant to the terms of the Share Exchange Agreement. An additional 120,000 shares were issued during the fourth quarter of 2011 which completed the issuance of 22,000,000 shares of common stock under the terms of the amended Share Exchange Agreement. Z3 officially changed its name to HPEV, Inc. on April 12, 2012.

30.     According to its public filings, the Company has developed and intends to commercialize dispersion technologies in various product platforms, and has developed and intends to commercialize an electric load assist technology around which it has designed a vehicle retrofit system. In preparation, the Company has applied for trademarks for one of its technologies and its acronym. The Company currently has two trademarks in the application process: HPEV and TEHPC.  The Company believes that its proprietary technologies, including its patent portfolio and trade secrets, can help increase the efficiency and affect manufacturing cost structure in several large industries beginning with motor/generator and fleet vehicles.

31.     The markets for products utilizing the Company's technology include consumer, industrial and military markets, both in the U.S. and worldwide. The Company's initial target markets include those involved in moving materials and moving people, such as: (i) motors/generators; (ii) mobile auxiliary power; (iii) compressors; (iv) turbines (wind, micro); (v) bearings; (vi) electric vehicles: rail, off-highway, mining, delivery, refuse; (vii) brakes/rotors/calipers; (viii) pumps/fans; (ix) passenger vehicles: auto, bus, train, aircraft; (x) commercial vehicles: SUV, light truck, tram, bucket truck; (xi) military: boats, Humvee, truck, aircraft; and (xii) marine: boats ranging in size from 30 feet to 120 feet and beyond.  The Company's technologies are divided into three distinct but complimentary categories: heat dispersion technology, mobile electric power and electric load assist.

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

**The Spirit Bear Transaction**

32.     On December 14, 2012 ("Closing Date"), Cool Technologies entered into a Securities Purchase Agreement ("SPA") with Spirit Bear Limited ("Spirit Bear"). Pursuant to the SPA,  Cool Technologies sold to Spirit Bear (i) 200 shares of Company's Series A Convertible Preferred Stock, $.001 per share ("Preferred Stock") and (ii) warrants to purchase (the "Warrants") (a) 2,000,000 shares of the Company's common stock at an exercise price of $.35 per share (subject to adjustment as provided in the warrant); (b) 2,000,000 shares of the Company's common stock at an exercise price of $.50 per share (subject to adjustment as provided in the warrant); (c) 2,000,000 shares of the Company's common stock at an exercise of $.75 per share (subject to adjustment as provided in the warrant) (collectively, the "Warrant Shares"). The purchase price for sale of the Preferred Stock and Warrants was $500,000, of which $313,777.62 was paid in cash and $186,222.38 was paid by cancelation of $186,222.38 in outstanding indebtedness held by Spirit Bear.

33.     Each share of the Preferred Stock was convertible into 20,000 shares of Cool Technologies common stock and under certain circumstances the Preferred Stock was convertible into Senior Convertible Notes (the "Debentures").

34.     Cool Technologies and Spirit Bear also entered into a Registration Rights Agreement, dated December 14, 2012 (the "Registration Rights Agreement"). Pursuant to the Registration Rights Agreement, the Company was required to file a registration statement to register the shares issuable upon conversion of the Preferred Stock and the Debentures and the shares issuable upon the exercise of the Warrants. If the Registration Statement was not filed within thirty days of the Closing Date, then the number of Warrant Shares would be increased by 500,000 to 6,500,000. If the SEC had not declared the Registration Statement effective within 120 days of the Closing Date (the "Effectiveness Deadline"), then the Company was required to pay to each holder of Preferred Stock an amount in cash per Preferred Stock held equal to the product of (i) $5,000.00 multiplied by (ii) the product of (A) .02 multiplied by (B) the number of

months after the Effectiveness Deadline that the Registration Statement is not declared effective by the SEC.

35.     Additionally, the SPA set forth certain conditions that the Company and Spirit Bear had agreed to in connection with the purchase of the Preferred Stock and the Warrants. Section 6(xiii) stated the following:

> Stockholders of the Company shall have agreed in writing satisfactory to Purchaser (1) to nominate to serve as independent directors individuals designated in writing by Purchaser (the "**Spirit Bear Designees**") in such number as shall be equal to the number of current directors; (2) to call a special meeting of the shareholders of the Company for the purpose of ratifying the nomination of the Spirit Bear Designees; (3) as applicable, to vote its respective shares in the affirmative for the election of the Spirit Bear Designees to the Board of Directors; and (4) to take any and all such steps as shall be required to ensure that, during the period of three (3) years beginning on the Closing Date (or until such date as Purchaser shall cease to be an affiliate of the Company, should such date occur earlier than the third anniversary of the Closing Date) the Company's Board of Directors shall, irrespective of the number of members, at all times be composed of an even number of members of which at least Fifty Percent (50.00%) shall be Spirit Bear Designees.

36.     Further, Section 6(xiv) stated:

> The Bylaws or charter of the Company shall be amended to the satisfaction of the Purchaser to provide that the Company's Board of Directors shall, irrespective of the number of members, at all times be composed of an even number of members of which at least Fifty Percent (50.00%) shall be individuals designated by Spirit Bear and who shall be deemed Independent Directors during the period of three (3) years beginning on the Closing Date (or until such date as Purchaser shall cease to be an affiliate of the Company, should such date occur earlier than the third anniversary of the Closing Date).

37.     In other words, on or before the Closing Date of the transaction, the Company agreed that: (i) its Board of Directors would, at all times, be composed of an even number of directors of which at least 50% would be Spirit Bear Designees; and (ii) that the Company would amend its Bylaws or charter to memorialize the foregoing changes to the Board.

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

38.     Further, the SPA contained a provision providing anti-dilution protection to Spirit Bear.  Section 7 of the SPA, entitled SUBSEQUENT SALE OF SHARES BELOW PURCHASE PRICE, stated the following, in relevant part:

> For a period of one (1) year from the Closing Date, in the event that the Company issues or sells any shares of common stock for a price ("**Base Price**") less than $0.22 per share, or issues or sells any Common Stock Equivalent (defined below) convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, common stock for less than payment of the Base Price (any such sale or issuance of common stock or Common Stock Equivalents being referred to herein as a "**Dilutive Issuance**"), then the Company shall promptly issue additional shares of common stock to Purchaser, for no additional consideration, in an amount sufficient that the total purchase price paid by Purchaser for all Preferred Shares and Warrants purchased by such Purchaser at the Closing and held of record by such Purchaser at the time of the Dilutive Issuance, when divided by the sum of (i) the product of (A) 20,000 and (B) the number of such Preferred Shares so held plus (ii) the total number of additional shares of common stock to be issued to Purchaser under this Section as a result of the Dilutive Issuance, will equal the Base Price (such adjustment, a "**Dilution Adjustment**"). Such Dilution Adjustment shall be made successively whenever a Dilutive Issuance is made within the one (1) year period. Notwithstanding the foregoing, this Section shall not apply in respect of an Exempt Issuance (defined below).

39.     On February 6, 2013, the Company received a letter from Spirit Bear claiming that the Company was in default of the SPA. According to Spirit Bear, the Company had not acted promptly to make 50% of the Company's Board Spirit Bear Designees. In addition, Spirit Bear stated that the Company had not amended its bylaws with respect to Special Meetings and Meeting Adjournments nor had it provided a certified copy of its Articles of Incorporation within 10 days of the closing of the SPA.

**The February 20, 2013 Resolutions**

40.     In response to Spirit Bear's letter, on February 20, 2013, the Current Director Defendants adopted a number of Board resolutions (the "February 20, 2013 Resolutions"), which stated the following: (i) pursuant to the SPA, the Board of Directors appointed Jay A. Palmer ("Palmer") and Carrie Dwyer ("Dwyer"), two Spirit Bear Designees, to the Board of Directors; and (ii) pursuant to the SPA, the Company agreed to amend Section 3 of Article II of the Bylaws

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

which shall reduce the percentage of shareholders who may call a special meeting of the Board of Directors from 25% to 10% of all shareholders entitled to cast votes and Section 6 of Article II of the Bylaws shall reduce the period of adjournment between shareholders' meetings, for which notice is given regarding the subsequent meeting as in the case of an original meeting, from more than 45 days to more than 10 days.  The February 20, 2013 Resolutions were memorialized in a document entitled "*Unanimous Written Consent of the Directors of HPEV Inc., A Nevada Corporation.*"

41.     The February 20, 2013 Resolutions also contained the following provision which authorized management to solicit investment in the Company of up to $3.2 million:

**APPROVAL OF CAPITAL RAISE**

**WHEREAS**, the Board has determined that it is in the best interests of the Corporation and its shareholders to provide capital to implement the Corporations business plan;

**WHEREAS**, the officers of the Corporation have analyzed the expected financial needs of the company for the next year and beyond; calculated the expenses to be incurred, the payments to consultants and the salaries to be paid; and created estimates regarding the generation of revenues, the payment of debts and the point at which the company becomes self-sustaining;

**WHEREAS**, additional funding is needed to enable the Corporation to continue to implement the business plan; and

**WHEREAS**, the Chief Executive Officer and the President have previously made a presentation to an accredited investor in California.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors hereby authorizes the Chief Executive Officer and the President to continue negotiating and finalize the specific terms of the investment of up to $3.2 million through the issuance of equity or debt as long as existing obligations and agreements are not violated; and be it

**RESOLVED FURTHER** that any officer of the Corporation, acting alone, be and hereby is authorized, empowered and directed, for and on behalf of the Corporation, to negotiate, deliver and perform the agreement with the investor, including the execution of an agreement with the aforementioned investor…

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

42.     Neither of the two Spirit Bear director appointees were signatories to the February 20, 2013 Resolutions, nor were requested to be signatories to the February 20, 2013 Resolutions.

43.     On March 6, 2013, the Cool Technologies Board of Directors held a meeting. Pursuant to the meeting minutes, Defendants Hassett, Ponder, Bibb, and Banzhaf were in attendance, as well as the two Spirit Bear Designees, Palmer and Dwyer.

44.     During the meeting, the Board, among other things: (i) unanimously elected Donica Holt ("Holt"), the third Spirit Bear Designee, to serve on Cool Technologies' Board of Directors;[2] (ii) moved to increase the total number of Board members to six; and (iii) agreed that any type of funding the Company gets will be authorized by the Board.

45.     Despite the foregoing resolutions which provided that any type of funding the Company received had to be authorized by the Cool Technologies Board, the Current Director Defendants, in breach of their fiduciary duties, continued to issue Cool Technologies equity or debt in exchange for additional funding without the proper authorization of the Company's Board of Directors, including the Spirit Bear Directors.

**The Spirit Bear Litigation**

46.     On April 12, 2013, the Company and Spirit Bear reached agreement regarding the settlement of allegations that the Company did not perform certain obligations pursuant to the SPA with Spirit Bear, and with respect to certain actions taken by the Company with respect to providing compensation to its management (the "April 12, 2013 Settlement Agreement"). Spirit Bear agreed to discharge the Company from all claims Spirit Bear may have had as well as to forgo all actions of any kind related to those claims which existed on or prior to April 12, 2013. Both parties also agreed that the signing of the agreement did not constitute an admission of wrongdoing or liability.

---

[2] Directors Palmer, Dwyer and Holt are hereinafter sometimes collectively referred to as the "Spirit Bear Directors."

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

**The Spirit Bear/Palmer Demand for Documents and Demand to Cease and Desist**

47.     On August 16, 2013, the Company received a Demand for Documents and Demand to Cease and Desist from Nevada counsel representing Spirit Bear and Palmer, one of the Spirit Bear Directors (the "Demand"). The Demand requested that the Company provide Palmer all books and records regarding all equity or debt issued by the Company since January 1, 2013, and an accounting of all compensation disbursed to Company executive officers since such date. Spirit Bear claimed that management of the Company issued equity or debt without authority, and established compensation levels for the Company's officers and paid salaries to its officers in violation of its agreements with Spirit Bear and the Company's public filings.

48.     On September 16, 2013, Palmer filed an emergency petition for a writ ordering the Company to allow him to inspect the books and records of the Company. On October 1, 2013 the Court awarded Palmer the right to inspect the books and records regarding (a) all equity or debt issued by Company management since January 1, 2013, and (b) all compensation disbursed to the Company's executive officers since January 1, 2013, with an accounting of disbursements.

**The Cool Technologies Complaint and Spirit Bear Derivative Counter & Third Party Claims and Direct Counter Claims**

49.     On August 27, 2013, the Company filed a complaint in the United States District Court, District of Nevada, against Spirit Bear and the Spirit Bear Directors (Case 2:13-cv-01548) (the "Spirit Bear Litigation") seeking a judicial declaration that the Board resolutions from February 2013 authorizing the compensation of management and the issuance of debt and equity were valid and that defendants Spirit Bear and the Spirit Bear Directors were bound by the April 12, 2013 Settlement Agreement.[3]

---

[3] In addition Spirit Bear and Cool Technologies also filed the following direct lawsuits against one another (collectively the "Lawsuits"): (i) *HPEV, Inc. v. Spirit Bear Ltd., Palmer and Olins* 14-cv-9175 (PGG) (S.D.N.Y.); (ii) *HPEV, Inc. v. Spirit Bear Ltd.,* 13-cv-01548 (JAD)(GWF) (D. Nev.),  (iii) *Hassett v. Palmer, et al.*, Index No. 14-004473 (NY Sup. Ct. Nassau Cnty.); (iv) *Manhattan Transfer Registrar Company v. HPEV, Inc. and Michael Kahn* 14-cv-6418 (ADS) (SIL) (E.D.N.Y.) and (v) *Palmer, et al. v. HPEV, Inc.* (Clark Cnty. Distr. Ct., NV, Case No. A-14-703641-B, Dept. XXV). *HPEV, Inc. v. Spirit Bear Limited* 13-cv-01548 (JAD)(GWF) (D. Nev.), also pled derivative claims and the term Lawsuits does not include the derivative claims

---

17

50.     On October 9, 2013, the Company filed a First Amended Complaint which dismissed, without prejudice, the Spirit Bear Directors from the Spirit Bear Litigation. On October 28, 2013, Spirit Bear filed its Answer to the Company's First Amended Complaint and asserted derivative and third party claims on behalf of Cool Technologies against the Individual Defendants ("Verified Derivative Counter & Third Party Claim").

51.     Spirit Bear's Verified Derivative Counter & Third Party Claim asserted that: (i) Cool Technologies' management altered documents and issued debt or equity without authority; (ii) Cool Technologies' management misled directors and forged directors' signatures on the Company's second amended Form 10-K filed with the SEC on May 21, 2013; and (iii) pursuant to the February 20, 2013 Resolution adopted by the Cool Technologies Board of Directors which, at that time, consisted of the Current Director Defendants, management took unauthorized and excessive compensation even after management stated that it had rescinded said compensation.

52.     In support of its Verified Derivative Counter & Third Party Claim, Spirit Bear referenced the "Approval of Capital Raise" provisions of the February 20, 2013 Resolution, which provided management with the authority and discretion to issue Cool Technologies equity or debt beyond negotiating and finalizing one specific investment with one specific investor located in California. After Palmer learned that management had improperly issued debt or equity beyond the one specific investment with one accredited California investor, he expressed his concerns to the Cool Technologies' Board and management.  In response, management furnished a second document entitled "*Unanimous Written Consent of the Directors of HPEV Inc., A Nevada Corporation*," which was virtually identical to the original document (including signatures), except that the Approval of Capital Raise provision was altered and the reference to "an accredited investor in California" was stricken and replaced with "accredited investors."

brought by SBL on behalf of the Company. Those derivative claims are referred to herein as the "Shareholder Derivative Claims."

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

53.    On October 15, 2013, the Company filed an Emergency Motion for Partial Summary Judgment on its claim for Declaratory Relief set forth in Cool Technologies' First Amended Complaint (the "Motion for Partial Summary Judgment") in an effort to streamline the litigation as delay could have a negative impact on the business, including meeting contractual milestones by December 14, 2013. In the Motion for Partial Summary Judgment, the Company sought a declaration that the resolutions were valid, the Company's capital raises were authorized and the April 12, 2013 Settlement Agreement was valid and enforceable.

54.    By Order filed August 5, 2014, the Court found that genuine issues of material fact exist on the issues raised in the Motion for Partial Summary Judgment and, on that basis, denied the motion.  Notably, the Court found that Spirit Bear had presented evidence that created the inference that the original document entitled "*Unanimous Written Consent of the Directors of HPEV Inc., A Nevada Corporation*" had been altered and that the term "an accredited investor in California" had been subsequently replaced with the term "accredited investors" without making any further changes to the document.

55.    On April 7, 2014, while the Motion for Partial Summary Judgment was still pending, Spirit Bear filed an Emergency Motion for a Preliminary Injunction seeking an order from the Court requiring the Company to maintain an effective registration statement with the SEC applicable to the Cool Technologies securities that Spirit Bear previously acquired. The Company opposed the Motion for Preliminary Injunction. By Order dated August 5, 2014, the Court denied Spirit Bear's Motion for Preliminary Injunction.

56.    Also, on April 7, 2014, the Third Party Defendants, except defendant Banzhaf who had not yet been served, filed a Motion to Dismiss Spirit Bear's Verified Derivative Counter & Third Party Claim for, among other things, lack of personal jurisdiction and failure to state a claim upon which relief may be granted (the "Motion to Dismiss").

57.    Spirit Bear filed its opposition to the Motion to Dismiss on April 24, 2014 and on May 5, 2014 moved the court for Leave to Amend its Answer to First Amended Complaint, Verified Derivative Counter & Third Party Claim. On May 19, 2014, Defendant Banzhaf joined

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

in the Motion to Dismiss. By Order dated June 26, 2014, the Court granted Spirit Bear's Motion to Amend its Answer, Verified Derivative Counter & Third Party Claim, which it filed on June 27, 2015, adding a direct counter claim against Cool Technologies (the "Direct Counter Claim"). The Court stated that it would "treat Cool Technologies' motion [to dismiss] as a challenge to the newly amended third-party complaint and issue a separate order on that motion." By Order dated November 21, 2014, the Court granted the Company's Motion to Dismiss Spirit Bear's derivative and third party counter claim as to Defendant Mark Hodowanec and denied it with respect to the all other Defendants.  In so ordering, the Court found, *inter alia*, that "Spirit Bear has pled sufficient facts to satisfy its demand obligations and avoid dismissal of their claims under the business judgment rule."

58.     Spirit Bear's Direct Counter Claim asserted various causes of action against the Company including: (i) Breach of the SPA, (ii) Breach of the Implied Covenant of Good Faith and Fair Dealing with respect to the SPA, (iii) Breach of the Registration Rights Agreement, (iv) Breach of the Implied Covenant of Good Faith and Fair Dealing with respect to the Registration Rights Agreement, (v) Conversion, and (vi) Declaratory Relief seeking a declaration that (a) Spirit Bear's three designees to the Board (i.e. Palmer, Dwyer and Holt) remain holdover directors of the Company until their successors are elected, (b) every action taken by the Board since the annual meeting was not valid, (c) the Lincoln Park Registration Statement was not valid, (d) every action to be taken by the Board in the future is invalid, and (e) the amendment to Cool Technologies' Bylaws from plurality voting to majority voting and the election of directors that occurred at the annual meeting was improper and invalid. The Company filed a Motion to Dismiss Spirit Bear's Direct Counter Claim on July 17, 2014. By Order dated November 26, 2014, the Court denied the Company's Motion to Dismiss the Direct Counter Claim.

59.     On July 8, 2014, Spirit Bear filed a Motion for Partial Summary Judgment regarding the composition of the Company's Board of Directors. The Motion sought an Order from the Court declaring that Cool Technologies' Board is and has been comprised of six directors since March 6, 2013, which included the Current Director Defendants and the Spirit

1  Bear Directors. The Company opposed this Motion. By Order dated November 26, 2014, the

2  Court granted Spirit Bear's Motion for Partial Summary Judgment, in part, by granting a partial

3  declaratory judgment in favor of Spirit Bear declaring that the Spirit Bear Directors remained

4  holdover directors on the Company's board despite the January 2014 director election wherein

5  they failed to receive a majority vote of the shareholders.

6  **The Settlement Agreements**

7      60.    On January 28, 2015, SBL and the Company entered into a Settlement and

8  Release Agreement (the "January 28, 2015 SRA") to settle the Lawsuits and the Shareholder

9  Derivative Claims. See January 28, 2015 SRA at 1 ("WHEREAS, the Parties wish to enter this

10  [January 28, 2015 SRA] to resolve with finality all issues related to and arising directly and

11  indirectly from said Purchase Agreement as well as any disputes, claims and allegations of

12  whatever nature among the Parties and their respective affiliates, specifically including but not

13  limited to the Lawsuits and the Shareholder Derivative Claims …"). Pursuant to Section 1.1-4 of

14  the January 28, 2015 SRA, if ... $4,134,618.00 (the "Purchase Funds") is "not provided to

15  escrow by HPEV within the specified time frame, the [January 28, 2015] SRA, [including the

16  Derivative Action Settlement Agreement (the "DASA")] shall terminate."[4]  As indicated, the

17  DASA was contingent on the payment of over $4 million into escrow by the Company for the

18  sole benefit of SBL and not any of the Company's other shareholders.

19      61.    Pursuant to the DASA, SBL agreed to dismiss the Shareholder Derivative Claims

20  with prejudice in exchange for the Company (1) forming the Independent Directors Committee

21  ("IDC"), consisting of McKee, Schul and Bowman); and (2) having the IDC review the merits of

22  the Shareholder Derivative Claim. (Preliminary Approval Motion and Order ¶ 9). The DASA

23  further provided that, in the exercise of their sound business judgment, the IDC shall determine

24  the appropriate corporate response of the Company to the Shareholder Derivative Claims.

25

26  [4] *See, HPEV, Inc. v. Spirit Bear Ltd.,* Case No. 2:13-cv-01548-JAD-GWF (D. Nev.), Stipulation

27  and [Proposed] Order Regarding Settlement and Dismissal of Derivative Claims at ¶ 11[Dkt 166] (referred to herein as the "Preliminary Approval Motion and Order").

28
**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

1    (DASA ¶ 3). The DASA also provided a rather unusual release by SBL, which was intended "to

2    prevent [SBL] from being deemed a proper party to refile a new derivative action based upon the

3    actions of the IDC in the event [SBL] disagrees with the actions approved by the IDC in

4    handling the allegations set forth in the [Settlement Derivative Claims] and a court should

5    construe this language accordingly." (Id at ¶ 5).  This unusual release raises an issue as to SBL's

6    adequacy because it is giving up its individual right to challenge the IDC's refusal to pursue the

7    Shareholder Derivative Claims even if such refusal is wrongful.

8        62.    Further, SBL stated that pursuant to ¶ 1.1-4 of the January 28, 2015 SRA, "SBL

9    intends to sell one hundred percent of all shares of common and preferred stock it owns in HPEV

10   to HPEV or HPEV's assignee or designee." (Preliminary Approval Motion and Order ¶ 10).

11   SBL's relinquishment of its right to challenge the decision of the IDC, despite having an absolute

12   legal right to do so, coupled with its intention to sell all of its equity stake in the Company

13   renders it an inadequate plaintiff because it has no motive to protect the Company and

14   shareholder rights.

15       63.    On February 20, 2015, the SBL and the Company submitted the Preliminary

16   Approval Motion and Order to the Court requesting preliminary approval of the DASA. In the

17   Preliminary Approval Motion and Order, the Parties correctly noted that "court approval of

18   settlements under Rule 23.1 discourage private settlements under which the plaintiff-stockholder

19   and his attorney profit to the exclusion of the corporation and nonparty stockholders." (*Id*. at ¶

20   15). Yet, that is precisely what occurred here by the Company agreeing to pay SBL over $4

21   million and the Parties' agreement that if the monies were not payed into escrow for the benefit

22   of SBL, then the DASA would be terminated. (January 28, 2015 SRA ¶ 1.1-4). Tying the DASA

23   to personally receiving a benefit of over $4 million violates Rule 23.1's mandate that the

24   plaintiff-shareholder not receive a personal benefit when settling derivative claims. The Court

25   preliminarily approved the DASA, approved a Notice to Shareholders, and set April 30, 2015 as

26   the deadline for filing any objections to the DASA. There was no date scheduled for the fairness

27   hearing, or any briefing schedule put in place in order to permit potential objectors to review the

28

details of SBL's reasons for entering into the DASA and basis for claiming that the DASA was fair and reasonable and in the best interests of the Company and its shareholders.

64.     At some point after the proposed settlement of the Lawsuits and the Shareholder Derivative Claims was reached pursuant to the January 28, 2015 SRA (and DASA), a dispute arose between SBL and the Company regarding the timing of the payment to SBL.  As a consequence, the Company and SBL entered into a revised SRA, effective, May 1, 2015 (the "May 1, 2015 SRA"), one day after the objection period pursuant to the DASA ended.

65.     Pursuant to the terms of the May 1, 2015 SRA, SBL and the Company agreed to resolve with finality all issues related directly to and arising from the Purchase Agreement, amongst other things, "including but not limited to the Lawsuits and the Shareholder Derivative Claims."[5]  Again, only SBL and its assignees benefitted from the settlement of the Lawsuits. No other shareholders benefitted from the settlements of the Lawsuits.

66.     The May 1, 2015 SRA called for the Company to file a registration statement on Form S-1 covering an aggregate of over 14 million shares of Company common stock, preferred stock and common stock warrants on behalf of SBL and its assignees no later than fifteen (15) business days of May 1, 2015 (the "Registration Statement"). (Exhibit 4, May 1, 2015 SRA ¶ 1.3-1).[6] Upon the effective date of the Registration Statement (the "Registration Date"), the Parties agreed to mutual releases with SBL releasing the Company from any and all claims including "any and all derivative claims and the extent permissible by law the Shareholder Derivative Claims …" (May 1, 2015 SRA ¶ 2.3-2).

67.     Again, as was the case with the January 28, 2015 SRA, the May 1, 2015 SRA tied the DASA to the relief the Company was to individually receive pursuant to the settlement of the Lawsuits and prevented SBL from filing a wrongful refusal derivative suit if it was not satisfied with the decision of the IDC. See, May 1, 2015 SRA ¶ 2.4 ("Upon the Registration Date, HPEV and [SBL] … agree to dismiss … with prejudice the Lawsuits (including to the extent

---

[5] *See,* May 1, 2015 SRA at p.1.
[6] The term "Shares" as used in ¶ 1.3-1 is defined in ¶ 1.1-1.

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

permissible by law the Shareholder Derivative Claims …) …").[7] Indeed, the DASA specifically states that it is the intent of the Parties, through the May 1, 2015 SRA, to settle all actions and claims including but not limited to the Shareholder Derivative Claims.[8]

68.   Also as part of the May 1, 2015 SRA, SBL and its assignees were to deliver to SBL's counsel the 6,000,000 warrants in their possession. At the same time, the Company was to deliver to its counsel new warrants that were nearly identical to the outstanding warrants, except that the new warrants had an exercise price of $0.25 per share and an issue date of May 7, 2015. (May 1, 2015 SRA ¶ 1.2.1).[9] The 1,000,000 penalty warrants that were issued to SBL in 2012, relating to the parties bridge loan made prior to SBL's equity investment, were also reissued with an exercise price of $0.25. (Id. at p.1). No additional shares or warrants were issued as part of the May 1, 2015 SRA.

69.   SBL also agreed that the three SBL holdover directors would tender their written resignations from the Board of Directors of the Company within three (3) days following the May 1, 2015 SRA, which resignation shall state that it is effective as of the May 1, 2015 SRA. (May 1, 2015 SRA ¶ 2.1-1).[10] The resignations were to be held in escrow until the business day following the Company's filing the Registration Statement with the SEC. (Id.).[11]

---

[7] See, May 1, 2015 SRA, DASA Exhibit A ¶ 5 ("The intent of this provision is to prevent [SBL] from being deemed a proper party to refile a new derivative action based upon the actions of the IDC in the event [SBL] disagrees with the actions approved by the IDC in handling the allegations set forth in the [Shareholder Derivative Claims] …").

[8] See, Exhibit 4, May 1, 2015 SRA, DASA Exhibit A at p. 14 ("WHEREAS it is the intent of the parties through the Settlement and Release Agreement to which this Derivative Action Settlement is attached as Exhibit A [DASA] to settle all actions and claims by and among them including but not limited to the [Shareholder] Derivative [Claims].").

[9] The $0.25 exercise price for the warrants was substantially less than the Parties prior agreement with respect to the 6,000,000 warrants, which was: (i) 2,000,000 warrants with an exercise price of $0.35 per share; (ii) 2,000,000 warrants at an exercise price of $0.50 per share; and (iii) 2,000,000 warrants at an exercise price of $0.75 per share. Cool Technologies' Schedule 14A filed with the SEC on November 15, 2013 at p. 14.

[10] See, HPEV, Inc., v. Spirit Bear Ltd., Case No. 2:13-cv-01548-JAD-GWF, 2014 U.S. Dist. LEXIS 165958, at * 29-31 (D. Nev. Nov. 26, 2014) (granting summary judgment that the three SBL directors remained holdover directors of the Company under the bylaws and NRS 78.330(1)).

[11] In addition to SBL's and its assignees' rights to enforce the Company's obligation to file the

24

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

70.     On June 1, 2015, the Company and SBL amended the May 1, 2015 SRA (the "Amendment").[12] Pursuant to the Amendment, the SBL holdover directors' resignation letters were not to be delivered until the twenty-second (22nd) business day following the May 1, 2015 SRA.[13] The Company agreed to file the Registration Statement on Form S-1 covering an aggregate of over 14 million shares of common stock, preferred stock and warrants on behalf of SPB and its assignees no later than July 15, 2015. (Amendment ¶ 1.3-1). Within ten (10) business days of June 1, 2015, the parties agreed to dismiss the Lawsuits and to the extent permissible by law, the Shareholder Derivative Claims, without prejudice with the right to refile or reopen the Lawsuits if the Registration Date (i.e., the effective date of the Registration Statement") did not occur. This dismissal did not occur within ten (10) business days of June 1, 2015. Since the only outstanding issue was Cool Technologies' filing of a Registration Statement, which only purportedly affected the settlements of the Lawsuits and not the Shareholder Derivative Claims (and inured to the benefit of solely SBL), there was no just reason to delay setting the fairness hearing in connection with the Shareholder Derivative Claims given that the Preliminary Approval Motion and Order had been signed back in February 20, 2015, almost 4 months prior.

71.     On June 3, 2015, SBL holdover directors' resignations were delivered to the Company in accordance with the Amendment. On July 15, 2015, the Company filed the

---

Registration Statement by injunctive relief and/or specific performance without posting a bond, the Company also agreed to pay SBL and its assignees weekly, liquidated damages per day equal to the amount of shares owned by SBL and its assignees, multiplied by $0.02 for each day that such Registration Statement was not in effect. (May 1, 2015 SRA ¶ 1.2-3). Also, if the Company failed to deliver the shares in connection with a warrant exercise within five trading days of receipt of a conversion notice, the Company would also be required to weekly pay liquidated damages to the warrant holder equal to the amount of warrants exercised multiplied by $0.02 for each day that the Company failed to deliver such shares, unless the failure was a result of regulatory action or force majeure. (*Id.* at ¶ 1.2-4).

[12] *See,* Amendment.
[13] *See,* Amendment ¶ 2.1-1.

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

Registration Statement. (The Company's Form S-1). Still, no dismissal of the Lawsuits or the Shareholder Derivative Claims was forthcoming.

72.     On August 18, 2015, Peak Finance, the Proposed Intervenor, filed a verified shareholder derivative complaint in this Court (the "Peak Finance Complaint") on behalf of the Company against Hassett, Ponder, Bibb, Banzhaf and Hodowanec (collectively the "Individual Defendants").   The Peak Finance Complaint asserted claims for: (i) violations of §14(a) of the Exchange Act against Banzhaf, Hassett, Bibb and Ponder; (ii) unjust enrichment against the Individual Defendants; (iii) waste of corporate assets against the Individual Defendants; (iv) unjust enrichment against the Individual Defendants; and (v) gross mismanagement against the Individual Defendants. (the "Peak Finance Action"). Many of the claims set forth in the Peak Finance Complaint challenge the same transactions as *ultra vires* as did the Shareholder Derivative Claims brought by SBL and also included additional *ultra vires* transactions involving certain of the members of the IDC, infecting those members independence. Recognizing that now there was another shareholder challenging the same and similar compensation issues and transactions involving the issuance of equity without proper Board approval, the Company and SBL sprang into action.

73.     On August 28, 2015, the Parties filed a Stipulation and Order for Dismissal seeking a court order dismissing, without prejudice, the Lawsuits filed by the Company against SBL and those filed by SBL against the Company, excluding the Shareholder Derivative Claims ("Order of Dismissal"). On September 2, 2015, the Court issued an order granting the Order of Dismissal dated September 1, 2015, which dismissed the Lawsuits filed by the Company against Spirit Bear and those asserted by Spirit Bear against the Company.

74.     On September 4, 2015, just days after the Court signed the Order of Dismissal settling the Lawsuits (except as to the Shareholder Derivative Claims) and after SBL had received the benefit of the filing of the Registration Statement rendering the Lawsuits moot, the Company, Hassett, Ponder, Bibb and Banzhaf filed an Unopposed Motion to Set Fairness Hearing Re: Derivative Lawsuit Settlement (the "Fairness Hearing Motion"). The Fairness

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Hearing Motion sought the scheduling of a fairness hearing for the Court to consider giving final approval to the DASA and to approve Notice thereof.

75.     The Fairness Hearing Motion specifically provides that "Peak Finance will have the opportunity to argue its position at a fairness hearing duly noticed by the Court." *See* Fairness Hearing Motion at p. 10 ("To the extent this newly filed litigation raises any issues regarding the fairness of the DASA, Peak Finance, LLC will not be prejudiced in any way by the Court setting a fairness hearing.").   The Notice confirms this fact stating that "[i]n determining whether the settlement is fair to the corporation and before giving its final approval, the Court may consider any and all evidence and arguments that are raised by shareholders at the fairness hearing." (*See* Notice at p. 3; *see also* Notice at p. 2 ("This Notice is intended to advise you of (1) the terms of the proposed settlement and (2) your right to attend the fairness hearing and present evidence and arguments in favor of or in opposition to the settlement.")).

76.     On September 10, 2015, the Court issued an order granting the unopposed motion to set a final fairness hearing and approving the Notice. The Order further stated that a formal, final fairness hearing to consider the approval of the DASA as amended will take place on November 20, 2015.

**Going Concern**

77.     The Company received going concern opinions from its auditors for years ended December 31, 2013 and December 31, 2014.

78.     The 2013 Form 10-K filed with the SEC on April 2, 2014 stated that "The Company's ability to continue as a going concern is dependent upon its ability to generate future profitable operations and repay its liabilities arising from normal business operations when they come due.  At this time, the Company is no longer seeking additional sources of capital through the issuance of debt, equity, or joint venture agreements, but there can be no assurance the Company will be successful at accomplishing its objectives."

79.     Additionally, the 2013 Form 10-K stated "notwithstanding the going concern opinion of our independent public auditors, as of the filing date of this report, management

27

believes that it has adequate funding to ensure completion of the initial phases of its business plan, which is to license its thermal technologies and applications; to license or sell a mobile electric power system powered by the Company's proprietary gearing system; and to license its submersible motor dry pit technologies and/or to bring to market its technologies and applications through key distribution partners. The Company believes that it has sufficient funds for its planned operations in the next 12 months, including without limitation, funding the litigation it commenced against Spirit Bear Limited."

80.     Yet, despite the Company's statements that it was no longer seeking additional sources of capital, Defendant Banzhaf and the Current Director Defendants  improperly and aggressively approved and/or authorized an astounding number of transactions involving the issuance of  Cool Technologies' equity or debt, all of which were undertaken without Board authorization.

81.     The Company's 2014 Form 10-K filed with the SEC on March 31, 2015 (the "2014 Form 10-K"), repeated the going concern opinion. The Company reported that it had continued to incur losses and had not yet fully commenced operations, raising substantial doubt about its ability to continue as a going concern.  The 2014 Form 10-K also stated the following: "Our ability to continue as a going concern is dependent on our ability to generate revenue, achieve profitable operations and repay our obligations when they come due. These consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classification of liabilities that might result from this uncertainty. As of the filing date of this Annual Report on Form 10-K, *management is negotiating additional funding arrangements to support completion of the initial phases of our business plan*: to license its thermal technologies and applications, including submersible dry-pit applications; to license and sell mobile generation retrofit kits (our Ultimate Power Truck business) driven by our proprietary gearing system; and to license a plug-in hybrid conversion system for heavy duty trucks, tractor trailers and buses. There can be no

assurance, however, that we will be successful in accomplishing these objectives." (Emphasis added).

82.    The Company's 2015 2Q Form 10-Q filed with the SEC on August 12, 2015, indicated that the Company had already incurred an additional $3,113,778 in net losses and still had not generated any revenues. The 2015 2Q Form 10-Q stated:

> The accompanying condensed consolidated financial statements have been prepared assuming we will continue as a going concern. We have incurred net losses of $36,649,585 since inception and have not fully commenced operations, raising substantial doubt about our ability to continue as a going concern. Our ability to continue as a going concern is dependent on our ability to generate revenue, achieve profitable operations and repay our obligations as they come due.

83.    Thus, despite the Company commencing operations in 2011, the only thing that the Individual Defendants have been successful at is rewarding themselves with lavish compensation and bonuses and diluting shareholder ownership stakes.

**The Ultra Vires Transactions**

84.    Article III Section 1 of the Company's Bylaws states the following:

SECTION 1. POWERS. Subject to limitation of the Nevada Revised Statutes, the Articles of Incorporation, of these bylaws, and of actions required to be approved by the shareholders, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board. The Board may, as permitted by law, delegate the management of the day-to-day operation of the business of the corporation to a management company or other persons or officers of the corporation provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board. **Without prejudice to such general powers, it is hereby expressly declared that the Board shall have the following powers:**

a)    To select and remove all of the officers, agents and employees of the corporation, prescribe the powers and duties for them as may not be inconsistent with law, or with the Articles of Incorporation or by these bylaws, fix their compensation, and require from them, if necessary, security for faithful service.

b)    To conduct, manage, and control the affairs and business of the corporation and to make such rules and regulations therefore not

inconsistent with law, with the Articles of Incorporation or these bylaws, as they may deem best.

c)   To adopt, make and use a corporate seal, and to prescribe the forms of certificates of stock and to alter the form of such seal and such of certificates from time to time in their judgment they deem best.

**d)   To authorize the issuance of shares of stock of the corporation from time to time, upon such terms and for such consideration as may be lawful.**

**e)   To borrow money and incur indebtedness for the purposes of the corporation, and to cause to be executed and delivered therefore, in the corporate name, promissory notes, bonds, debentures, deeds of trust, mortgages,  pledges, hypothecation or other evidence of debt and securities there for.**

(Emphasis added).

85.    Board authorization can be accomplished two ways: (i) Actions taken at a meeting, and (ii) Actions taken without a meeting. Actions taken at a meeting requires a quorum to be present and that every act or decision requires a majority of that quorum to transact business. Article III of the Company's By-Laws provide:

SECTION 10. QUORUM. A majority of the authorized number of directors then in office constitutes a quorum of the Board for the transaction of business, except to adjourn as hereinafter provided. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board, unless a different number is required by law or by the Articles of Incorporation. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the number of directors required as noted above to constitute a quorum for such meeting.

86.    Actions taken without a meeting requires unanimous Board approval:

SECTION 15. ACTION WITHOUT MEETING. Any action required or permitted to be taken by the Board may be taken without a meeting if, before or after the action, all members of the Board shall individually or collectively consent in writing to such action. Such consent or consents shall have the same effect as a unanimous vote of the Board and shall be filed with the minutes of the proceedings of the Board.

87.     Throughout the Relevant Period, the Current Director Defendants, in breach of their fiduciary duties to  Cool Technologies, unilaterally entered into and/or approved or caused the Company to enter into and/or approve the following transactions, all of which were undertaken either without a quorum present when a meeting was held or without obtaining the necessary and requisite consent from all of the members of the Board when a meeting was not held (namely, the three Spirit Bear Directors, all of which failed to approve the following transactions):

88.     On July 1, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for $50,000. The warrants enable the investor to purchase, up to  January 3, 2016, an aggregate of 111,111 shares of common stock at an exercise  price of $0.66. The warrants were exercisable on a cashless basis. The Company  agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with  the SEC covering the securities.

89.     On July 1, 2013, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.44 per share in  consideration for $100,000. The warrants enabled the investor to purchase, up to  January 2, 2016, an aggregate of 222,222 shares of common stock at an exercise  price of $0.60. The warrants were exercisable on a cashless basis. The Company  agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with  the SEC covering the securities.

90.     On July 9, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for $50,000. The warrants enabled the investor to purchase, up to  January 16, 2016, an aggregate of 111,111 shares of common stock at an  exercise price of $0.69. The warrants were exercisable on a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

1  sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC

2  covering the securities.

3      91.     On July 10, 2013, an accredited investor purchased 225,000 shares of common

4  stock and warrants in a private offering at a purchase price of $0.44 per share in consideration for

5  $100,000. The warrants enabled the investor to purchase, up to January 11, 2016, an aggregate of

6  337,500 shares of common stock at an exercise price of $0.60. The warrants were exercisable on

7  a cashless basis. The Company agreed that within 45 days of the consummation of the offer and

8  sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC

9  covering the securities.

10     92.     On July 15, 2013, an accredited investor purchased 111,111 shares of common

11  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

12  $50,000. The warrants enabled the investor to purchase, up to January 16, 2016, an aggregate of

13  111,111 shares of common stock at an exercise price of $0.66. The warrants were exercisable on

14  a cashless basis. The Company agreed that within 45 days of the consummation of the offer and

15  sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC

16  covering the securities.

17     93.     On July 16, 2013, an accredited investor purchased 222,222 shares of common

18  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

19  $100,000. The warrants enabled the investor to purchase, up to January 15, 2016, an aggregate of

20  222,222 shares of common stock at an exercise price of $0.69. The warrants were exercisable on

21  a cashless basis. The Company agreed that within 45 days of the consummation of the offer and

22  sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC

23  covering the securities.

24     94.     On July 16, 2013, an accredited investor purchased 222,222 shares of common

25  stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

26  $100,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of

27  222,222 shares of common stock at an exercise price of $0.54. The warrants were exercisable on

28

a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and sale  of $1,000,000 of shares and warrants, it would file a Registration Statement with  the SEC covering the securities.

95.      On July 17, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for $50,000. The warrants enabled the investor to purchase, up to  January 18, 2016, an aggregate of 111,111 shares of common stock at an  exercise price of $0.59. The warrants were exercisable on a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and sale  of $1,000,000 of shares and warrants, it would file a Registration Statement with  the SEC covering the securities.

96.      On July 17, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for $50,000. The warrants enabled the investor to purchase, up to  January 24, 2016, an aggregate of 111,111 shares of common stock at an  exercise price of $0.54. The warrants were exercisable on a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and sale  of $1,000,000 of shares and warrants, it would file a Registration Statement with  the SEC covering the securities.

97.      On July 17, 2013, an accredited investor purchased 166,666 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for $75,000. The warrants enabled the investor to purchase, up to  January 24, 2016, an aggregate of 166,667 shares of common stock at an  exercise price of $0.54. The warrants were exercisable on a cashless basis. The  Company agreed that within 45 days of the consummation of the offer and sale  of $1,000,000 of shares and warrants, it would file a Registration Statement with  the SEC covering the securities.

98.      On July 19, 2013, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in  consideration for $25,000. The warrants enabled the investor to purchase, up to  January 24, 2016, an aggregate of

33

55,555 shares of common stock at an exercise price of $0.54. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

99.   On July 22, 2013, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of 55,555 shares of common stock at an exercise price of $0.54. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

100.   On July 22, 2013, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to January 24, 2016, an aggregate of 83,333 shares of common stock at an exercise price of $0.49. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

101.   On July 22, 2013, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to February 16, 2016, an aggregate of 55,555 shares of common stock at an exercise price of $0.56. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

102.   On July 25, 2013, an accredited investor purchased 388,889 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

$175,000. The warrants enabled the investor to purchase, up to  January 25, 2016, an aggregate of 388,889 shares of common stock at an  exercise price of $0.54. The warrants were exercisable on a cashless basis. The  Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement.

103.    On August 2, 2013, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45  per share in consideration for $50,000. The warrants enabled the investor to  purchase, up to February 6, 2016, an aggregate of 111,111 shares of common  stock at an exercise price of $0.56. The warrants were exercisable on a cashless  basis. The Company agreed that all investments made subsequent to  achievement of the $1,000,000  threshold  and  before  the  filing  of  the  Form  S-1  would  be  included  in  the Registration Statement.

104.    On August 12, 2013, the Company issued 166,667 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for $75,000 in funding. The investor also received warrants to purchase 250,000  shares of common stock at a purchase price of fifty eight cents ($0.58) per  share. The warrants were exercisable on a cashless basis and expired on  February 12, 2016. The Company agreed that all investments made subsequent  to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement.

105.    On August 13, 2013, the Company issued 111,111 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for $50,000 in funding. The investor also received warrants to purchase 166,667  shares of common stock at a purchase price of fifty eight cents ($0.58) per  share. The warrants were exercisable on a cashless basis and expired on  February 12, 2016. The Company agreed that all investments made subsequent  to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

106.    On August 14, 2013, an accredited investor was awarded an additional 336,956 shares of restricted common stock as a result of the fact that the market price  per share of the common stock did not trade at $0.77 or higher on the  ninetieth business day from the closing date. The reset shares combined with  the original shares received changed the overall value of the stock purchased to $0.23 per share.

107.    On August 19, 2013, the Company issued 111,111 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for $50,000 in funding. The investor also received warrants to purchase 111,111  shares of common stock at a purchase price of thirty seven cents ($0.37) per  share. The warrants were exercisable on a cashless basis and expired on February 23, 2016. The Company agreed that all investments made  subsequent to achievement of the $1,000,000 threshold and before the filing of  the Form S-1 would be included in the Registration Statement.

108.    On August 21, 2013, the Company issued 55,555 shares of restricted common stock valued at $0.45 per share to an accredited investor in exchange for $25,000 in funding. The investor also received warrants to purchase 55,555  shares of common stock at a purchase price of thirty seven cents ($0.37) per  share. The warrants were exercisable on a cashless basis and expired on  February 23, 2016. The Company agreed that all investments made subsequent  to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement.

109.    On September 9, 2013, the Company issued 222,222 shares of restricted  common stock valued at $0.45 per share to an accredited investor in exchange  for $100,000 in funding. The investor also received warrants to purchase  222,222 shares of common stock at a purchase price of forty three cents ($0.43)  per share. The warrants were exercisable on a cashless basis and expired on  March 9, 2016. The Company agreed that all  investments made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1  would be included in the Registration Statement.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

110.    On October 10, 2013, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $100,000. The warrants enable the investor to purchase, up to April 16, 2016, an aggregate of 333,333 shares of common stock at an exercise price of $0.52. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

111.    On October 10, 2013, an accredited investor purchased 222,222 shares of common stock and warrants to purchase an aggregate of 333,333 shares of common stock at an exercise price of $0.52 until April 16, 2016, in a private offering for $100,000.

112.    On December 17, 2013, an accredited investor purchased 166,667 shares of common stock and warrants in a private offering at a purchase price of $0.30 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to June 18, 2016, an aggregate of 166,667 shares of common stock at an exercise price of $0.56. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

113.    On December 17, 2013, an accredited investor purchased 100,000 shares of common stock and warrants in a private offering at a purchase price of $0.30 per share in consideration for $30,000. The warrants enabled the investor to purchase, up to June 18, 2016, an aggregate of 100,000 shares of common stock at an exercise price of $0.56. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

114.    On December 17, 2013, accredited investors purchased an aggregate of 533,334 shares of common stock and warrants to purchase an aggregate of 533,334 shares of common stock at an exercise price of $0.56 until June 18, 2016, in a private offering for an aggregate of $160,000.

115.    On December 18, 2013, an accredited investor purchased 125,000 shares of common stock and 168,750 warrants in a private offering at a purchase price of $0.40 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to June 18, 2016, an aggregate of 168,750 shares of common stock at an exercise price of $0.66. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

116.    On December 18, 2013, the Company granted Monarch Bay Securities, LLC ("Monarch") warrants to purchase 42,667 shares of common stock as a commission for acting as a placement agent for the Company with respect to finding investors for offerings of the Company's securities. The warrants enabled Monarch to purchase shares of common stock at a price of fifty six cents ($0.56) per share. The warrants were exercisable on a cashless basis and will expire on June 18, 2016.

117.    On December 18, 2013, an accredited investor purchased 125,000 shares of common stock and warrants to purchase 168,750 shares of common stock at an exercise price of $0.66 per share until June 18, 2016 in a private offering for $50,000.

118.    On December 20, 2013, the Company issued a 30-month warrant to purchase 200,000 shares of common stock at an exercise price of $0.51 per share to Andrew Kyzyk as an inducement to join the Company's Board of Advisors. Mr. Kyzyk resigned from the Advisory Board on February 28, 2014 and the warrant was cancelled.

119.    On December 27, 2013, an accredited investor purchased 125,000 shares of common stock and warrants in a private offering at a purchase price of $0.40 per share in

38

consideration for $50,000. The warrants enabled the investor to purchase, up to June 26, 2016, an aggregate of 125,000 shares of common stock at an exercise price of $0.66. The warrants were exercisable on a cashless basis. The Company agreed that all sales made subsequent to achievement of the $1,000,000 threshold and before the filing of the Form S-1 would be included in the Registration Statement. The issuance was conducted in reliance upon an exemption from registration provided under Section 4(2) of the Securities Act of 1933, as amended.

120.   On December 27, 2013, an accredited investor purchased 125,000 shares of common stock and warrants to purchase 125,000 shares of common stock at an exercise price of $0.66 per share until June 26, 2016 in a private offering for $50,000.

121.   **On December 31, 2013, the Company issued a warrant for 200,000 shares of common stock to Schul in order to induce him to join the Company's Board of Advisors and retain his services for a period of at least 12 months.**

122.   **On December 31, 2013, the Company issued a warrant for 200,000 shares of common stock to McKee in exchange for serving on the Company's Board of Advisors.**

123.   **During fiscal year 2013, Defendant Banzhaf was paid consulting fees in the amount of: (i) $9,829 for December 2013, and (ii) $12,500 per month for January 2013 through July 2013, (iii) $17,500 per month for August through November 2013, and (iv) an additional $7,671 accrued by Defendant Banzhaf.**

124.   On January 31, 2014, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $100,000. The warrants enabled the investor to purchase, up to January 31, 2019, an aggregate of 222,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

125.   On January 31, 2014, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for

$50,000. The warrants enabled the investor to purchase, up to January 31, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

126.    On February 1, 2014, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to February 1, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

127.    On February 5, 2014, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to February 5, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

128.    On February 5, 2014, the Company completed the sale of $930,000 of units (the "Units") in a private placement (the "Offering") pursuant to subscription agreements with 17 accredited investors (the "Investors"). Each Unit consisted of shares of the Company's common stock priced at $0.45 per share, and (ii) a five-year warrant to purchase up to the identical amount of shares of common stock purchased at an exercise price of $0.60 per share (each individually a "Warrant", and collectively, the "Warrants"). The Warrants (and Placement Agent Warrants described below) contained a provision for cashless exercise. A total of 2,066,668 shares of common stock were sold, and Warrants to purchase up to an

40

additional 2,066,668 shares of common stock were issued to the Investors in the Offering.  In connection with the Offering, the Company paid a placement agent fee of $74,400 to Drexel Heritage (the "Placement Agent"), and issued a five-year warrant to the Placement Agent (the "Placement Agent Warrant") to purchase up to an aggregate of 261,333 shares of common stock at an exercise price of $.60 per share pursuant to the placement agent agreement ("Placement Agreement") with the Placement Agent. Under the Placement Agreement, the Placement Agent was also issued a 5-year warrant to purchase 1,500,000 shares of common stock with an exercise price of $.56 per share. The warrants issued to the Placement Agent provided for cashless exercise and piggyback registration rights.

129.    On February 10, 2014, an accredited investor purchased 55,555 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $40,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 55,556 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a registration statement with the SEC covering the securities.

130.    On February 10, 2014, an accredited investor purchased 88,889 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $40,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 88,889 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

131.    **The Company entered into an employment agreement, dated February 10, 2014, with Defendant Hodowanec to serve as the Company's Chief Technical Officer for an initial annual salary of $175,000, to be paid in equal monthly installments. Defendant Hodowanec's annual salary would be increased to $210,000 upon commercialization of the**

41

25/50 kW mobile generators; to $240,000 upon the Company generating $100,000 in revenues or $1,000,000 in new financing; to $300,000 upon the Company achieving profitability; and to $360,000 upon the Company maintaining profitability for four consecutive quarters. The Company also agreed to reimburse Defendant Hodowanec for his healthcare costs until the Company adopted a healthcare plan. If Defendant Hodowanec's employment was terminated without cause, he would be entitled to severance in the amount of two years' salary in effect at such time to be paid by the Company in one payment or in four equal installments at the end of each quarter following termination, at the Company's discretion. Such severance obligation shall accelerate and become immediately payable upon a change of control of the Company. The Company would also pay any excise tax on Defendant Hodowanec's behalf that may be triggered under the Internal Revenue Code as a result. Defendant Hodowanec would not compete with the Company during the term of the agreement.

132.    On February 14, 2014, an accredited investor purchased 88,889 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $40,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 88,889 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

133.    On February 15, 2014, an accredited investor purchased 222,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $100,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 222,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

134.   On February 19, 2014, Cool Technologies and Lincoln Park Capital Fund, LLC ("Lincoln Park") entered into a purchase agreement (the "Purchase Agreement"), together with a registration rights agreement (the "Registration Rights Agreement"), pursuant to which the Company had the right to sell to Lincoln Park up to $10,000,000 in shares of its common stock, par value $0.001 per share ("Common Stock"), subject to certain limitations. Under the terms and subject to the conditions of the Purchase Agreement, Lincoln Park was obligated to purchase up to $10,000,000 in shares of common stock (subject to certain limitations) from time to time over the 36-month period commencing on the date that a Registration Statement (the "Initial Registration Statement"), which the Company agreed to file with the SEC pursuant to the Registration Rights Agreement, was declared effective by the SEC and a final prospectus in connection therewith is filed. The Company could direct Lincoln Park, at its sole discretion and subject to certain conditions, to purchase up to 75,000 shares of common stock in regular purchases. In addition, the Company could direct Lincoln Park to purchase additional amounts as accelerated purchases if on the date of a regular purchase the closing sale price of the common stock equaled or exceeded $0.60 per share**.** The purchase price of shares of common stock related to future funding would be based on the prevailing market prices of such shares at the time of sales (or over a period of up to 12 business days leading up to such time), but in no event would shares be sold to Lincoln Park on a day the common stock closing price is less than the floor price of $0.25, subject to adjustment. The Company would control the timing and amount of any sales of common stock to Lincoln Park. The Company's sales of shares of common stock to Lincoln Park under the Purchase Agreement are limited to no more than the number of shares that would result in the beneficial ownership by Lincoln Park and its affiliates, at any single point in time, of more than 9.99% of the then outstanding shares of the common stock. As consideration for its commitment to purchase shares of common stock pursuant to the Purchase Agreement, the Company agreed to issue to Lincoln Park 671,785 shares of common stock upon execution of the Purchase Agreement. The 671,785 shares of common stock were issued to Lincoln Park on February 25, 2014; no consideration was received. The Purchase Agreements

43

and the Registration Rights Agreement contained customary representations, warranties and agreements of the Company and Lincoln Park and customary conditions to completing future sale transactions, indemnification rights and obligations of the parties. Except that Lincoln Park is not obligated to purchase more than $500,000 of common stock in any single regular purchase, there is no upper limit on the price per share that Lincoln Park could be obligated to pay for shares of common stock under the Purchase Agreement. The Company had the right to terminate the Purchase Agreements at any time, at no cost or penalty. Actual sales of shares of common stock to Lincoln Park under the Purchase Agreements would depend on a variety of factors to be determined by the Company from time to time, including (among others) market conditions, the trading price of the common stock and determinations by the Company as to the appropriate sources of funding for the Company and its operations. Lincoln Park's Registration Statement with respect to 4,671,785 of Cool Technologies common stock was declared effective July 3, 2014. The Company hoped that the funds from selling shares to Lincoln Park would be sufficient to meet its liquidity needs until it begins generating cash flows from revenues.

135. On February 24, 2014, an accredited investor purchased 100,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $45,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 100,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

136. On February 24, 2014, an accredited investor purchased 111,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

137.    On February 24, 2014, an accredited investor purchased 11,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

138.    On February 24, 2014, an accredited investor purchased 55,556 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 55,556 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis.

139.    On February 25, 2014, an accredited investor purchased 418,333 shares of common stock in a private offering at a purchase price of $0.60 per share in consideration for $251,000. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

140.    On February 25, 2014, an accredited investor purchased 40,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $18,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 40,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

141.    On February 27, 2014, an accredited investor purchased 144,444 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $65,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 144,444 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

142.    On February 28, 2014, an accredited investor purchased 133,334 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $60,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 133,334 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

143.    On February 28, 2014, an accredited investor purchased 444,445 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $200,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 444,445 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

144.    On February 28, 2014, an accredited investor purchased 40,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $18,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 40,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

145.   On February 28, 2014, an accredited investor purchased 100,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $45,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 100,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

146.   On February 28, 2014, an accredited investor purchased 333,333 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $150,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 111,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

147.   On February 28, 2014, an accredited investor purchased 112,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $50,400. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 112,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

148.   On March 1, 2014, an accredited investor purchased 50,000 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $22,500. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 50,000 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a

47

cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

149.    On March 1, 2014, an accredited investor purchased 666,666 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $300,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 666,667 shares of common stock at an exercise price of $0.60. The warrants would be exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

150.    On March 1, 2014, an accredited investor purchased 11,111 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to March 14, 2019, an aggregate of 11,112 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

151.    On March 1, 2014, an accredited investor purchased 22,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $10,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 22,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

152.    On March 1, 2014, an accredited investor purchased 33,333 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $15,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of

33,333 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

153.    On March 1, 2014, an accredited investor purchased 22,222 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $10,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 22,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

154.    On March 1, 2014, an accredited investor purchased 22,223 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $10,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 22,222 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

155.    On March 1, 2014, an accredited investor purchased 11,112 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

156.    **The Company entered into an employment agreement, dated March 5, 2014, with Defendant Hassett to serve as CEO for an initial annual salary of $210,000, to be paid**

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

in equal monthly installments. If the Company's cash flow is positive for three consecutive months, the monthly compensation would increase to $25,000 per month. If the Company maintained profitability for four consecutive quarters, the monthly compensation would increase to $30,000 per month. The Company also agreed to reimburse Defendant Hassett for his healthcare costs until the Company adopted a healthcare plan. If Defendant Hassett's employment was terminated without cause, he would be entitled to severance in the amount of two years' salary in effect at such time to be paid by the Company in one payment or in four equal installments at the end of each quarter following termination, at the Company's discretion. Such severance obligation shall accelerate and become immediately payable upon a change of control of the Company. The Company would also pay any excise tax on defendant Hassett's behalf that may be triggered under the Internal Revenue Code as a result. Defendant Hassett agreed not to compete with the Company during the term of the agreement.

157.  On March 8, 2014, an accredited investor purchased 33,334 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $15,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 33,333 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

158.  On March 8, 2014, an accredited investor purchased 55,556 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $25,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 55.556 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

159.    On March 8, 2014, an accredited investor purchased 11,112 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

160.    On March 8, 2014, an accredited investor purchased 11,112 shares of common stock and warrants in a private offering at a purchase price of $0.45 per share in consideration for $5,000. The warrants enabled the investor to purchase, up to February 14, 2019, an aggregate of 11,111 shares of common stock at an exercise price of $0.60. The warrants were exercisable on a cashless basis. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

161.    On March 11, 2014, an accredited investor purchased 166,667 shares of common stock in a private offering at a purchase price of $0.60 per share in consideration for $100,000. The Company agreed that within 45 days of the consummation of the offer and sale of $1,000,000 of shares and warrants, it would file a Registration Statement with the SEC covering the securities.

162.    **On March 14, 2014, a five-year warrant to purchase 400,000 shares of common stock at an exercise price of $0.60 was issued to Paul Hodowanec, the brother of Defendant Hodowanec, the Company's Chief Technical Officer, for business development services provided to the Company. The warrant was exercisable on a cashless basis.**

163.    **On March 14, 2014, a warrant for 250,000 shares was issued to Bowman for legal services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 250,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis.**

164.    On March 14, 2014, a warrant for 107,000 shares was issued to Global H2O for business development services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 107,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis.

165.    On March 14, 2014, a warrant for 780,000 shares was issued to Sagiv Israeli for business development services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 780,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis; and 195,000 shares of common stock were issued.

166.    On March 14, 2014, 195,000 shares of common stock were issued to Sagiv Israeli for business development services.

167.    On March 14, 2014, a warrant for 400,000 shares was issued to consultants for business development services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 400,000 shares of common stock at an exercise price of $2.00. The warrant was exercisable on a cashless basis.

168.    On March 14, 2014, a warrant for 250,000 shares was issued to David Lubin for legal services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 250,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis.

169.    On March 14, 2014, a warrant for 15,000 shares was issued to Dennis Murchison for business development services provided to the Company. The warrant enabled the recipient to purchase, up to March 14, 2019, an aggregate of 15,000 shares of common stock at an exercise price of $0.60. The warrant was exercisable on a cashless basis.

170.    On March 18, 2014, the Company issued a warrant for 200,000 shares to Scott Van Dorn as an inducement to join and remain on the Company's Board of Advisors for at least 12 months.

171.   **On March 31, 2014, the Board amended Banzhaf's options to provide for cashless exercise and for the stock price milestones to be: $1.50, $1.75, $2.00, $2.25 and $2.50 in lieu of the current milestone prices of $2.00, $3.00, $5.00, $7.50 and $10.00.**

172.   **On March 31, 2014, grant of options to purchase 1,000,000 shares of common stock at $2.00 per share to Hassett.**

173.   **On March 31, 2014, grant of options to purchase 1,000,000 shares of common stock at $2.00 per share to Banzhaf.**

174.   **On March 31, 2014, grant of options to purchase 1,000,000 shares of common stock at $2.00 per share to Hodowanec.**

175.   **On March 31, 2014, the Board approved the grant of options to Bibb to purchase 2,000,000 shares of common stock at  an exercise price of $2.00 per share.**

176.   On July 1, 2014, Cool Technologies entered into a 36 month independent contractor agreement with PGC Investments LLC ("PGC Agreement"), to manage the day- to-day operations of Ultimate Power Truck. The PGC Agreement includes  monthly cash compensation, warrants in common stock and shares of  common stock, as follows: a) 350,000 cashless warrants with a strike price of $1.00 that vest upon reaching revenues of $1,000,000; b) 1,530,000 cashless warrants with a strike price of $1.00 that vest ratably upon reaching incremental revenues of $3,000,000 with a total target revenue of $100,000,000; c) 720,000 cashless warrants with a strike price of $1.00 that vest ratably over 36 months; and d) 500,000 shares of Cool Technologies common stock that vest  upon reaching revenues of $100,000,000 or upon sale of the Company.

177.   On July 1, 2014, Cool Technologies issued 17,778 shares to Monarch upon the cashless exercise of 42,667 shares subject to a warrant held  by Monarch.

178.   On July 1, 2014,  Cool Technologies issued PGC (i) a three-year (commencing upon vesting) cashless warrant to purchase an aggregate of  1,530,000 shares of common stock exercisable at $1.00 per share that become exercisable ratably upon reaching incremental revenues of $3,000,000 (from MG product sales which result from the efforts of Dennis

53

Campbell and PGC) with a total target revenue of $100,000,000 and (ii) a three-year cashless warrant to purchase an aggregate of 720,000 shares of common stock at an exercise price of $1.00 that become exercisable ratably on a quarterly basis; and (iii) 500,000 shares of common stock that vest upon reaching revenues of $100,000,000 or upon sale of the Company.

179. On July 9, 2014, Cool Technologies issued 7,467 shares to an accredited investor upon the cashless exercise of 16,000 shares subject to a warrant held by such investor.

180. On July 30, 2014, Cool Technologies issued a 30 month warrant to purchase 200,000 shares of our common stock at an exercise price of $0.80 per share to William Finley for serving on the Company's Board of Advisors. The warrant was exercisable on a cashless basis.

181. On July 30, 2014, Cool Technologies reached preliminary terms on an LLC Agreement (the "Preliminary LLC Agreement") with Alfred A. Cullere ("Cullere") concerning the governance and operations of Ultimate Power Truck. Under the terms of the Preliminary LLC Agreement, Cool Technologies would own 95% of the membership interests and Cullere would own 5%. Cullere's interest cannot be diluted, even if additional membership interests are issued. These terms could change upon formalizing the final agreement.

182. On August 25, 2014, Cool Technologies issued a three-year warrant to purchase 750,000 shares of common stock at an exercise price of $0.80 per share to John Storer for business development consulting services provided to the Company. The warrant was exercisable on a cashless basis.

183. **On September 10, 2014, Cool Technologies issued a 30-month warrant to purchase 200,000 shares of common stock at an exercise price of $0.80 per share to Ustian for serving on the Company's Board of Advisors. The warrant was exercisable on a cashless basis.**

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

184.   On September 12, 2014, Cool Technologies sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

185.   On September 15, 2014, Cool Technologies sold 181,818 shares and a three-year warrant to purchase 121,818 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

186.   On September 16, 2014, Cool Technologies sold 363,636 shares and a three-year warrant to purchase 243,636 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

187.   On September 16, 2014, Cool Technologies sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

188.   On September 17, 2014, Cool Technologies sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

189.   On September 18, 2014, Cool Technologies issued a 30 month warrant to purchase 200,000 shares of common stock at an exercise price of $0.80 per share to Roman Kuropas for serving on Cool Technologies' Board of Advisors. The warrant was exercisable on a cashless basis.

190.   On September 23, 2014, Cool Technologies sold 90,909 shares and a three-year warrant to purchase 60,909 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

191.   On September 24, 2014, Cool Technologies sold 181,818 shares and a three-year warrant to purchase 121,818 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

192.    On October 3, 2014, Cool Technologies sold 454,545 shares and a three-year warrant to purchase 304,545 shares of common stock at an  exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless  basis.

193.    On October 31, 2014, Cool Technologies sold 90,909 shares and a five-year warrant to purchase 90,909 shares of common stock at an  exercise price of $0.70 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless  basis.

194.    On November 10, 2014, Cool Technologies sold 181,818 shares and a three-year warrant to purchase 181,818 shares of common stock at  an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless  basis.

195.    On November 10, 2014, Cool Technologies sold an aggregate of 140,909 shares and a five-year warrant to purchase an aggregate of 140,909  shares of common stock at an exercise price of $0.70 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

196.    On December 5, 2014, Cool Technologies sold an aggregate of 78,728 shares and a three-year warrant to purchase an aggregate of 78,728  shares of common stock at an exercise price of $0.75 per share to three accredited investors in a private offering. The warrants were exercisable on a cashless basis.

197.    On December 8, 2014,  Cool Technologies sold 36,364 shares and a three-year warrant to purchase 36,364 shares of common stock at an  exercise price of $0.75 per share and 37,000 shares and a three-year warrant to purchase 37,000 shares at an exercise price of $0.55 per share to two accredited investors in a private offering. The warrants were exercisable on a cashless basis.

198.    On December 9, 2014, Cool Technologies sold 100,000 shares and a three-year warrant to purchase 100,000 shares of common stock at  an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless  basis.

199.    On December 11, 2014, Cool Technologies sold 36,364 shares and a three-year warrant to purchase 36,364 shares of common stock at an exercise price of $0.75 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

200.    On February 6, 2015, Cool Technologies sold 18,181 shares and a three-year warrant to purchase 18,181 shares of common stock at an exercise price of $0.65 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

201.    On March 24, 2015, Cool Technologies issued an aggregate of 120,000 shares of common stock to Elite Bay for investor relations services provided to Cool Technologies.

202.    On March 31, 2015, Cool Technologies issued a five-year warrant to purchase 400,000 shares of common stock at an exercise price of $2.50 per share to Drexel Hamilton for services provided to Cool Technologies.

203.    On April 21, 2015, Cool Technologies sold 333,333 shares and a five-year warrant to purchase 333,333 shares of common stock at an exercise price of $0.57 per share to an accredited investor in a private offering. The warrants were exercisable on a cashless basis.

204.    On April 23, 2015, Cool Technologies entered into a subscription agreement with Lincoln Park, pursuant to which Lincoln Park agreed to purchase 555,556 shares of common stock at a per share price of $0.45 and a warrant to purchase 555,556 shares of common stock, for an aggregate purchase price of $250,000 subject to certain limitations.

205.    **On April 29, 2015, Cool Technologies sold 222,222 shares and a five-year warrant to purchase 222,222 shares of common stock at an exercise price of $0.57 per share to McKee.**

206.    Notwithstanding the foregoing unauthorized transactions, the Current Director Defendants have also committed waste by causing Cool Technologies to pay or accrue millions of dollars in compensation despite the Company's precarious financial condition and going concern opinion.

**Cool Technologies' False and Misleading Proxy Statement and the Reasons for Its Falsity**

207.   On July 10, 2015, Cool Technologies filed the 2015 Proxy stating the following with respect to the calculation of the number of shares beneficially owned by Defendant Banzhaf:

> Includes five options to purchase 1,000,000 shares each at such time as our common stock trades at $2.00, $3.00, $5.00, $7.50 and $10.00 for 20 consecutive days while Mr. Banzhaf serves as President and one year following a termination of Mr. Banzhaf employment without cause. Exercise prices of these options will be equal to the closing price of the Company's stock on the date the option vests. ***On March 31, 2014, the Board amended Mr. Banzhaf's options*** to provide for cashless exercise and for the stock price milestones to be: $1.50, $1.75, $2.00, $2.25 and $2.50 in lieu of the current milestone prices of $2.00, $3.00, $5.00, $7.50 and $10.00. Also includes options to purchase 1,000,000 shares of common stock at $2.00 per share. (Emphasis added).

208.   The 2015 Proxy was false and misleading as it failed to disclose to investors that the March 31, 2014 amendment was void or voidable because a majority of the Company's directors had not approved the change to Defendant Banzhaf's compensation.

209.   Additionally, the 2015 Proxy contained information about McKee, Schul, Bowman, and Ustian, the four nominees to the Cool Technologies Board who would be running for election at the special meeting of stockholders to be held on August 19, 2015.  With respect to Ustian, the 2015 Proxy stated the following:

> Daniel C. Ustian served as the Chairman of the Board of Navistar International Corporation, a holding company of Navistar, Inc. from February 17, 2004 until August 2012 and its Chief Executive Officer since February 19, 2003 and President from April 2002 to August 2012. He served as the Chief Operating Officer of Navistar, Inc. and Navistar International Corporation from April 2002 to February 2003. Prior to this, Mr. Ustian served as the President of the Engine Group of Navistar, Inc. from 1999 to 2002. He served as Group Vice President and General Manager of Engine & Foundry from 1990 to 1999. He served as a Director of AGCO Corporation from March 17, 2011 to October 25, 2012. Mr. Ustian served as a Director of Monaco Coach Corp. from June 2003 to June 4, 2009. He is a Member of the Society of Automotive Engineers and the American Foundry Association and participates in the Electrical Council for the Economy. He was a Member of the Business Roundtable, Society of Automotive Engineers. Mr. Ustian holds a Bachelor's degree in Business Administration from DePaul University in 1972.

210.    The 2015 Proxy was false and misleading as it failed to disclose to investors that on August 13 and 17, 2015, the SEC staff transmitted Wells Notices stating that the staff has made a preliminary determination to recommend that the SEC file an enforcement action against Navistar and Ustian, alleging violations of the 1934 Act, certain related regulations, the Securities Act of 1933, and an August 5, 2010 Order Instituting Cease-and-Desist Proceedings against Navistar.   The SEC may also pursue issues concerning disclosures related to the circumstances of Ustian's departure from Navistar in August 2012.

211.    Because Ustian was a nominee to the Cool Technologies Board during the filing of the 2015 Proxy and was subsequently elected to the Board at the 2015 Special Meeting, the foregoing information concerning Ustian was material to investors when determining whether to vote in favor of Ustian's nomination to the Board.   Accordingly, the Current Director Defendants breached their fiduciary duties by failing to include the foregoing information in the 2015 Proxy and/or by failing to file an amendment to the 2015 Proxy to include the material information pertaining to the Wells Notices that were issued by the SEC to Navistar and Ustian stating that the SEC has made a preliminary determination to file an enforcement action against Ustian. Further, the failure of the Current Director Defendants to amend the 2015 Proxy to disclose the material adverse information about their chosen nominee Ustian also calls into question their judgment and intent in nominating Bowman, McKee and Schul, and may have altered the shareholders' vote for these nominees as well.

212.    Further, the 2015 Proxy failed to disclose that many of the prior transactions entered into while the Spirit Bear Directors were members of the Board were consummated by solely the Current Director Defendants without the approval of the Spirit Bear Directors, calling into question the validity of those numerous transactions, including those transactions involving Bowman, Schul, McKee and Ustian.

213.    Indeed, the Company had previously admitted in a December 24, 2013 Proxy Statement filed pursuant to Section 14(a) of the Securities Exchange Act of 1934 that "neither the Bylaws nor Nevada law grants the three management directors, [the Current Director

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

Defendants] such authorization; according to the Bylaws only the Board or a majority of the outstanding shares can alter, amend or repeal the bylaws."

214.    Further, in its October 7, 2014 Proxy Statement filed pursuant to Section 14(a) of 1934 Act the Company further admitted the following:

**Consequences of the Failure to Elect Replacement Directors**

If the three nominees to serve as replacement directors are not elected by the holders of a majority of issued and outstanding shares, it is likely that a Nevada court will decide who is and who is not a director. ***Further, in its Motion for Partial Summary Judgment, Spirit Bear advances the argument that if its three designees are and have been directors of the Company since January 13, 2014, several actions would have been undertaken without proper corporate authority and Spirit Bear may try to unwind those transactions.***

The uncertainty caused by this situation could result in further damage to the Company, both in terms of cost and money litigating the matter as well as hampering future capital raises. Third parties may not be willing to invest or do business with the Company if it is unclear who are the directors of the Company.

Timothy Hassett, as the shareholder calling for this Meeting, and Theodore Banzhaf, as the President of the Company, who are calling for the Special Meeting wish to eliminate the uncertainty that presently exists. The Company does not concede that Spirit Bear's position is correct. The election of replacement directors clearly eliminates the argument advanced by Spirit Bear that Palmer, Dwyer and Holt are still directors because their successors have not been elected. (Emphasis added).

215.    Yet, despite the fact the Company admitted in its December 24, 2013 and October 7, 2014 proxies that the Board's actions were ultra vires, it failed to do so in the 2015 Proxy, even after Judge Dorsey, on November 26, 2014, confirmed that the Spirit Bear Directors were holdover directors. This failure to disclose also renders the 2015 Proxy materially false and misleading.

216.    Further, the 2015 Proxy fails to disclose that on December 31, 2013, the Company issued a warrant for 200,000 shares of common stock to McKee in exchange for serving on the Company's Board of Advisors without the requisite Board approval. This failure to disclose renders the 2015 Proxy materially false and misleading.

217.    Additionally, the 2015 Proxy fails to disclose that on April 29, 2015, Cool Technologies sold 222,222 shares and a five-year warrant to purchase 222,222 shares of common stock at an  exercise price of $0.57 per share to McKee without the requisite Board approval.

## THE INDIVIDUAL DEFENDANTS HAVE COMMITTED WASTE

218.    As previously discussed, on February 20, 2013, the Board of Directors at the time, consisting of the Current Director Defendants, resolved to establish compensation levels for the officers of the Company, including themselves.  The February 20, 2013 Resolutions provided that the following amounts would begin to accrue on January 15, 2013: (i) $13,500 per month to Defendant Hassett[14], (ii) $10,000 per month to Defendant Ponder, (iii) $14,500 per month to Defendant Banzhaf, (iv) $14,500 per month a still undesignated Chief Technical Officer[15] and (v) $8,000 per month to Defendant Bibb. The accrued compensation would not be paid until the Company raised $1 million.

219.    In other words, of the one million dollars raised by the Company, the Company's officers would pocket $60,500 per month or $726,000 per year in salary. This amounts to a whopping 72.6% of funds which should ideally be used to fund the Company's operations, as Cool Technologies has not generated any revenue to date, lost $2.875 million in 2013, $23.560 million in 2014 and $4.238 million for the six months ended June 30, 2015, and whose independent auditors have expressed their concern as to the ability of the Company to continue as a going concern for fiscal years 2013 and 2014. Instead, the Individual Defendants put their own interests above those of the Company and decided that the money should go directly to the Company's officers.

---

[14] The Company falsely stated in 18 separate filings with the SEC that Defendant Hassett would be paid $12,500 per month pursuant to the February 20, 2013 Resolutions, including most recently, the Company's 2015 Proxy, when in fact he was to receive $13,500 per month commencing January 15, 2013.

[15] The Company entered into an employment agreement with Defendant Hodowanec to serve as Chief Technical Officer on February 10, 2014.

220.    On July 24, 2013 the Company finally raised $1 million.

221.    Subsequent to July 24, 2013 and pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Hassett the compensation he had accrued from January 15, 2013 and, in August 2013, began to pay him $13,500 per month in salary.

222.    Subsequent to July 24, 2013 and pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Ponder the compensation he had accrued from January 15, 2013 and, in August 2013, began to pay him $10,000 per month in salary.

223.    Subsequent to July 24, 2013 and pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Banzhaf the compensation he had accrued from January 15, 2013 and, in August 2013, began to pay him $14,500 per month in salary.

224.    Subsequent to July 24, 2013 and pursuant to the February 20, 2013 Resolutions, the Company paid Defendant Bibb the compensation he had accrued from January 15, 2013 and, in August 2013, began to pay him $8,000 per month in salary.

225.    On February 10, 2014, the Company hired Defendant Hodowanec to serve as the Company's Chief Technical Officer. According to the Company's SEC filings, he was initially paid $14,583.33 per month, an amount in excess of what the Board had authorized pursuant to the February 20, 2013 Resolutions. Pursuant to Article III Section 1(a) of the Company's Bylaws, the Board has the power to "fix the compensation of officers, agents and employees of the Corporation." Upon information and belief, the Spirit Bear Directors did not authorize the increase in compensation to Defendant Hodowanec and thus, the Board lacked the requisite authority to approve the increased compensation.

226.    On February 20, 2013, the Current Director Defendants also approved a resolution providing that when and if the Company achieves certain milestones, the compensation to the officers would be further increased. The milestones are as follows: (1) generating $1 million in additional funding, (2) generating $100,000 in revenue or an additional $1 million in funding, (3) achieving profitability (which is defined as being cash flow positive for three consecutive months) and (4) maintaining profitability for four consecutive quarters.

227.   With the achievement of the first milestone, the compensation for Defendant Banzhaf and the still undesignated Chief Technical Officer would increase to $17,500 per month.

228.   With the achievement of the second milestone, the compensation for defendant Hassett would increase to $17,500 per month, the compensation for Defendant Ponder would increase to $12,000 per month, the compensation for Defendant Banzhaf and the still undesignated Chief Technical Officer would increase to $20,000 per month, and the compensation for defendant Bibb would increase to $10,000 per month.

229.   In other words, in exchange for raising $3 million, the Current Director Defendants voted to pay themselves, Defendant Banzhaf and the undesignated Chief Technical Officer $954,000 a year or approximately 1/3 of the money raised.

230.   With the achievement of the third milestone, the compensation for Defendant Hassett would increase to $25,000 per month, the compensation for Defendant Ponder would increase to $18,000 per month, the compensation for Defendant Banzhaf would increase to $24,000 per month, the compensation for still undesignated Chief Technical Officer would increase to $25,000 per month, and the compensation for Defendant Bibb would increase to $12,000 per month.

231.   With the achievement of the fourth milestone, the compensation for Defendant Hassett would increase to $30,000 per month, the compensation for Defendant Ponder would increase to $24,000 per month, the compensation for Defendant Banzhaf would increase to $29,000 per month, the compensation for the undesignated Chief Technical Officer would increase to $30,000 per month, and the compensation for Defendant Bibb would increase to $15,000 per month.

232.   Further, on February 20, 2013, the Current Director Defendants also authorized the payment of bonuses of $50,000 and/or 50,000 shares of or options to purchase common stock available for each officer plus, special payments from 5% of the Company's net income be given for individual contributions to the Company that Defendant Hassett deemed to be "extraordinary," such as the awarding of patents or the signing of major customer contracts.

233.   All told, on February 20, 2013, the Current Director Defendants voted to pay the Company's officers $954,000 in salary and bonuses of $1,000,000 assuming they could raise $3 million without even generating a penny in revenue for the Company.   In other words, the Company's officers would divert 65% or $1,954,000 of the $3 million they raised for their own benefit.

234.   The Current Director Defendants also resolved to decrease the exercise price of the five options to purchase one million shares awarded to Defendant Banzhaf and to provide for cashless exercise of these options. The milestone stock prices were reduced to $2.00, $3.00, $4.00, $4.50 and $5.00 for 20 consecutive trading days each. These milestone stock prices have been changed from $2.00, $3.00, $5.00, $7.50 and $10.00. Once the stock has traded at these prices for 20 consecutive trading days, Defendant Banzhaf has the right to exercise an option to purchase 1,000,000 shares of common stock at each milestone stock price. These options expire one year after defendant Banzhaf has been terminated without cause.

235.   The Board also granted Defendant Bibb an option to purchase 2,000,000 shares of the Company's common stock, at a purchase price of par value or $0.001 per share. The options expire one year after Defendant Bibb has been terminated without cause. The options can be exercised on a cashless basis.

236.   The Company's July 15, 2015 Registration Statement filed with the SEC on Form S-1 discloses that the Company's Officers, as a result of the numerous *ultra vires* transactions described above, paid themselves far more than they had originally authorized. Specifically, Defendant Hassett was paid a total of $1,951,500 in salary, bonus and stock options compensation in 2014, Defendant Bibb was paid $3,293,500 salary, stock options and other compensation in 2014 and Defendant Banzhaf was paid $4,238,617 in salary, bonus, stock options and other compensation 2014. The total compensation for these three officers in 2014 was $9,483,617.  The Company did not disclose how much the Company actually paid in total compensation to Defendants Hodowanec or Ponder in 2014.

## DAMAGES TO COOL TECHNOLOGIES CAUSED BY THE INDIVIDUAL DEFENDANTS

237.    As a direct and proximate result of the Individual Defendants' misconduct, the Individual Defendants have entered into and/or caused Cool Technologies to enter into a number of unauthorized transactions while wasting corporate assets by rewarding themselves with improper compensation and bonuses, all of which have substantially damaged the Company's credibility, corporate image and goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

238.    Plaintiff brings this action derivatively in the right and for the benefit of Cool Technologies to redress injuries suffered, and to be suffered, by Cool Technologies as a direct result of breaches of fiduciary duty, waste of corporate assets and unjust enrichment.

239.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

240.    Cool Technologies is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff is and was a shareholder of Cool Technologies at the time of the transgressions complained of.  Plaintiff will adequately and fairly represent the interests of Cool Technologies and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

241.    The wrongful acts complained of herein subject, and will continue to subject, Cool Technologies to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

242.    The wrongful acts complained of herein were unlawfully concealed from Cool Technologies' shareholders.

243.    At the time of the filing of this Complaint in Intervention, the Board was comprised of seven directors: Defendants Hassett, Ponder and Bibb and nonparties McKee,

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

Ustian, Schul and Bowman.   Plaintiff did not make a demand upon the Board to institute this action because such a demand would have been a futile, wasteful and useless act.

244.   With respect to Defendants Hassett, Ponder and Bibb, the foregoing Defendants face a significantly substantial likelihood of liability such that they are incapable of considering a demand to pursue legal action on behalf of the Company, particularly for the following reasons:

a.   As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and the Board meetings, each of the Current Director Defendants knew, or were reckless in not knowing, that they engaged in numerous *ultra vires* transactions and committed fraud in determining the Company's officer compensation scheme. Consequently, each of the Current Director Defendants faces a substantial likelihood of liability for the claims asserted in this action;

b.   The Company admits in its July 15, 2015 Registration Statement filed with the SEC on Form S-1 that, "[w]e currently do not have any independent directors as the term 'independent' is defined by the rules of the American Stock Exchange." The NYSE MKT LLC[16] rules state that a director is not independent "unless the issuer's board of directors affirmatively determines that the director does not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." Thus by their own admission, the Current Director Defendants admit that a demand would be futile.

c.   The Company further admits in the July 15, 2015 S-1 that, "[b]ecause **our directors are not independent**, we do not currently have independent audit or compensation committees. As a result, the directors have the ability, among other things, to determine their own level of compensation. **Until we comply with such corporate governance measures, regardless of whether such compliance is required, the absence of such standards of corporate governance may leave our stockholders without protections against interested**

---

[16] The American Stock Exchange changed its name to the NYSE MKT LLC on May 14, 2012.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   **director transactions, conflicts of interest and similar matters** and investors may be reluctant

2   to provide us with funds necessary to expand our operations." (Emphasis added).

3          d.     The acts complained of herein constitute violations of fiduciary duties owed by

4   Cool Technologies' Board and these wrongful and unreasonable acts are incapable of

5   ratification;

6          e.     Each of the Current Director Defendants knew of and/or directly benefited from

7   the wrongdoing complained of herein;

8          f.     In order to bring this suit, the Current Director Defendants of Cool Technologies

9   would be forced to sue themselves and persons with whom they have extensive business and

10   personal entanglements, which they will not do, thereby excusing demand; and

11          g.     Moreover, despite the Current Director Defendants having knowledge of the

12   claims and causes of action raised by Plaintiff, the Current Director Defendants have failed and

13   refused to seek to recover on behalf of Cool Technologies for any of the wrongdoing alleged by

14   Plaintiff herein.

15        245.    With respect to the remaining members of the Board, McKee, Ustian, Bowman

16   and Schul, Plaintiff did not make a demand upon the foregoing directors as such a demand would

17   have been futile because the foregoing directors are neither independent nor disinterested, for the

18   following reasons:

19        246.    As previously set forth in paragraph 121, on December 31, 2013, the Company

20   granted Schul a non-qualified stock option to purchase 200,000 shares of common stock at an

21   exercise price of $0.50 per share for becoming a member of the Company's board of advisors

22   without the requisite Board approval.

23        247.    As previously set forth in paragraph 122, on December 31, 2013, the Company

24   issued a warrant for 200,000 shares of common stock to McKee in exchange for serving on the

25   Company's Board of Advisors without the requisite Board approval.

26        248.    As previously set forth in paragraph 163, on March 14, 2014, the Company

27   granted Bowman a non-qualified stock option to purchase 250,000 shares of common stock at an

28

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

exercise price of $0.60 per share for becoming a member of the Company's board of advisors without the requisite Board approval;

249.    As previously set forth in paragraph 183, on September 10, 2014, the Company granted Ustian a non-qualified stock option to purchase 200,000 shares of common stock at an exercise price of $0.80 per share for becoming a member of the Company's board of advisors without the requisite Board approval.

250.    As previously set forth in paragraph 205, on April 29, 2015, Cool Technologies sold 222,222 shares and a five-year warrant to purchase 222,222 shares of common stock at an  exercise price of $0.57 per share to McKee without the requisite Board approval.

251.    Accordingly, because McKee, Bowman, Ustian and Schul directly benefitted from the foregoing *ultra vires* transactions, each of which, among many others, are at issue in this action, they cannot in good faith exercise business judgment to determine whether to bring this action because they would be determining whether the equity each of them received was pursuant to an *ultra vires* transaction.

252.    Further, Bowman, Schul, McKee and Ustian's election to the Board may be null and void and another vote may need to be held because they were elected pursuant to the materially false and misleading 2015 Proxy.

253.    Bowman, Schul, Ustian and McKee are equally not independent in connection with their duties as set forth in the derivative settlement pending before the Court for the reasons set forth herein.

## CAUSES OF ACTION

## COUNT I

**(Violations of § 14(a) of the Exchange Act Against Defendants Banzhaf, Hassett, Bibb and Ponder)**

254.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

255.    This claim for relief is not based on any allegations of knowing or reckless conduct by any Defendant. This claim does not allege, and does not sound in fraud, and Plaintiff disclaims any reliance upon or reference to allegations of fraud.

256.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of ant security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

257.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

258.    Here, Cool Technologies' 2015 Proxy violates § 14(a) and Rule 14a-9 because it omits material facts.  The 2015 Proxy was reviewed and issued by Defendants Hassett, Ponder, Bibb, and Banzhaf, and in the exercise of reasonable care, Defendants Hassett, Ponder, Bibb, and Banzhaf should have known that the 2015 Proxy was materially false and misleading.

259.    The omissions and the false and misleading statements in the 2015 Proxy were material because a reasonable shareholder would have considered them important in deciding how to vote on the various matters set forth in the 2015 Proxy for shareholder action. In addition, a reasonable shareholder would consider the omitted information as significantly altering the "total mix" of information made available in the 2015 Proxy.

260.    The Company was damaged as a result of the material misrepresentations and omissions in the 2015 Proxy.

1

**COUNT II**

2

**(Against The Individual Defendants for Breach of Fiduciary Duty)**

3      261.    Plaintiff incorporates by reference and realleges each of the foregoing allegations
4  as though fully set forth herein.

5      262.    The Individual Defendants owed and owe Cool Technologies fiduciary
6  obligations, including the obligations of good faith, fair dealing, loyalty and care. Among
7  other things, the Individual Defendants were and are required to act in furtherance of the
8  best interests of Cool Technologies and its shareholders so as to benefit all shareholders
9  equally and not in furtherance of their personal interest or benefit. Each director and officer
10 of the Company owes to Cool Technologies and its shareholders the fiduciary duty to exercise
11 good faith and diligence in the administration of the Company's affairs and in the use and
12 preservation of its property and assets, and the highest obligations of fair dealing. The
13 Individual Defendants breached their fiduciary duties by:

14          a.      Entering into a series of *ultra vires* transactions concerning the issuance
15 of Cool Technologies equity or debt without obtaining the requisite authorization of the Board
16 of Directors;

17          b.      Improperly awarding themselves excessive and unauthorized
18 compensation; and

19          c.      Causing the Company to issue a materially false and misleading 2015
20 Proxy Statement.

21      263.    By reason of the foregoing, Cool Technologies was damaged.

22

23

24

**COUNT III**

25

**(Against the Individual Defendants for Waste of Corporate Assets)**

26      264.    Plaintiff incorporates by reference and realleges each of the foregoing allegations
27 as though fully set forth herein.

28

70

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

265.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor Cool Technologies and by allowing the Company to engage in an illegal, unethical and improper course of conduct.

266.    As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duty, Cool Technologies has wasted valuable corporate assets through payments of compensation to themselves because the Company has incurred and will continue to incur significant potential liability for legal costs, penalties, fines and/or other legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

267.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

268.    By reason of the foregoing, Cool Technologies was damaged.

## COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

269.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

270.    Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Cool Technologies.  The wrongful conduct was continuous and resulted in ongoing harm to the Company.  The Individual Defendants were unjustly enriched pursuant to receiving compensation and/or remuneration while breaching their fiduciary duties to the Company, as alleged herein.

271.    Plaintiff, as a shareholder of Cool Technologies, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

272.    By reason of the foregoing, Cool Technologies was damaged.

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

## COUNT V

### (Derivatively Against the Individual Defendants for Gross Mismanagement)

273.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

274.   By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cool Technologies in a manner consistent with the operations of a publicly held corporation:

a.   Entering into a series of *ultra vires* transactions concerning the issuance of Cool Technologies equity or debt without obtaining the requisite authorization of all of the members of the Board of Directors;

b.   Improperly awarding themselves excessive and unauthorized compensation; and

c.   Causing the Company to issue a materially false and misleading 2015 Proxy Statement.

275.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Cool Technologies has sustained significant damages.

276.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Directing Defendants to account to Cool Technologies for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.   Directing Cool Technologies to file an amendment to the 2015 Proxy which shall contain all material information which was previously omitted from the 2015 Proxy, directing the Company to issue a public statement invalidating the vote by Company shareholders that

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

took place on August 19, 2015 at the special meeting of the stockholders of the Company and directing the Company to schedule a special meeting of shareholders to vote on the matters disclosed in the amended 2015 Proxy;

C.   Directing Cool Technologies to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote resolution for amendments to Cool Technologies' By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on corporate governance policies;

D.   Awarding to Cool Technologies restitution from the Individual Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.   Permanently enjoin the approval of Derivative Settlement Agreement in the Spirit Bear Action and find that it is not fair and reasonable and not in the best interests of the Company;

F.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

G.   Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 22, 2015                    Respectfully submitted,

**MUCKLEROY LUNT, LLC**


By: /s/ Martin A. Muckleroy
Martin A. Muckleroy (Nev. Bar # 9634)
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Telephone: 702-907-0097
Facsimile: 702-938-4065

73

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

Email: martin@muckleroylunt.com

**FARUQI & FARUQI, LLP**
Stuart J. Guber
Timothy J. Peter
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile:  215-277-5771
Email:  sguber@faruqilaw.com
          tpeter@faruqilaw.com

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Nina M. Varindani
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile:  212-983-9331
Email: nfaruqi@faruqilaw.com
          nvarindani@faruqilaw.com
*Attorneys for Plaintiff*

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

## <u>CERTIFICATE OF SERVICE</u>

I, Martin A. Muckleroy, hereby certify that on the 22nd day of October, 2015, true and correct copies of the foregoing Verified Amended Shareholder Derivative Complaint was electronically filed with the Clerk of the Court by using CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification in this case.

Dated: October 22, 2015

By: /s/ Martin A. Muckleroy
Martin A. Muckleroy

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

1

**VERIFICATION**

2  I, Shirley Wright, hereby declare as follows:

3      1.   I am authorized to sign this verification on behalf of Peak Finance, LLC;

4      2.   I have read the foregoing Verified Amended Shareholder Derivative Complaint. Based upon

5           discussions with and reliance upon my counsel, and as to those facts of which I have personal

6           knowledge, the Complaint is true and correct to the best of my knowledge, information, and

7           belief.

8      3.   I declare under penalty of perjury that the foregoing is true and correct.

9

10  Executed on October 20, 2015.

11

12                                     Shirley Wright

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

VERIFICATION